This case has been designated as an eFiling case, for more information please visit www.oakgov.com/efiling

| Approved, SCAO | Original - Court | 2nd copy - Plaintiff |
|---|---|---|
| | 1st copy - Defendant | 3rd copy - Return |

| STATE OF MICHIGAN | | CASE NO. |
|---|---|---|
| JUDICIAL DISTRICT | **SUMMONS** | 2023-201199-CZ |
| 6th JUDICIAL CIRCUIT | | JUDGE KWAME' L. ROWE |
| COUNTY | | |

**Court address**
1200 N Telegraph Rd, Pontiac MI 48341

**Court telephone no.**
(248) 858-0344

**Plaintiff's name, address, and telephone no.**
Gary Grossman

v

**Defendant's name, address, and telephone no.**
The Charter Twp. of W. Bloomfield
4550 Walnut Lake Road
West Bloomfield, MI 48323

**Plaintiff's attorney, bar no., address, and telephone no.**
Jan Jeffrey Rubinstein (P57937)
Kevin M. Burton (P86626)
30665 Northwestern Hwy., Ste. 165
Farmington Hills, MI 48334
(248) 220-1415

*(stamp: WEST BLOOMFIELD TOWNSHIP CLERKS OFFICE 2023 JUL 10 PM 3:3 RECEIVED)*

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (MC 21). The summons section will be completed by the court clerk.

**Domestic Relations Case**
☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.
☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (MC 21) listing those cases.
☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

**Civil Case**
☐ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.
☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).
☑ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk. **SUMMONS**

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside of Michigan).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.
4. If you require accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date | Expiration date* | Court clerk |
|---|---|---|
| 6/30/2023 | 09/29/2023 | Lisa Brown |

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

MC 01 (3/23) **SUMMONS**

MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

FILED Received for Filing Oakland County Clerk 6/30/2023 12:35 PM

**Summons  (3/23)**

Case No. _____

**PROOF OF SERVICE**

**TO PROCESS SERVER**: You must serve the summons and complaint and file proof of service with the court clerk before the expiration date on the summons. If you are unable to complete service, you must return this original and all copies to the court clerk.

**CERTIFICATE OF SERVICE / NONSERVICE**

☐ I served  ☐ personally  ☐ by registered or certified mail, return receipt requested, and delivery restricted to the the addressee (copy of return receipt attached)   a copy of the summons and the complaint, together with the attachments listed below, on:

☐ I have attempted to serve a copy of the summons and complaint, together with the attachments listed below, and have been unable to complete service on:

| Name | Date and time of service |
|---|---|
| Place or address of service | |
| Attachments (if any) | |

☐ I am a sheriff, deputy sheriff, bailiff, appointed court officer or attorney for a party.

☐ I am a legally competent adult who is not a party or an officer of a corporate party. I declare under the penalties of perjury that this certificate of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee | Miles traveled | Fee | | Signature |
|---|---|---|---|---|
| $ | | $ | | |
| Incorrect address fee | Miles traveled | Fee | TOTAL FEE | Name (type or print) |
| $ | | $ | $ | |

**ACKNOWLEDGMENT OF SERVICE**

I acknowledge that I have received service of a copy of the summons and complaint, together with

_____ on _____
Attachments (if any)          Date and time

_____ on behalf of _____
Signature

_____
Name (type or print)

MCL 600.1910, MCR 2.104, MCR 2.105

This case has been designated as an eFiling case, for more information please visit www.oakgov.com/efiling.

**STATE OF MICHIGAN**
**IN THE OAKLAND COUNTY CIRCUIT COURT**

GARY GROSSMAN,
an individual,
    Plaintiff,

- vs -

THE CHARTER TWP. OF WEST BLOOMFIELD
a Michigan Municipal Corporation,
    Defendant.

Case No.: 2023-    -CZ
Hon.

**2023-201199-CZ**

**JUDGE KWAME' L. ROWE**

THE RUBINSTEIN LAW FIRM
Jan Jeffrey Rubinstein (P57937)
Kevin M. Burton (P86626)
Attorney for Plaintiff
30665 Northwestern Hwy., Ste. 165
Farmington Hills, MI 48334
(248) 220-1415
jjr@therubinsteinfirm.com
kb@therubinsteinfirm.com

/

/

**VERIFIED COMPLAINT AND JURY DEMAND**

There are no other pending complaints contemplating the transactions or occurrences outlined herein by this Verified Complaint.

NOW COMES Plaintiff, GARY GROSSMAN, by and through his attorney, THE RUBINSTEIN LAW FIRM, and for his Verified Complaint, state as follows:

**JURISDICTION AND VENUE**

1. Plaintiff is an individual who resides in Oakland County, Michigan and owns real property at 6221 W. Maple Road, W. Bloomfield, MI 48322.

2. Defendant, CHARTER TOWNSHIP OF WEST BLOOMFIELD ("WBT"), is a municipal corporation formed under the laws of the State of Michigan, exercising its governmental prerogatives within the territorial limits of said township, and is physically located in Oakland County, Michigan.

1

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

FILED  Received for Filing  Oakland County Clerk  6/30/2023 12:35 PM

3. The events giving rise to this action took place and this matter involves real property located in West Bloomfield Township, Michigan.

4. The amount in controversy exceeds Twenty-Five Thousand Dollars ($25,000.00), exclusive of interest and costs.

5. This action also seeks equitable relief, such as both injunctions and declaratory judgments, within the sole jurisdiction of the Oakland County Circuit Court.

6. Venue is proper in this Court.

<u>INTRODUCTION</u>

7. Plaintiff incorporates the above paragraphs as if fully restated herein.

8. Certain WBT municipal employees have conspired to intentionally and illegally injure Plaintiff by using their official government positions to apply and maintain two (2) Stop Orders on the Subject Property, halting rehabilitation work and effectively locking Plaintiff out of his home for 2-1/2 years.

9. The injury is not limited to irreparably taking away Plaintiff's time living in his unique piece of real estate.

10. Defendant has inflicted economic and non-economic injury for the last 2-1/2 years, terrorizing Plaintiff with the threat of losing his home.

11. Defendant has extorted Plaintiff to make duplicate payments and pay for services not delivered, threatened Plaintiff with permanent loss of property rights, and has demanded Plaintiff force his neighbor to act against his will.

12. Without merit, Defendant has prosecuted Plaintiff in 48th District Court, criminal division.

13. The Stop Orders have caused Plaintiff to default on his construction loan, forcing Plaintiff to pay nearly three times the mortgage cost to a private lender.

2

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

14. The loan was at 4.5% with a 30 year amortization.  Now, because of Plaintiff's default forced by Defendant, his private lender interest rate is 12% interest.

15. The Stop Orders have caused Plaintiff to lose all of his contractors and workers.

16. The Stop Orders halted construction when the interior walls were open and all attic insulation was removed, threatening the condition of the Subject Property.

17. With open walls and no insulation, the heating and cooling system cannot adequately control temperature and humidity.

18. Without climate control for 2-1/2 years, some completed work within the Subject Property may need to be ripped out and redone, negatively affecting Plaintiff's ability to complete restoration work and reside in the Subject Property.

19. Construction projects are dangerous and have a significantly increased risk of fire, which is why insurance on an uninhabitable home undergoing rehabilitation is often three times as costly as regular homeowners insurance.

20. Plaintiff has not only sustained the extra insurance cost, he has suffered amplified fear of a fire continuously and unnecessarily for an additional 2-1/2 years.

<u>BACKGROUND FACTS</u>

21. Plaintiff hereby incorporates the above paragraphs as if fully restated herein.

22. The property that is the subject of this lawsuit (the "Subject Property") is Assessor's Parcel Number ("APN") 18-33-200-062.  The Subject Property is a parcel of improved land commonly known as 6221 W. Maple, West Bloomfield Township, Michigan, 48322, that is located within the Township and zoned for residential use.  (See Exhibit "A" – Deed)

23. The Subject Property includes a single-family residence and is located south of Maple Road and East of Farmington Road.

3

24. The Subject Property is unique, especially compared to other modern homes in the area. It is the site of the original farmhouse dating back to when all of the surrounding subdivisions were agricultural land. The land is still acreage, never platted into a house lot.

25. The original farmhouse was replaced over 60 years ago, however a century-old barn, long ago converted into bedrooms and bathrooms, connects to the newer part of the home.

26. The Subject Property is surrounded on all 4 sides by acres of undeveloped land and protected forest.

27. On March 26, 2019, Plaintiff purchased the Subject Property from Fannie Mae, after the Subject Property was abandoned, foreclosed upon, and vacant for approximately 3 years. (See Exhibit "A").

28. At the time Plaintiff purchased the Subject Property, it was in very poor condition. The Township had determined it to be uninhabitable with 22 pre-existing code violations including damaged electric service, mold, structural issues, rotted wood, damaged plumbing and 17 other violations, all of which were required to be corrected before the Township would issue a Certificate of Occupancy. See Exhibit "B" – List of Code Violations.

29. April 29, 2019, Plaintiff secured a construction loan from Michigan Mutual Bank to rehabilitate the house located on the Subject Property and correct all code violations for the sole purpose of Plaintiff moving into the code-compliant structure as his permanent home. (See Exhibit "C" – Loan Information).

30. Beginning on or about May 22, 2021, in connection with the proposed renovation work on the Subject Property, Plaintiff applied for and received necessary building permits from the Township, including, electrical, mechanical, indoor plumbing, and exterior sewer tap plumbing (the "Building Permits" – Exhibit "D").

4

31. Shortly after securing the building permits, Plaintiff commenced rehabilitation work to correct all pre-existing Code violations.

32. In reliance on the Building Permits issued by the Township, Plaintiff invested in excess of $100,000.00 to correct code violations and improve the Subject Property in conformance with building code.

33. From the date Plaintiff's purchased the Subject Property, the Township performed 20 inspections, determining steady correction of the pre-existing code violations. (See Exhibit "E" – Inspection List)

34. As the Subject Property is landlocked, title includes an access easement (the "Access Easement") over an adjacent property to the north (APN 18-33-200-034), owned by a neighbor (the "Neighbor's Parcel"). See Exhibit "A" – Deed Reflecting Easement.

35. The Access Easement is the only authorized access to the Subject Property from Maple Road, which is the nearest public right of way.

36. The Access Easement path over the Neighbor's Parcel consists of a single lane gravel road, and a small steel bridge with a clear span of only 8 feet (the "Bridge") crossing over a creek. A bridge of this small size is commonly referred to as a "culvert" by licensed Professional Engineers and on government maps.

37. With the exception of the gravel road and Bridge, the Neighbor's Parcel is undeveloped.

38. The Bridge consists of structural steel beams spanning the creek, and a concrete deck roadway surface.

39. From the date of Plaintiff's purchase of the Subject Property, the Bridge has proven to be structurally sound and capable of supporting heavy loads.

40. For example, DTE crossed the bridge multiple times with heavy equipment necessary to remove and replace a utility pole on the Subject Property (on or about May 7, 2019) and

5

excavate a long trench to install underground electric service to the Subject Property (on or about October 1, 2019, and October 4, 2019).

41. The heavy equipment necessary for this work crossed over the Bridge, demonstrating the Bridge was structurally sound.

42. While the steel beam structure of the bridge was structurally sound, the concrete deck surface was significantly disintegrated, with much of the concrete missing entirely.

43. This resulted in an uneven roadway and a 14-inch deep dip measured from the gravel bridge approach ramps to the center of the bridge roadway.

44. On one occasion, Plaintiff met at the Subject Property with a West Bloomfield Township Fire Department (WBTFD) Fire Inspector, who Plaintiff believes identified himself as David Goff. This was the first of four meetings with WBTFD representatives to address fire safety at the Subject Property.

45. The Fire Inspector visited the site to confirm the location of the nearest fire hydrants. It was determined they were located in two nearby subdivisions each over 400 feet away from the Subject Property home.

46. Utilizing one or both of these hydrants for firefighting would require parking fire engines in adjacent subdivisions to connect short supply hoses to the fire engines, and then run attack hoses more than the length of a football field to reach the home.

47. The Fire Inspector explained that many fires are quickly extinguished with only the fire engine's onboard water supply, without the delay required to connect to a hydrant and run attack hoses.

48. Nonetheless, the Fire Inspector expressed concern about WBTFD fire engines not being able to cross the Bridge to access the Subject Property because of the disintegrated concrete deck.

6

49. This would mean no onboard water supply to extinguish a fire, adding delay to connect to the distance fire hydrants, resulting in increased risk to life and property. WBTFD fire trucks contain life support tools and equipment. They are dispatched not just to fight fires, but also to accompany EMS ambulances to support medical emergency response.

50. In the event of a medical emergency at the Subject Property, EMS support fire trucks not being able to cross the Bridge could further endanger life.

51. Following the Fire Inspector meeting, Plaintiff was left with serious concerns about life and property safety at the Subject Property.

52. Plaintiff reached out to WBTFD and met three more times at the site with the WBTFD Fire Marshal to determine whether or not firefighters and EMS support personnel could safely access the Subject Property.

53. June 3, 2020, was the date of the first Fire Marshal inspection. Plaintiff was informed that WBTFD fire engines, fire trucks and the aerial ladder truck *would not cross the bridge* with the disintegrated deck and the 14" deep dip because the equipment could get stuck on the bridge, not only becoming unavailable to fight a fire at the Subject Property, but also blocking other emergency response vehicles from access to the Subject Property.

54. When told about the DTE trucks crossing the bridge with heavy equipment, the Fire Marshal explained that the DTE trucks have large tires and wheels and high chassis clearance because they are designed for off road travel and can safely navigate the deep dip in the concrete bridge deck. By comparison, the WBTFD fire engines and fire trucks have smaller tires and wheels and low chassis clearance, and are designed for use on pavement only.

55. The Fire Marshal further explained that if the emergency equipment were to get stuck on the bridge and become disabled, the equipment would not only block access to the Subject

7

Property, it would also be taken out of commission and not be available to fight fires or support emergency medical treatment for other WBT residents.

56. September 8, 2020, was the date of the second meeting with the Fire Marshal, and at this meeting Plaintiff presented an alternative access route that did not require crossing the Bridge. This route involved driving across a Consumers Energy gas transmission line easement on property owned by a neighboring subdivision. The alternative access route consisted of a dirt path through the woods along the south border of the Subject Property, continuing to the Subject Property backyard. This alternative was rejected, and the Fire Marshal reiterated WBTFD fire trucks and fire engines are not designed to travel off-road.

57. Beginning October 5, 2020, and continuing to October 12, 2020, Plaintiff maintained his easement by restoring the concrete deck on the Bridge at his sole cost and expense. The deck restoration allowed WBTFD, other first responders, and other invitees and guests to safely cross the Bridge and access the Subject Property.

58. The owner of the neighboring parcel took no issue regarding the bridge maintenance work.

59. The maintenance work made no alterations to the Bridge's steel beam structure.

60. The restored concrete deck dimensions exactly matched the length and width of the disintegrated deck, and the thickness varied only to correct the uneven roadway and deep dip. When the maintenance work was complete, the top surface of the restored Bridge deck was perfectly level and matched the top height of the gravel approach ramps at each end of the Bridge.

61. On December 2, 2020, Plaintiff met with the Township Environmental Manager and the Township Engineer at the Neighbor's Parcel and the Subject Property. The Environmental Manager expressed concerns. Several days later Plaintiff emailed the Environmental

8

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

Manager requesting to meet and review his concerns. There was no response to the meeting request.

62. April 9, 2021, was the third and final meeting with the Fire Marshal, and at this meeting the Bridge with the restored deck was presented for evaluation. The Fire Marshal said WBTFD equipment would cross the Bridge, subject to a load rating report showing it could support the weight of the WBTFD equipment.

63. On May 18, 2021 the load rating report was completed and determined the restored Bridge was more than capable of supporting all legal loads allowed on a public roadway by the Michigan Department of Transportation (MDOT). The restored Bridge would allow the WBTFD safe access to the Subject Property. See Exhibit "F" – Load Rating Report.

64. On March 4, 2021, without any advance notice to Plaintiff, the Township informed Plaintiff the plumbing inspection scheduled for the following day was cancelled because of two secret Stop Orders, that were improperly executed and not served on Plaintiff by way of posting, despite WBT City Ordinances requiring such conduct.

65. Despite Plaintiff's request for an explanation, no additional information or details regarding the Stop Orders was provided, other than some inaccurate field notes and unclear site photos dated December 2, 2020.

66. Plaintiff subsequently learned that the two Stop Orders were placed months earlier, with the first placed on December 8, 2020, and the second on January 21, 2021.

67. Municipal due process steps required for legal Stop Order placement are identified in multiple overlapping Township Ordinances and written standard procedures. The steps are described below sorted in chronological order of application. For added clarity the list of due process steps are grouped into four sequential phases: Immediate phase, Violation

9

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

phase, Hearing phase, and Delivery phase. Following the list of due process steps in each phase are Defendant's failures to comply with the due process steps required at that stage.

68. Immediate phase: According to defendant's ordinances, Stop Orders may be placed immediately only when there is 'imminent danger[1]', or 'serious concern[2]' or 'imminent threat[3]' of dangerous construction or environmental harm. Even when circumstances do qualify for immediate placement of a Stop Order, the municipal due process steps described below must follow for the Stop Order placement to be legal.

69. The Stop Order placement is procedurally deficient because none of the required municipal due process steps followed the immediate placement of the Stop Orders. At the time the Stop Orders were placed it was the middle of winter and there was no ongoing work activity, meaning work was already "stopped". There never was any 'imminent danger', or 'serious concern' or 'imminent threat'. For over 2-1/2 years following the initial inspection, Defendant has not required any specific work to be stopped, or for there to be any corrective action to resolve 'imminent danger', or 'serious concern' or 'imminent threat'.

70. Violation phase: Typical due process for initiating a Stop Order begins with the Violation phase. Upon discovery of a violation, a code enforcement case is opened, a code case number is assigned, a written courtesy notice or violation notice is drafted, and must be delivered to the accused by mail with return receipt requested. The notice must describe the ordinance violation, and the remedy necessary to correct the matter, and a deadline for correcting the violation. *A compliance recheck is performed a week after the initial visit.* The vast majority of code cases are resolved at this stage, without initiation of a Stop Order.

---

[1] WBT Ord Sec 1-12(a)
[2] WBT Ord Sec 8-308(c)
[3] WBT Ord Sec 20-111

10

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

Continuing non-compliance by the accused results in a final code compliance letter, stating that a municipal hearing will be scheduled to place a Stop Order if non-compliance continues.

71. The Stop Order placement is procedurally deficient because no code enforcement case was opened, no code case number was assigned, there was no courtesy notice or violation notice issued to the accused and nothing delivered by mail with return receipt requested. There was no notice describing the ordinance violation, and no description of the remedy necessary to correct the matter within a 5-day compliance deadline. *A compliance recheck was not performed a week after the initial visit.* There was no final code compliance letter stating that a municipal hearing will be scheduled to place a Stop Order if non-compliance continues.

72. Hearing Phase: A written Notice of Hearing must be delivered to the accused 10 days prior to the hearing[4]. There are two possible hearing venues. A Stop Use Order hearing is before the Environmental Commission, at a regularly scheduled meeting. The Township Supervisor is required to concur if the Environmental Commission votes to affirm a Stop Use Order. A Stop Work Order hearing is before the full Township Board, including the Township Supervisor and all other elected officials, and takes place at a regularly scheduled meeting. Both types of Stop Order hearing notices must identify the ordinance noncompliance, that is the reason for the hearing. The hearing notice must specify the date, time, and location of the hearing. The hearing notice must state that a full day is allowed for the hearing, the accused has a right to counsel[5], right to bring witnesses[4], evidence[4],

---

[4] WBT Ord 20-113(1)
[5] WBT Ord 20-113(1)(d)

11

Doc ID: 222a3f34efab2544a2681011a071cf82a16c775b

and experts[4]. The Township Board votes[6]. The Environmental Commission votes[7], and the Township Supervisor must concur in writing with the Environmental Commission vote.

73. The Stop Order placement is procedurally deficient because no written Notice of Hearing was delivered to the accused. There was no identification of the ordinance noncompliance, that is the reason for the hearing. There was no specified date, time, or location for a hearing. There was no statement that a full day is allowed for the hearing, the accused has a right to counsel, right to bring witnesses, evidence, and experts. There never was a Township Board hearing, so no Township Board voted to place a Stop Work Order. There never was an Environmental Commission hearing, so no Environmental Commission voted to place a Stop Use Order. As there was no Environmental Commission hearing and no vote, the Township Supervisor did not concur in writing with an Environmental Commission vote to place a Stop Use Order.

74. Delivery Phase: If the Township Board votes to affirm a Stop Work Order, or if the Environmental commission votes to affirm a Stop Use Order, and the Township Supervisor concurs, the voting entity must create a public record[8] of the decision by entering it into the meeting minutes. The voting entity must deliver a written notice[9] of the decision to the accused. The actual Stop Order must be in writing. The written Stop Order must state the scope of the work to be stopped[10], and the corrective actions[10] that must be accomplished for work to be resumed. The written Stop Order must be delivered, including being posted[10] on the Subject Property. Compliance recheck inspections must follow posting of the Stop Order to determine compliance.

---

[6] WBT Ord 20-113(3)
[7] WBT Ord 12-15(d)
[8] WBT Ord 20-113(3)
[9] WBT Ord Sec 20-113(3)
[10] WBT Ord Sec 1-12(a)

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

75. The Stop Order placement is procedurally deficient because there was no public record of a decision to place a Stop Order, and nothing entered into meeting minutes. There was no notice to the accused of the decision to place a Stop Order. *There was no Stop Order in writing.* There was no written description specifying the scope of the work to be stopped, and no written description specifying the corrective actions that must be accomplished for work to be resumed. No written Stop Order was delivered, and nothing was posted on the Subject Property. *There were no compliance recheck inspections to determine compliance.*

76. Plaintiff is unable to ascertain with certainty the substance of the reason for the two Stop Orders because there are no written violation notices, there were no hearings, and there are no written Stop Orders. Plaintiff speculates and infers from Defendant's actions and documents that two (2) properties are likely involved, namely the Subject Property and the Neighbor's Parcel. Plaintiff speculates and infers from Defendant's actions and documents that lack of two (2) types of permits are likely involved, namely Building Department construction permits and Planning Development Services Department environmental use permits.

77. Plaintiff speculates and infers from Defendant's actions and documents two (2) types of code or ordinance violations are likely involved, namely hazardous construction in violation of building code, and environmental impact, disturbance, or damage in violation of environmental ordinance. None of these potential factors are a substantive reason for a Stop Order on the Subject Property. The lack of substance for all of these possible factors is systematically addressed in the following paragraphs, beginning with the Subject Property.

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

78. The Subject Property had all required building permits on the dates of the Stop Order placement, so lack of building permits is not a substantive reason for a Stop Order on the Subject Property.

79. Defendant has refused to inspect permitted work at the Subject Property and therefore could not have knowledge of any dangerous or not-to-code construction on the Subject Property, so dangerous or not-to-code construction is not a substantive reason for a Stop Order on the Subject Property.

80. As a result of Defendant's oversight, Defendant prosecuted Plaintiff in 48th District Court alleging the Subject Property failed to have environmental use permits[11].

81. To address the issue of possible environmental harm, the 48th District Court ordered a reinspection of the Subject Property and the Neighbor's Parcel, the day following the dismissal. According to ordinance, this compliance recheck reinspection should have occurred 17 months earlier, 5 days after the initial site inspection on December 2, 2020. Plaintiff willingly agreed to the reinspection of the Subject Property, believing it would resolve the matter. The neighbor, who had been subpoenaed to appear in court, agreed to the reinspection of the Neighbor's Parcel.

82. On the date of the inspection, it was determined there was no environmental impact, disturbance, or damage on the Subject Property or the Neighbor's Parcel at the court-ordered reinspection.

83. Confirmation of no impact, disturbance, or damage was by Defendant's Environmental Manager. This was the employee who performed the initial inspections, claimed

---

[11] That case was dismissed by way of a plea to four (4) counts of double parking, at $175.00 each, despite no environmental permits being required.

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

environmental impact, disturbance or damage, and who initiated the first Stop Order on the Subject Property 17 months earlier.

84. As it was determined there was no harm to the environment on the Subject Property, this is not a substantive reason for a Stop Order on the Subject Property.

85. The work performed on the Neighbor's Parcel Bridge, restoring the concrete deck within the footprint of the disintegrated deck and without alterations to the steel beam bridge structure, is considered maintenance, according to Defendant's ordinances.

86. Also, MDOT considers concrete deck replacement to be a standard type of steel bridge maintenance, called a shallow deck overlay. Maintenance work does not require building permits, so lack of building permits on the Neighbor's Parcel is not a substantive reason for a Stop Order on the Subject Property.

87. The maintenance work performed on the Bridge deck is compliant with building code and is not dangerous.

88. Specifically, the load rating of the Bridge performed by Plaintiff's licensed Professional Engineers to satisfy the Fire marshal's concerns states: "... *the culvert is more than capable of supporting all legal loads allowed by MDOT.*" *See Exhibit "F".*

89. The restored Bridge deck can certainly allow WBTFD fire engines and fire trucks to safely access the Subject Property. To ensure Plaintiff's load rating report was accurate, Defendant hired DLZ, another licensed Professional Engineer firm, to evaluate the Bridge and the Rowe engineering load rating report. ***The DLZ report confirmed load rating determined by Rowe.*** (See Exhibit "G").

90. Dangerous or not-to-code construction activity on the Neighbor's Parcel is not a substantive reason for a Stop Order on the Subject Property.

15

Doc ID: 222a3f34efab2644a2681011a071cf62a16c775b

91. No environmental use permits are required for maintenance work on an existing structure in an environmental feature area such as a creek. Lack of environmental use permits on the Neighbor's Parcel is not a substantive reason for a Stop Order on the Subject Property.

92. On June 28, 2021, Plaintiff requested MI EGLE Environmental Quality Analyst Robert Primeau to perform a site visit to the Subject Property and Neighbor's Parcel to give an independent expert opinion of the existence of an environmental harm on either property.

93. On July 14, 2021 EGLE performed the site visit. On September 22, 2021 Primeau completed a findings report stating: **"Based on our site investigation we have determined that the activities cited did not appear to cause impacts to wetlands..."**

94. EGLE issued no violation, required no remediation, and there was no penalty assessed. This independent government expert opinion of no environmental harm was confirmed by the determination of no environmental harm at the court-ordered reinspection.

95. Environmental impact, disturbance, or damage on the Neighbor's Parcel is not a substantive reason for a Stop Order on the Subject Property.

96. Since March 4, 2021, when Plaintiff was first made aware of the existence of the Stop Orders, Plaintiff has been unable to work on or otherwise make use of the Subject Property.

97. Plaintiff has made every effort to resolve the situation without litigation by bringing government experts and licensed engineers to evaluate both properties and report their findings. Plaintiff has met with every involved employee of Defendant to explain the procedurally and substantively defective Stop Orders, including the Environmental Manager who made the initial accusation of damage and conceded there was none, the Building and Planning Department Directors responsible for enforcing the Stop Order ordinances and who illegally placed them, the Director of Human Resources, the Chief of

16

Police, and the Township Supervisor Steve Kaplan, who is an attorney and former Macomb County prosecutor.

98. For 16 months Defendant had failed to reinspect the two properties for noncompliance, avoiding the determination that everything was compliant with ordinance and code.

99. Defendant chose to ignore Plaintiff-initiated reports from government experts and licensed engineers. Defendant chose to not reinspect the properties showing willful ignorance of Plaintiff's compliance.

100.    It has been proven Plaintiff's actions created no hazardous construction condition, and Plaintiff caused no harm to the environment. Defendant was ordered to reinspect by the 48th District court and make the determination whether or not there was noncompliance.

101.    When it was determined that everything was compliant with ordinance and code, Defendant simply refused to lift the illegal Stop Orders.

102.    As of the date of this Complaint, Plaintiff has hired no less than six (6) law firms to address Defendant's concerns, and demand that the Township lift the illegal Stop Orders, but the Township has refused thereby necessitating the commencement of the instant action[12].

## <u>COUNT I – REQUEST FOR DECLARATORY RELIEF</u>

103.    The allegations contained in the foregoing paragraphs are re-alleged and incorporated as if fully set forth herein.

104.    The court rule governing actions for declaratory relief, MCR 2.605, confirms the authority of a Michigan court to "declare the rights and other legal relations of an interested

---

[12] Remarkably, things have gotten to this point following a conversation Plaintiff has with WBT Board Member Jim Manna, where Manna offered to look into the issues contemplated by this Complaint and help Plaintiff – Manna reached out to Twp. Supervisor Steve Kaplan, who informed Manna that Plaintiff must sue the Township.

17

party seeking a declaratory judgment" "[i]n a case of actual controversy within its jurisdiction."

105.    There is a bona fide, actual and practical need for a declaration of the issues raised herein.

106.    The declaration sought herein deals with a present, ascertained or ascertainable state of facts or present controversy as to a state of facts.

107.    Plaintiff has an actual, present, adverse and antagonistic interest in the declaration sought herein.

108.    The relief sought is not merely the giving of legal advice or the answer to questions propounded out of curiosity.

109.    For all the reasons discussed herein, the Stop Orders are procedurally and substantively defective as they were improperly issued and maintained in violation of Township Ordinances.

110.    Defendant's activities are confiscatory and do not serve legitimate governmental interests.

111.    In the absence of declaratory and equitable relief, Plaintiff will be irreparably harmed.

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Declare the Stop Orders to be improperly issued;

B. Compel the Defendant to immediately rescind the Stop Orders and any demands that Plaintiff take any action with regard to the Stop Orders;

C. Compel the Defendant to accept the Bridge as compliant with ordinance;

D. Compel the Defendant to restore permits or grant new permits on the Subject Property as required to perform work necessary for a Certificate of Occupancy, re-commence building permit inspections and perform them in a fair manner, and upon approval of all permitted work award Plaintiff a Certificate of Occupancy;

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

E.  Award Plaintiff damages in such amount in excess of $25,000 as will fully compensate him for the economic and non-economic injury he has sustained;

F.  Award Plaintiff his costs and attorney fees so needlessly sustained; and

G.  Grant such other relief as may be appropriate.

## COUNT II - INJUNCTIVE RELIEF

112.  The allegations contained in the foregoing paragraphs are re-alleged and incorporated as if fully set forth herein.

113.  Injunctive relief is necessary to preserve the status quo and prevent irreparable injury.

114.  Defendant has consistently demonstrated willful disregard for due process, and has refused to remove the Stop Orders when presented with evidence there are no violations. Plaintiff fears that without Injunctive Relief this behavior will continue.

115.  Plaintiff has a substantial likelihood of success on the merits of its claims because it is clear that Defendant's conduct is in violation of the Defendant's own ordinances and the Stop Orders were improperly issued and maintained by Defendant.

116.  Defendant's conduct substantially and immediately threatens the Subject Property and the viability of Plaintiff's ability to complete and reside in the Subject Property.

117.  Plaintiff will suffer immediate irreparable harm if the Stop Orders remain in place. Plaintiff's time taken away by Defendant is an irreparable loss. Plaintiff's claims in these proceedings involve interests in and rights to unique real property, and, therefore, such claims are entitled to be enforced through equitable relief.

118.  There is no harm to Defendant if the Court grants injunctive relief in Plaintiff's favor and enjoins Defendant from continuing to recognize and enforce the Stop Orders because

19

there are no code violations to be corrected, and no construction or environmental remediation to be performed.

119. Granting Plaintiff injunctive relief is in the public interest. It is a benefit to the public to rehabilitate an uninhabitable and potentially hazardous residential property such as the Subject Property.

120. Plaintiff has no adequate remedy at law in money damages for Plaintiff's loss of time in his permanent residence are difficult, if not impossible, to determine. Without injunctive relief Plaintiff will be precluded from living in his unique real property for which there is no substitute.

121. Since the injunctive relief sought herein is merely to preserve Plaintiff's rights consistent with the Building Permits issued by the Township, Plaintiff should not be required to post security, rather Defendant should be required to post bond, due to its history of willful noncompliance with its own ordinances.

WHEREFORE, Plaintiff respectfully requests that the Court:

A. Declare the Stop Orders to be improperly issued;

B. Compel the Defendant to immediately rescind the Stop Orders and any demands that Plaintiff take any action with regard to the Stop Orders;

C. Compel the Defendant to accept the Bridge as compliant with ordinance;

D. Compel the Defendant to restore permits or grant new permits on the Subject Property as required to perform work necessary for a Certificate of Occupancy, re-commence building permit inspections and perform them in a fair manner, and upon approval of all permitted work award Plaintiff a Certificate of Occupancy;

E. Award Plaintiff damages in such amount in excess of $25,000 as will fully compensate him for the economic and non-economic injury he has sustained;

F. Compel Defendant to accept the Bridge as compliant with ordinance;

G. Compel Defendant to restore permits or grant new permits on the Subject Property as required to perform work necessary for a Certificate of Occupancy, re-commence

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

building permit inspections and perform them in a fair manner, and upon approval of all permitted work award Plaintiff a Certificate of Occupancy;

H.   Award Plaintiff his costs and attorney fees so needlessly sustained; and

I.   Grant such other relief as may be appropriate.

## COUNT III - VIOLATION OF CONSTITUTIONAL DUE PROCESS

122.   The allegations contained in the foregoing paragraphs are re-alleged and incorporated as if fully set forth herein.

123.   The Due Process Clauses of the Fourteenth Amendment and the Michigan Constitution guarantee both procedural and substantive due process to landowners. US Const amend XIV; Mich Const 1963 art 1, §17.

124.   Substantive due process requires that a governmental action or regulation be reasonable in its operation. *Plum Hollow Golf & Country Club v Southfield*, 341 Mich 84, 67 NW2d 122 (1954).

125.   Procedural due process requires the government to provide notice and an opportunity for hearing appropriate to the nature of the case before it can terminate a protected interest. *Board of Regents v Roth*, 408 US 564, 570 (1972); *Warren v City of Athens*, 411 F3d 697, 708 (6th Cir 2005); *Bonner v City of Brighton*, 495 Mich 209, 227;848 NW2d 380 (2014).

126.   Plaintiff's ownership interest in the Subject Property is a property right as defined under Michigan law.

127.   Defendant was required under state law to provide Plaintiff with notice and an opportunity to respond prior to the issuance of a stop work order.

128.   Defendant failed to afford due process by, minimally, (i) failing to notify Plaintiff of a specific violation of ordinance or building code; (ii) failing to provide notice and an opportunity to respond to or otherwise be heard regarding the Stop Orders; (iii) failing to notify

21

Plaintiff of the issuance of the Stop Orders; (iv) failing to notify Plaintiff of the specific reasons for the Stop Orders; (v) issuing the Stop Orders without a valid governmental purpose; and (vi) issuing the Stop Orders arbitrarily and capriciously.

129. The issuance of the Stop Orders, and refusal to remove them, is arbitrary and discriminatory enforcement of the law, thereby violating Plaintiff's substantive and procedural due process rights under the Fourteenth Amendment and the Michigan Constitution. US Const amend XIV; Mich Const 1963 art 1, §17.

130. The Stop Orders are in violation of Plaintiff's rights and are not supported by or narrowly tailored to further any compelling governmental interest.

131. As a direct result of Defendant's violation of the Plaintiff's procedural and substantive due process rights, Plaintiff is suffering irreparable harm for which there is no adequate remedy of law, as Defendant's conduct amounts to an unconstitutional taking of Plaintiff's Property.

132. As a direct result of the Defendant's violation of the Plaintiff's procedural and substantive due process rights, as alleged herein above, Plaintiff has suffered and is entitled to recover damages, costs and attorney fees.

WHEREFORE, Plaintiff, GARY GROSSMAN, respectfully requests this Honorable Court enter a judgment in her favor against Defendant, CHARTER TOWNSHIP OF WEST BLOOMFIELD, in an amount in excess of $25,000.00, exclusive of interest and costs, and to award any other relief deemed just and appropriate.

## COUNT IV – MALICIOUS PROSECUTION

133. Plaintiff incorporates and realleges all above paragraphs as if set forth in full herein.

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

134. In filing for criminal charges before the 48[13] District Court[13], Defendant has abused the criminal process by using it for an ulterior motive and improper purposes. This use of the criminal process is not legitimate, regular, or legal.

135. Defendant's conduct in initiating this cause of action without proper cause was willful and intentional.

136. Defendant's use and misuse of the criminal process is improper since WBT knew, or should have known, that the allegations regarding Grossman's actions and conduct were false, and not founded on applicable ordinance and state legislative authority.

137. As a direct and proximate result of Defendant's misuse of the criminal process, Plaintiff has suffered significant damages, including, but not limited to, harm to his professional reputation, economic damages, mental anguish, and unnecessary costs and legal expenses.

WHEREFORE, Plaintiff, GARY GROSSMAN, respectfully requests this Honorable Court enter a judgment in her favor against Defendant, CHARTER TOWNSHIP OF WEST BLOOMFIELD, in an amount in excess of $25,000.00, exclusive of interest and costs, and to award any other relief deemed just and appropriate.

## COUNT V – TORTIOUS INTERFERENCE WITH A CONTRACT

138. Plaintiff incorporates and realleges all above paragraphs as if set forth in full herein.

139. The allegations WBT made accusing Plaintiff of numerous violations of Twp. Ordinances, have been carried out in an unethical and unlawful manor, in an attempt to harass Plaintiff.

---

[13] Case No. 21WB0616A; *Twp. Of West Bloomfield v. Grossman*

23

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

140.    Plaintiff had contractual relationships and expectancies that had a reasonable likelihood of future economic benefit for Plaintiff, in the form of construction agreements for improvements to be carried out at his property, to rectify all of the code violations and make the Subject Property inhabitable.

141.    Plaintiff also had contractual relationships with lending institutions for the purpose of carrying out the subject work that is the basis of this dispute -- based on this, Plaintiff has incurred severe and substantial carrying costs while having illegitimate "stop-work" orders looming over his property over the course of the last two and a half years.

142.    Specifically, Defendant WBT executed these stop-work orders in an illegitimate, spiteful, and vexatious fashion, failing to notify Plaintiff so that he could exercise his due process rights, concerning Plaintiff's maintenance of his easement to get onto his property, despite such allegations being absolutely baseless and false in nature.

143.    Defendant knew of the contracts and beneficiary expectancies thereof between Plaintiff and its construction companies that were performing work at the property, as well as Plaintiff's lending institutions.

144.    By its conduct described throughout this complaint, Defendant intentionally and improperly interfered with the contracts, and expectancies of Plaintiff.

145.    The conduct outlined throughout this complaint was intended to, and did, interfere with the contracts and expectancies, causing their breach, disruption, or termination.

146.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff has suffered substantial economic injury, loss of goodwill, harm to its business reputation, loss of esteem and standing in the community, and loss of business opportunities.

WHEREFORE, Plaintiff, GARY GROSSMAN, respectfully requests this Honorable Court enter a judgment in her favor against Defendant, CHARTER TOWNSHIP OF WEST BLOOMFIELD, in an

Doc ID: 222a3f34efab2544a2681011a071cf62a18c775b

amount in excess of $25,000.00, exclusive of interest and costs, and to award any other relief deemed just and appropriate.

Respectfully submitted,
THE RUBINSTEIN LAW FIRM

By: _____
Jan Jeffrey Rubinstein (P57937)
Attorney for Plaintiff

I declare that the statements above are true to the best of my information, knowledge, and belief.

_____
GARY GROSSMAN

Sworn to and subscribed
before me this _____ day
of June, 2023.

_____
Notary Public

25

Doc ID: 222a3f34efab2544a2681011a071cf62a16c775b

# EXHIBIT "A"

COVENANT DEED

Fannie Mae aka Federal National Mortgage Association organized and existing under the laws of the United States of America ("Grantor"), whose address is P.O. Box 650043, Dallas, TX 75265-0043 convey(s) to: Gary Grossman, a single man, ("Grantee"), whose address is 7450 Brynmawr CL, West Bloomfield, MI, 48322, the following described real property situated in the Township of West Bloomfield, County of Oakland; and State of Michigan, to-wit:

SEE ATTACHED EXHIBIT "A"

Commonly Known as: 6221 W. Maple Road, West Bloomfield, MI 48322-2171
Parcel ID No.: X-18-33-200-062, X-18-33-200-062

For the full consideration of Three Hundred Forty Five Thousand and 00/100 Dollars ($345,000.00)

Subject to easements, building and use restrictions, and restrictive covenants of record, if any.

Grantor covenants to Grantee and agrees that Grantor has not done, committed or willingly suffered to be done or committed, anything that would cause the premises granted in this deed, or any part of them, to be charged or encumbered in title, estate, or otherwise.

Dated: **MAR 2 6 2019** _____

*Print name below signature in black ink only.

Signed:

Fannie Mae aka Federal National Mortgage Association organized and existing under the laws of the United States of America, Grantor

By: _____ ,

_____Ebony Gerwin, Attorney_____, Trott Law, P.C., as Attorney-In Fact pursuant to Limited Power of Attorney dated December 7th, 2018

State of : Michigan            )
                               )SS.
County of : Oakland            )

The foregoing instrument was acknowledged to me on this _____ day of **MAR 2 6 2019**___, 20 ____ by Fannie Mae aka Federal National Mortgage Association organized and existing under the laws of the United States of America by _____Ebony Gerwin, Attorney_____ of Trott Law, P.C., as Attorney-In Fact pursuant to Limited Power of Attorney dated December 7th, 2018

MARIANNE SAKOWSKY
Notary Public, State of Michigan
County of Macomb
My Commission Expires 03-27-2022
Acting in the County of Oakland

Notary Public: _____
Notary County: _____ State: _____
Commission Expires: _____
Acting In. _____

This instrument is exempt from county transfer tax pursuant to 12 U.S.C. 1723a(c) and MCL 207.505(c)

This instrument is exempt from state transfer tax pursuant to 12 U.S.C. 1723a(c) and MCL 207.526(c)

Instrument Drafted by:
Kenneth E. Kurel, Trott Law, P.C.
31440 Northwestern Hwy, Suite 200
Farmington Hills, MI 48334
File No.: 63-185929898

Send subsequent tax bills and recorded deed to:
Gary Grossman
7450 Brynmawr Ct, West Bloomfield, MI, 48322,

Page 2 of 2 of Covenant Deed between Fannie Mae aka Federal National Mortgage Association organized and existing under the laws of the United States of America, ("Grantor") and Gary Grossman, a single man, ("Grantee") dated this
MAR 2 6 2019 , 20

### EXHIBIT "A"

Township of West Bloomfield, County of Oakland; and State of Michigan:

Part of the North 1/2 of Section 33, Town 2 North, Range 9 East, described as beginning at a point distant South 88 degrees 18 minutes 19 seconds West 1670.61 feet and South 00 degrees 44 minutes 48 seconds East 2395.13 feet from the Northeast Section corner; thence North 89 degrees 14 minutes 28 seconds East 337.00 feet, thence South 00 degrees 44 minutes 48 seconds East 264.00 feet; thence South 89 degrees 14 minutes 28 seconds West 337.00 feet; thence North 00 degrees 44 minutes 48 seconds West 264.00 feet to the point of beginning.

Together with a non-exclusive 50.00 foot easement for ingress and egress and public utilities, described as beginning at a point located distant North 89 degrees 15 minutes 30 seconds East 990.80 feet from the North 1/4 corner of said Section 33,
thence continuing North 89 degrees 15 minutes 30 seconds East 50.00 feet; thence due South 2512.14 feet; thence South 89 degrees 15 minutes 30 seconds West 50.00 feet; thence due North 2512.14 feet to the point or beginning of said easement, as created by Instrument recorded in Liber 4364, Page 47.

And together with a non-exclusive 60.00 foot wide ingress and egress and public utilities easement, centerline of said easement is described as beginning at a point located distant South 88 degrees 18 minutes 19 seconds West 1670.57 feet and
South 00 degrees 44 minutes 48 seconds East 2425.13 feet from said Northeast 1/4 corner; thence North 89 degrees 14 minutes 28 seconds East 277.00 feet to a point later referred to as Point "A", thence South 00 degrees 44 minutes 48 seconds East 30.00 feet to the center of a curve (radius 60.00 feet, long chord bears North 89 degrees 14 minutes 28 seconds East 120.00 feet, arc length = 188.50 feet); thence continuing from aforementioned Point "A" North 89 degrees 14 minutes 28 seconds East 60.00 feet to the point of ending, as created by Instrument recorded in Liber 4364, Page 47.

Commonly Known as: 6221 W. Maple Road, West Bloomfield, MI 48322-2171, 6221 W. Maple Road, West Bloomfield, MI 48322-2171
Parcel ID No.: X-18-33-200-062, X-18-33-200-062

# EXHIBIT "B"



22 CODE VIOLATIONS

Charter Township of
**West Bloomfield**
Building Department
248-451-4842
Inspection Request Line Only
248-451-4888

## VACANT PROPERTY COMPLIANCE REQUEST

01/10/2019

Vacant Property Permit Number: PB18-1152
Inspector: Brian Harris

Owner Agent/Property Manager:
PEMCO LIMITED
4600 S ULSTER ST, STE 530
Denver, CO  80237

FEDERAL NATIONAL MORTGAGE ASSOC.
5001 KINGSLEY DRIVE
Cincinnati, OH  45227

On **01/10/2019** the Building Department inspected the property at:

6221 W MAPLE
Parcel: X-18-33-200-062

**Violations of the Code of Ordinances for West Bloomfield Township were found to exist:**

- AREA:  ALL EXTERIOR SURFACES TO BE MAINTAINED IN A GOOD REPAIR; WOOD/METAL PROPERLY SURFACE COATED; PEELING, FLAKING, CHIPPED PAINTED REPAIRED (IPMC 304.1.1, 304.2)
- Damaged gable vent. White house. (Rear).

①

- AREA:  ALL EXTERIOR WALLS/SIDING TO BE FREE OF HOLES, BREAKS, LOSS/ROTTED MATERIAL; MAINTAINED WEATHER PROOF/PROPERLY SURFACE COATED WHERE REQUIRED (IPMC 304.6)
- Open soffit material. Both houses.

②

- AREA:  GUTTERS / DOWNSPOUT(S) MISSING (IPMC 304.7)  NOT IN WORKING CONDITION (IPMC 304.7)
- Damaged and missing gutters. White house.

③

- AREA:  M1202.1 NEED HVAC CERTS.
- HVAC certs needed for furnace and water heater. Both houses.

④



- AREA: An approved vacuum breaker required on all hose bibs or faucets to which hoses are attached and left in place (IPMC 505.2)
- All hose bibs need vacuum breakers. Interior and exterior on both houses.



- AREA: MOLD (IPMC 304.1, 304.1.1)
- Mold detected is excess of 10 sq ft. Upstairs bedrooms of red house. Abate same and provide an air quality test to the township. 10/2/18 BH.

-

- AREA: EXCESSIVE ACCUMULATION OF RUBBISH OR GARBAGE (IPMC 308.1)

⑦ • Glass shards of debris on side of home.
-

- AREA: Where it is found that the electrical system in a structure constitutes a hazard to the occupants or the structure by reason of inadequate service, improper fusing, insufficient receptacle and lighting outlets, improper wiring or installation, deterioration or damage, or for similar reasons, the code official shall require the defects to be corrected to eliminate the hazard. IPMC 604.3, 2015
- Damaged service drop cable needs replacement. Electrical permit required.
- Inoperable and missing light fixtures interior and exterior. Exposed wiring in both houses. Electrical permit required.
-

- AREA: Not operational / In need of repair (IPMC 304.13, IPMC 304.15 and IPMC 305.6)
- Doors are broken and inoperable. Both front doors will not latch or lock. This repair will require a locksmith. Door hinges are in bad shape.
-

- AREA: Non Conforming structure
- Floor is sinking in and not capable of supporting normally imposed loads. A letter of certification is required by a licensed state certified engineer that the floor is structually safe and capable of supporting normally imposed loads. Permits may be required. This is for upstairs bedroom of red house.
-

- See MRC Chapter 5
-

- AREA: Improper number (IPMC 704.2)
- Smoke detectors are required in all bedrooms, one in every hallway. One on each floor.
-

- AREA: Every bathroom shall have at least one-(1) receptacle (IPMC 605.2) Note: receptacle(s) damaged and warrant replacement must be replaced with GFCI if required (IPMC 605.2) Laundry rooms shall have at least one-(1) grounded or GFCI receptacle (IPMC 605.2) Ground Fault Protection required in Garages, crawl spaces, basements, kitchens, boat houses, heated floors, and must be readily accessable.
- GFI's are required in Every bathroom, kitchen and laundry room. Both houses.
-

- AREA: ALL EXTERIOR WALLS/SIDING TO BE FREE OF HOLES, BREAKS, LOSS/ROTTED MATERIAL; MAINTAINED WEATHER PROOF/PROPERLY SURFACE COATED WHERE REQUIRED (IPMC 304.6)
- Rotted wood & Fascia on both houses.
-

- AREA: EXCESSIVE ACCUMULATION OF RUBBISH OR GARBAGE (IPMC 308.1)

15 • Remove vegetation off roof & gutters.

•
• AREA:  Water shut off; contact Water and Sewer Department Billing Division at 248-451-4832
16 • Water shut off.

•
• AREA:  Handrail measured height < 30" or > 42" (IPMC 307.1)
17 • A graspable handrail [s] required on interior stairway leading to upstairs. Red house.

•
• AREA:  Fireplace Cert
18 • Certification is required for both fireplaces.

•
• AREA:  Exhaust for dryers not vented to outside of building: Clothes Dryers (IPMC 403.5)
19 • Remove accordian dryer vents in both houses.

•
• AREA:  Surfaces not being maintained in a clean, sanitary manner (IPMC 305.1, IPMC 305.2, and IPMC 305.3), (i.e. defective paint, plaster, wood, walls, counters, ceilings, floors, doors, windows, etc.)
20 • Drywall damage present in both houses.

•
• AREA:  Transfer of ownership. It shall be unlawful for the owner of any dwelling unit or structure who has received a compliance order or upon whom a notice of violation has been served to sell, transfer, mortgage, lease or otherwise dispose of such dwelling unit or structure to another until the provisions of the compliance order or notice of violation have been complied with, or until such owner or the owners authorized agent shall first furnish the grantee, transferee, mortgagee or lessee a true copy of any compliance order or notice of violation issued by the code official and shall furnish to the code official a signed and notarized statement from the grantee, transferee, mortgagee or lessee acknowledging the receipt of such compliance order or notice of violation and fully accepting the responsibility without condition for making the corrections or repairs required by such compliance order or notice of violation. IPMC [A] 107.6
21 • In the event of a transfer or ownership, the seller must make the new or potential buyer aware of all outstanding open code violations. Notorized affadavit is required.

•
• AREA:  Winterization
22 • Plumbing system winterized. 10-15-18.
•
•

A status re-inspection will be done every 30 days.  Home cannot be occupied until all violations have been corrected.  If you fail to correct these violations, any action taken by West Bloomfield Township may be charged against the real estate upon which the structure is located and shall be a lien upon such real estate.  Please notify the inspector below with any questions/concerns or upon compliance with the above orders.

Brian Harris

Building Department
Charter Township of West Bloomfield

# EXHIBIT "C"

# NOTE

GROSSMAN
Loan #: 2020020083
MIN: 100303620200200837

APRIL 29, 2020
[Date]

TROY,
[City]

MICHIGAN
[State]

6221 W MAPLE RD, WEST BLOOMFIELD, MI 48322
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $400,000.00 (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is MIMUTUAL MORTGAGE. I will make all payments under this Note in the form of cash, check or money order.

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 4.500%.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 6(B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making a payment every month.

I will make my monthly payment on the 1ST day of each month beginning on JULY 1, 2020. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on JUNE 1, 2050, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 911 MILITARY STREET, PORT HURON, MI 48060 or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $2,026.74.

## 4. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit;

MULTISTATE FIXED RATE NOTE --Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
EX 5.69
Form 3200   1/01   *(page 1 of 3 pages)*



2020020083

and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

## 7. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 8. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 9. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 10. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what

MULTISTATE FIXED RATE NOTE --Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
5.69

Form 3200  1/01  *(page 2 of 3 pages)*

2020020083

conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

*GARY GROSSMAN*

– BORROWER – GARY M GROSSMAN

*[Sign Original Only]*

Individual Loan Originator: CHRISTOPHER L GERMANO, NMLSR ID: 319781
Loan Originator Organization: CORE DIRECT MORTGAGE INC, NMLSR ID: 1656804
Loan Originator Organization (Creditor): MIMUTUAL MORTGAGE, NMLSR ID: 12901

MULTISTATE FIXED RATE NOTE --Single Family-- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
EX 5.69
Form 3200   1/01   *(page 3 of 3 pages)*

# EXHIBIT "D"

Engineering, Environmental, Planning & Zoning Services

**PLANNING & DEVELOPMENT SERVICES**
4550 Walnut Lake Road
West Bloomfield, MI 48323
P. (248) 451-4818
F. (248) 451-4871
wbtownship.org



**WETLAND DETERMINATION
APPLICATION**
Application must be filled out completely

Case No. _____

| APPLICANT INFORMATION | | |
|---|---|---|
| Name GARY GROSSMAN | | Phone 415 994 5694 |
| Address 6221 W MAPLE | | Email GARYGROSSMAN08 @ COMCST·UET |
| City W Bloomfield | State MI | Zip Code 48322 |

| PROPERTY OWNER INFORMATION (IF DIFFERENT FROM APPLICANT) | | |
|---|---|---|
| Name | | Phone |
| Address | | Email |
| City | State | Zip Code |

**PROPERTY INFORMATION**

Location/Street Address

Subdivision Name

Block #

Parcel ID # 17-33-200-034
Lot #

**SIGNATURE**

*I hereby authorize a wetland determination verification to be conducted for the property listed above.*

Date 5/27/21

Signature of Applicant GARY GROSSMAN

Date

Signature of Property Owner

Applications must be submitted on the attached completed application with all information typed or printed in ink along with the following fees:

| TYPE OF DETERMINATION | FEE |
|---|---|
| Acreage Parcels | $1,200.00 |
| Platted Single Family Lots | $350.00 |

**Wetland Determinations Outside of the Growing Season Acknowledgment: November 1st – May 1st (typically)**

According to the U.S. Army Corps of Engineers and the State of Michigan Wetlands Regulatory Assistance Program, wetland determinations must be completed within the growing season months only. Signature of the property owner below acknowledges that this wetland determination cannot be completed according to the required wetland indicators outside of the growing season. This wetland determination will be completed once the growing season officially returns.

Signature GARY GROSSMAN   Print GARY GROSSMAN   Date 5/27/21

Application Wetland Determination Revised 06/2019

**-$695.00**
Total

🗓 Jun 1, 2021
Post date

💳 4858
Check #

Front   Back



GARY GROSSMAN
6221 W MAPLE RD
WEST BLOOMFIELD, MI 48322-2171

4858
90/7162

DATE 5-27-21

PAY TO THE
ORDER OF WEST BLOOMFIELD TOWNSHIP $ 695 00

SIX HUNDRED NINTY FIVE AND 00/100 DOLLARS

CHASE 🏦 EXTENSIONS!
JPMorgan Chase Bank, N.A.
www.Chase.com

LB R-0599
PM19-0519, PD19-0266
PW20-0103

GARY GROSSMAN





**COMMUNITY DEVELOPMENT DEPARTMENT**
4550 Walnut Lake Road
West Bloomfield, MI 48323
(248) 451-4842 Phone
(248) 451-4871 Facsimile
www.wbtownship.org

# ELECTRICAL FEES

INSPECTION & REVIEWS (Modular Home Installation Minimum Fee) ........................................... $130

## MOTORS, TRANSFORMERS, POWER & HEATING UNITS (per unit)
Includes Generators, Rectifiers, Motion Picture Apparatus, Welders, Flood Lamps 1000 watts or over, Heating and/or
Power Units based on Horse Power, KW or KVA Rating
a)  1/4 HP to 10 HP, KW, or KVA.................................................................................... $20
b)  Over 10 to 30................................................................................................. $25
c)  Over 30 to 45................................................................................................ $30
d)  Over 45 to 100............................................................................................... $35
e)  Over 101.................................................................................................... $40

## OTHER ACCESSORY ITEMS
a)  Swimming Pool: (up to 2 circuits)............................................................................ $100
b)  Spa/Whirlpool/Hydro Massage (each)......................................................................... $50

POWER OUTLETS (includes, Dryer, Range, Water Heater, each) ............................................... $7

REINSPECTION FEE (re-inspection fees to be paid prior to re-call) ........................................ $75
   *Note: Permit fees include; one underground inspection, one rough inspection & one final inspection.*
   *All other needed inspections will be at the Special Inspection Rate.*

## SAFETY AND SPECIAL INSPECTION FEE
For the purpose of determining conformance with codes: (Observable components for Life/Safety Issues only)
a)  Residential, Commercial & Industrial (per trade, includes fire Inspection), each ........................ $75
b)  Any other (per trade)........................................................................................ $75
c)  Overtime Fees
    i.    Overtime, Monday – Friday (2 hour minimum), per hour.................................................. $115
    ii.   Overtime, Saturday & Sunday (2 hour minimum), per hour............................................... $150
    iii.  Overtime, All Holidays (2 hour minimum), per hour.................................................... $200
d)  Annual fire Inspection (surcharge for third and each additional inspection).............................. $75
e)  Compliance Inspections (per hour)........................................................................... $75
f)  Inspections for which no fee is specifically indicated (per hour)........................................ $75

## SIGNS (includes neon)
a)  One Circuit or Less Including Connection, new.............................................................. $65
b)  Each Additional Circuit (on one sign) .................................................................... $5
c)  Connection only, existing.................................................................................. $65

## TEMPERATURE CONTROL EQUIPMENT
For installing, altering or repairing Electrical Wiring and Temperature Control Equipment for Heating or Ventilating Units.
Complete equipment covering any one furnace or unit
a)  Minimum.................................................................................................... $50

TERMINATIONS (Low Voltage Controls other than Data/Telecommunications) per group of 25 .................... $7

---

**Work Started Prior To Permits**
For work started prior to issuance of the Building Permit, the fee shall be charged at a rate of 2 times the usual permit fee. These
additional fees are for Code Enforcement investigation, administrative procedures and follow up costs. In cases where special
inspections are required, an additional special inspection fee shall be charged for each visit to the site prior to any building permit review.
**Cancellations and Refunds**
None granted 6 months from date of issuance. Upon written request, prior to commencement of any work, permits may be cancelled by
the holder. Refund all fees except; application fee, 25% of permit fee plus $75 per inspection plus plan review fees. In those cases where
work has commenced, there will be no refunds.

# EXHIBIT "E"

Scheduled:    02/11/2019 01:51 PM                    Completed:    02/11/2019 01:45 PM
   **Comments:**
              1/2 mile road was snow covered. Did not do inspection.BH.

---

**VACANT PROPERTY Inspection | Brian Harris**

Status:       Completed                              Result:       Disapproved
Scheduled:    01/10/2019 02:15 PM                    Completed:    01/10/2019 01:50 PM
   **Comments:**
              No visible change.

---

**VACANT PROPERTY Inspection | Brian Harris**

Status:       Completed                              Result:       Disapproved
Scheduled:    12/03/2018 02:17 PM                    Completed:    12/03/2018 02:14 PM
   **Violations:**

Uncorrected        Plumbing system winterized. 10-15-18.

Area Description:   Winterization

   **Comments:**
              No entry. No exterior changes.

---

**VACANT PROPERTY Inspection | Brian Harris**

Status:       Completed                              Result:       Disapproved
Scheduled:    11/02/2018 02:58 PM                    Completed:    11/02/2018 02:16 PM
   **Comments:**
              minor changes.

---

**VACANT PROPERTY Inspection | Brian Harris**

Status:       Completed                              Result:       Disapproved
Scheduled:    10/02/2018 03:02 PM                    Completed:    10/02/2018 02:48 PM
   **Violations:**

Corrected          Gas meter is pinned.

Area Description:   Gas Shut off

---

Uncorrected        Drywall damage present in both houses.

Area Description:   Surfaces not being maintained in a clean, sanitary manner (IPMC 305.1, IPMC 305.2, and IPMC 305.3), (i.e. defective paint, plaster, wood, walls, counters, ceilings, floors, doors, windows, etc.)

---

Uncorrected        In the event of a transfer or ownership, the seller must make the new or potential buyer aware of all outstanding open code violations. Notorized affadavit is required.

Area Description:   Transfer of ownership. It shall be unlawful for the owner of any dwelling unit or structure who has received a compliance order or upon whom a notice of violation has been served to sell, transfer, mortgage, lease or otherwise dispose of such dwelling unit or structure to another until the provisions of the compliance order or notice of violation have been complied with, or until such owner or the owners authorized agent shall first furnish the grantee, transferee, mortgagee or lessee a true copy of any compliance order or notice of violation issued by the code official and shall furnish to the code official a signed and notarized statement from the grantee, transferee, mortgagee or lessee acknowledging the receipt of such compliance order or notice of violation and fully accepting the responsibility without condition for making the corrections or repairs required by such compliance order or notice of violation. IPMC [A] 107.6

   **Comments:**
              No change.

---

**VACANT PROPERTY Inspection | Brian Harris**

Status:       Completed                              Result:       Disapproved
Scheduled:    08/30/2018 12:00 PM                    Completed:    08/30/2018 02:23 PM
   **Violations:**

Corrected          Debris and rubbish all along the exterior premises. Both houses. Open code case

Area Description:   EXCESSIVE ACCUMULATION OF RUBBISH OR GARBAGE (IPMC 308.1)

Scheduled:   ' 05/10/2019 02:30 PM                          Completed:   05/10/2019 02:15 PM
Comments:

                          No change.

---

**VACANT PROPERTY Inspection | Brian Harris**
Status:       Completed                                   Result:      Disapproved
Scheduled:    04/11/2019 02:42 PM                         Completed:   04/11/2019 02:31 PM
   **Violations:**
   Uncorrected       Correct kitchen ventilation required. Mechanical permit required.
   Area Description:  Exhaust fans not vented to outside of building (IPMC 403.4)

   **Comments:**
                          Met with owner at property. A lot of projects will be taking place soon. Owner understands that all permits will be required,
                          drawings and engineering reports as well. Owner wants house up to code and understands he will do whatever it takes for
                          the home to be habitable. 4/11/19 BH.

---

**VACANT PROPERTY Inspection | Brian Harris**
Status:       Completed                                   Result:      Disapproved
Scheduled:    03/13/2019 01:45 PM                         Completed:   03/13/2019 02:39 PM
   **Comments:**
                          Gained access. Minor changes.

---

**VACANT PROPERTY Inspection | Brian Harris**
Status:       Completed                                   Result:      Disapproved
Scheduled:    02/11/2019 01:51 PM                         Completed:   02/11/2019 01:45 PM
   **Comments:**
                          1/2 mile road was snow covered. Did not do inspection.BH.

---

**VACANT PROPERTY Inspection | Brian Harris**
Status:       Completed                                   Result:      Disapproved
Scheduled:    01/10/2019 02:15 PM                         Completed:   01/10/2019 01:50 PM
   **Comments:**
                          No visible change.

---

**VACANT PROPERTY Inspection | Brian Harris**
Status:       Completed                                   Result:      Disapproved
Scheduled:    12/03/2018 02:17 PM                         Completed:   12/03/2018 02:14 PM
   **Violations:**
   Uncorrected       Plumbing system winterized. 10-15-18.
   Area Description:  Winterization

   **Comments:**
                          No entry. No exterior changes.

---

**VACANT PROPERTY Inspection | Brian Harris**
Status:       Completed                                   Result:      Disapproved
Scheduled:    11/02/2018 02:58 PM                         Completed:   11/02/2018 02:16 PM
   **Comments:**
                          minor changes.

---

**VACANT PROPERTY Inspection | Brian Harris**
Status:       Completed                                   Result:      Disapproved
Scheduled:    10/02/2018 03:02 PM                         Completed:   10/02/2018 02:48 PM
   **Violations:**
   Corrected         Gas meter is pinned.
   Area Description:  Gas Shut off .

## Building Permit PB18P1152

### Property Information

| | | | |
|---|---|---|---|
| (-18-33-200-062 | 6221 W MAPLE | Subdivision: | ACREAGE |
| | WEST BLOOMFIELD MI, 48322-2171 | Lot: | SEC 33 Block: |

### Name Information

| | | | |
|---|---|---|---|
| Owner: | FEDERAL NATIONAL MORTGAGE ASSOC. | Phone: | |
| Occupant: | | Phone: | |
| Applicant: | PEMCO LIMITED | Phone: | (720) 504 3238 |
| Contractor: | | Phone: | |
| Licensee: | | Phone: | |
| License Issued: | | | |
| License Expires: | | | |

### Permit Information

| | | | |
|---|---|---|---|
| Date Issued: | Date Expires: | Status: | HOLD (PREREQ) |

Work Description:
  LOCK BOX: FRD OR 4760

Stipulations:

Comment:

### Fee Information

| | | | |
|---|---|---|---|
| Application Fees Res Vacant Prop. App Residential | | 1.00 | 100.00 |
| Permit Fee Residenti Vac Prop & Main Resi Reg Fee | | 1.00 | 325.00 |

### VACANT PROPERTY Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Scheduled | Result: | |
| Scheduled: | 06/11/2019 02:17 PM | Completed: | |

### VACANT PROPERTY Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Completed | Result: | Disapproved |
| Scheduled: | 05/10/2019 02:30 PM | Completed: | 05/10/2019 02:15 PM |

**Comments:**
  No change.

### VACANT PROPERTY Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Completed | Result: | Disapproved |
| Scheduled: | 04/11/2019 02:42 PM | Completed: | 04/11/2019 02:31 PM |

**Violations:**
Uncorrected     Correct kitchen ventilation required. Mechanical permit required.

Area Description:  Exhaust fans not vented to outside of building (IPMC 403.4)

**Comments:**
  Met with owner at property. A lot of projects will be taking place soon. Owner understands that all permits will be required. drawings and engineering reports as well. Owner wants house up to code and understands he will do whatever it takes for the home to be habitable. 4/11/19 BH.

### VACANT PROPERTY Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Completed | Result: | Disapproved |
| Scheduled: | 03/13/2019 01:45 PM | Completed: | 03/13/2019 02:39 PM |

**Comments:**
  Gained access. Minor changes.

### VACANT PROPERTY Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Completed | Result: | Disapproved |

Did not do inspection. Snow covered 3/4 mile long path.

VACANT PROPERTY Inspection | Brian Harris

| Status: | Completed | Result: | Disapproved |
|---|---|---|---|
| Scheduled: | 01/09/2020 11:01 AM | Completed: | 01/09/2020 02:58 PM |

**Comments:**

monitoring.

VACANT PROPERTY Inspection | Brian Harris

| Status: | Completed | Result: | Disapproved |
|---|---|---|---|
| Scheduled: | 12/10/2019 02:50 PM | Completed: | 12/10/2019 10:59 AM |

**Comments:**

New siding going up in certain areas to address rotted wood and exterior deficiencies. Monitor with building dept. 12/10/19 BH.

Rcvd voicemail from owner. 415-994-5694. Not much is going ona t moment. waiting on construction loan before he does anymore work. Prob not going to take place until January. Just keeping me in the loop.

VACANT PROPERTY Inspection | Brian Harris

| Status: | Completed | Result: | Disapproved |
|---|---|---|---|
| Scheduled: | 11/08/2019 02:34 PM | Completed: | 11/08/2019 02:49 PM |

**Comments:**

Notified homeowner to schedule rough inspections when ready. 11/8/19 BH.

VACANT PROPERTY Inspection | Brian Harris

| Status: | Completed | Result: | Disapproved |
|---|---|---|---|
| Scheduled: | 10/10/2019 02:15 PM | Completed: | 10/10/2019 02:33 PM |

**Comments:**

Work progressing along at white house. 10/10/19 BH.

VACANT PROPERTY Inspection | Brian Harris

| Status: | Completed | Result: | Disapproved |
|---|---|---|---|
| Scheduled: | 09/09/2019 02:32 PM | Completed: | 09/09/2019 02:14 PM |

**Comments:**

No access. Nobody on site. Electrical alterations permit still needs to be pulled. Remove old electrtical service once de energized.

VACANT PROPERTY Inspection | Brian Harris

| Status: | Completed | Result: | Disapproved |
|---|---|---|---|
| Scheduled: | 08/09/2019 02:16 PM | Completed: | 08/09/2019 02:27 PM |

**Violations:**

| Uncorrected | Electrical alterations permit required for both structures. |
|---|---|
| Area Description: | Permit Required (IPMC 102.3) |

VACANT PROPERTY Inspection | Brian Harris

| Status: | Completed | Result: | Disapproved |
|---|---|---|---|
| Scheduled: | 07/11/2019 01:50 PM | Completed: | 07/11/2019 02:14 PM |

**Comments:**

No access. Nobody on site. Minor exterior change.

VACANT PROPERTY Inspection | Brian Harris

| Status: | Completed | Result: | Disapproved |
|---|---|---|---|
| Scheduled: | 06/11/2019 02:17 PM | Completed: | 06/11/2019 01:49 PM |

VACANT PROPERTY Inspection | Brian Harris

| Status: | Completed | Result: | Disapproved |
|---|---|---|---|

## Building Permit | PB18-1152

### Property Information:

K-18-33-200-062      6221 W MAPLE      Subdivision:
WEST BLOOMFIELD MI, 48322-2171    Lot:      Block:

### Name Information

| | | |
|---|---|---|
| Owner: | FEDERAL NATIONAL MORTGAGE ASSOC. | Phone: |
| Occupant: | | Phone: |
| Applicant: | PEMCO LIMITED | Phone: (720) 504 3238 |
| Contractor: | | Phone: |
| Licensee: | | Phone: |
| License Issued: | | |
| License Expires: | | |

### Permit Information

Date Issued: 08/23/2018     Date Expires: 08/23/2020     Status: ISSUED

Work Description:
LOCK BOX: FRD OR 4760

Stipulations:

Comment:

### Fee Information

| | | |
|---|---|---|
| Application Fees Res  Vacant Prop. App Residential | 1.00 | 100.00 |
| Permit Fee Residenti  Vac Prop & Main Resi Reg Fee | 1.00 | 325.00 |

### VACANT PROPERTY Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Scheduled | Result: | |
| Scheduled: | 08/10/2020 02:25 PM | Completed: | |

### VACANT PROPERTY Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Completed | Result: | Disapproved |
| Scheduled: | 07/09/2020 11:09 AM | Completed: | 07/09/2020 02:24 PM |

**Comments:**

Monitoring.

### VACANT PROPERTY Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Completed | Result: | Disapproved |
| Scheduled: | 06/05/2020 02:22 PM | Completed: | 06/05/2020 11:08 AM |

### VACANT PROPERTY Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Completed | Result: | Disapproved |
| Scheduled: | 03/11/2020 01:40 PM | Completed: | 03/11/2020 02:21 PM |

**Violations:**

Uncorrected    Cert of Occupancy Sec 26-6.4(3E)

INSPECTOR COMMENTS: C of O is required before occupancy.

Area Description:

### VACANT PROPERTY Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Completed | Result: | Disapproved |
| Scheduled: | 02/10/2020 02:58 PM | Completed: | 02/10/2020 01:40 PM |

**Comments:**

## Vacant Property Certificate | CVP21-0015

### Property Information

| | | | |
|---|---|---|---|
| X-18-33-200-062 | 6221 W MAPLE | Subdivision: | |
| | WEST BLOOMFIELD, MI 48322-2171 | Lot: | Block: |

### Name Information

| | | |
|---|---|---|
| Holder: | GROSSMAN, GARY | Phone: |
| Occupant: | | Phone: |
| Responsible Party: | GROSSMAN, GARY | Phone: |

### Certificate Information

| | | | | |
|---|---|---|---|---|
| Date Issued: | | Date Expires: | 08/23/2020 | Status: Hold |

Work Description:

Stipulations:

### Fee Information

| | | | |
|---|---|---|---|
| | Vacant Property | Vacant Prop - Renewal 2019 | 1.00 |
| | Vacant Property | Vacant Prop - Renewal 2020 | 1.00 |

### VP RENEWAL NOTICE Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Scheduled | Result: | |
| Scheduled: | 07/23/2022 11:00 AM | Completed: | |

### VP INSPECTION Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Scheduled | Result: | |
| Scheduled: | 08/18/2021 10:18 AM | Completed: | |

### VP INSPECTION Inspection | Brian Harris

| | | | |
|---|---|---|---|
| Status: | Completed | Result: | Not Complied |
| Scheduled: | 07/16/2021 11:00 AM | Completed: | 07/16/2021 09:56 AM |

**Violations:**

Uncorrected  Indoor mold areas greater than 10 square feet IPMC Sec 305.7.2
Occupational License. If the total visible contiguous area of the indoor mold area exceeds ten (10) square feet, the indoor mold contamination shall be remediated by a contractor licensed by the State of Michigan to perform the type of work specified in the mold remediation plan such as a Residential Builder, a Residential Maintenance and Alteration Contractor or a General Contractor licensed by the State of Michigan, or if required by State law or the applicable code, by a licensed plumbing, electrical, or mechanical contractor. Permit required – prior to remediation and must have mold assessment report from industry certified consultant and written remediation work plan shall be provided.

INSPECTOR COMMENTS: Moldlike substance detected in excess of 10 square feet located in upstairs bedroom of red house. Abate same and provide an air quality test. Transfered from 8/30/18 Inspection

Area Description:

Uncorrected  Structure unfit for human occupancy IPMC Sec 108.1.3
A structure is unfit for human occupancy whenever the code official finds that such structure is unsafe, unlawful or, because of the degree to which the structure is in disrepair or lacks maintenance, is insanitary, vermin or rat infested, contains filth and contamination, or lacks ventilation, illumination, sanitary or heating facilities or other essential equipment required by this code, or because the location of the structure constitutes a hazard to the occupants of the structure or to the public.

INSPECTOR COMMENTS: Floor is sinking in and not capable of supporting normally imposed loads. A letter of certification is required by a licensed state certified engineer. Permits may be required  Transfered from 8/30/18 Inspection

Area Description:

# EXHIBIT "F"



**ROWE PROFESSIONAL SERVICES COMPANY**

*Large Firm Resources, Personal Attention.* ℠

# Memorandum

**To:**     Mr. Gary Grossman

**From:**   Jon Lidgard, PE

**Date:**   May 18, 2021

**RE:**     Driveway Culvert Load Rating

ROWE was requested to conduct a load rating analysis for the concrete slab culvert that was recently constructed along the driveway leading to Mr. Grossman's residence. To complete this load rating, a ROWE structural engineer conducted a site visit to verify the condition and dimensions of the culvert. Once the field conditions were verified, a load rating analysis was completed using AASHTOware rating software approved by the Michigan Department of Transportation (MDOT). The culvert was analyzed for all of the MDOT rating trucks to ensure that all possible truck configurations are capable of passing over this structure.

Once the rating was completed, it has been determined that the culvert is more than capable of supporting all legal loads allowed by MDOT. The minimum rating factor for this structure is 2.15 times the legal load for any MDOT truck and is 1.27 times stronger than the HL-93 modified truck used by MDOT. A summary of all legal truck ratings is attached to this memo for reference.

This structure is capable of supporting any and all legal loads that are allowed to drive on Michigan roads without any concerns. If you have any questions, please feel free to contact me at (810) 341-7500 or jlidgard@rowepsc.com.

Attachment

\\hq\CADD\Projects\21C0090\Docs\Load Rating\Grossman Load Rating Memo.docx





**ROWE Professional Services Company**
Project: Grossman Residence Slab Culvert
Owner: Gary Grossman

Load Factor Rating

Rated By: JDL        Date:        5/12/21

| | Truck Use Designated Loading | Truck Weight | Rating Factor | Load Rating |
|---|---|---|---|---|
| Federal Inventory | LL Moment (HL-93) | 36 | 1.27 | 45.68 |
| Federal Operating | LL Moment (HL-93) | 36 | 1.65 | 59.22 |
| 1 Unit | 1 | 16.7 | 2.33 | 38.83 |
| | 2 | 23.7 | 2.15 | 50.88 |
| | 3 | 27.2 | 2.58 | 70.04 |
| | 4 | 33.70 | 2.58 | 86.78 |
| | 5 | 42.00 | 2.41 | 101.05 |
| 2 Unit | 6 | 50.70 | 3.01 | 152.66 |
| | 7 | 59.70 | 3.34 | 199.16 |
| | 8 | 45.70 | 2.34 | 107.03 |
| | 9 | 25.70 | 2.33 | 59.75 |
| | 10 | 32.70 | 2.15 | 70.21 |
| | 11 | 41.70 | 2.20 | 91.57 |
| | 12 | 58.70 | 3.29 | 193.06 |
| | 13 | 62.70 | 3.44 | 215.37 |
| | 14 | 66.20 | 4.25 | 281.09 |
| | 15 | 71.70 | 3.71 | 266.01 |
| | 16 | 69.20 | 3.62 | 250.71 |
| | 17 | 75.70 | 3.83 | 290.16 |
| | 18 | 77.00 | 4.19 | 322.25 |
| 3 Unit | 19 | 58.70 | 3.29 | 193.06 |
| | 20 | 43.70 | 2.45 | 106.93 |
| | 21 | 75.70 | 3.83 | 290.16 |
| | 22 | 80.70 | 3.96 | 319.89 |
| | 23 | 77.00 | 4.19 | 322.25 |
| | 24 | 61.00 | 3.67 | 223.57 |
| | 25 | 82.00 | 4.33 | 354.98 |

Coding                                                           Posting:

| | | | |
|---|---|---|---|
| Item 66 Federal Inventory | 1.27 Rating Factor | Item 65: 6 LFR RF 1 Unit | ton |
| Item 64F Federal Operating | 1.65 Rating Factor | Item 63: 6 LFR RF 2 Unit | ton |
| Item 64M Michigan Oper | 2.15 Rating Factor | Item 64MA: 6 LFR RF 3 Unit | ton |
| Item 64MC Mich Truck | 2 | | |

## Michigan Legal Vehicles: Configurations and Gross Vehicle Weights (GVW)

| | Truck Number | Truck Configuration | Normal Loading GVW | | Designated Loading GVW | | Special Designated GVW | |
|---|---|---|---|---|---|---|---|---|
| | | | (kips) | (tons) | (kips) | (tons) | (kips) | (tons) |
| 1-UNIT | 1 | | 33.4 | 16.7 | 33.4 | 16.7 | 39 | 19.5 |
| | 2 | | 41.4 | 20.7 | 47.4 | 23.7 | 45.4 | 22.7 |
| | 3 | | 54.4 | 27.2 | 54.4 | 27.2 | 54.4 | 27.2 |
| | 4 | | 67.4 | 33.7 | 67.4 | 33.7 | 67.4 | 33.7 |
| | 5 | | 78 | 39 | 84 | 42 | 84 | 42 |
| | 26 | | 50 | 25 | 50 | 25 | 50 | 25 |
| 2-UNIT | 6 | | 95.4 | 47.7 | 101.4 | 50.7 | 101.4 | 50.7 |
| | 7 | | 113.4 | 56.7 | 119.4 | 59.7 | 119.4 | 59.7 |
| | 8 | | 85.4 | 42.7 | 91.4 | 45.7 | 91.4 | 45.7 |
| | 9 | | 51.4 | 25.7 | 51.4 | 25.7 | 49.5 | 24.75 |
| | 10 | | 59.4 | 29.7 | 65.4 | 32.7 | 56.4 | 28.2 |
| | 11 | | 77.4 | 38.7 | 83.4 | 41.7 | 67.1 | 33.55 |
| | 12 | | 111.4 | 55.7 | 117.4 | 58.7 | 117.4 | 58.7 |
| | 13 | | 119.4 | 59.7 | 125.4 | 62.7 | 125.4 | 62.7 |
| | 14 | | 132.4 | 66.2 | 132.4 | 66.2 | 132.4 | 66.2 |
| | 15 | | 137.4 | 68.7 | 143.3 | 71.65 | 143.3 | 71.65 |
| | 16 | | 132.4 | 66.2 | 138.4 | 69.2 | 138.4 | 69.2 |
| | 17 | | 145.4 | 72.7 | 151.4 | 75.7 | 151.4 | 75.7 |
| | 18 | | 148 | 74 | 154 | 77 | 154 | 77 |
| | 27 | | 72 | 36 | 72 | 36 | 72 | 36 |

# BRIDGE ANALYSIS ASSUMPTIONS

Bridge ID: Grossman Slab Culvert                     Most Recent BSIR Date:      05/12/21

Rating Considers Field Condition of Members: Yes
Bridge was constructed in 2020 with no deficiencies noted

Most Recent Year Constructed/Reconstructed/Overlay:      2020

History of Work that Impacts Load Rating:

Superstructure Component: 1 Concrete                    | Beam Fy/fc':              /              ksi

Composite: _____    Number of Beams: _____      Shop Drawings Verified: _____

Size of Beams/Beam #'s/Spans: _____

Deck Thickness: 12" in   Deck Fy/fc': 55 / 4 ksi   Deck Design Load >H15: Yes

Wearing Surface Material/Thickness/Unit Weight:     Bare Concrete      / _____ in / _____ pcf

Barrier Type/Weight:   Timber / 30 plf (L); _____ / _____ plf (C);   Timber / 30 plf (R)

Sidewalk or Brush Block Width/Thick: _____ / _____ in (L); _____ / _____ in (C); _____ / _____ in (R)

Clear Roadway: ____11____ ft   Special Designated Route: No

Additional Loads:

Unique Factors that Affect Capacity:
Slab thickness varies, average of 12" was used.
Steel angles (L5x3x1/2) used as longitudinal supports where treated as equivalent rebar (#10).
Double layer of 6x6-8/8 wire mesh was tack welded to top of angles and treated as equivalent rebar (#5).

Analyzed By – Signature and Date   Jon Lidgard, PE                           05/13/21

Checked By – Signature and Date   Mike Soteropoulos, PE                      05/13/21

# BRIDGE ANALYSIS SUMMARY

Bridge ID: Grossman Slab

The above structure was analyzed using: AASHTOWare Bridge Rating

Version or Other: 6.8.4

Analysis based on field inspection dated:          05/12/21

Controlling Component and Failure Mode:
Moment at midspan

NEW INVENTORY CODING

| | |
|---|---|
| NBI ITEM 63 - Operating Rating Method | 8 - LRFR in Rating Factor |
| NBI ITEM 64F - Federal Operating Rating | 1.65          Rating Factor |
| MDOT Item 64MA - Michigan Operating Method | 8 - LRFR in Rating Factor |
| MDOT Item 64MB - Michigan Operating Rating | 2.15          Rating Factor |
| MDOT Item 64MC - Michigan Operating Truck | 2 \| D - Designated |
| NBI Item 65 - Inventory Rating Method | 8 - LRFR in Rating Factor |
| NBI Item 66 - Federal Inventory Rating | 1.27          Rating Factor |
| NBI Item 41 - Structure Open Posted Closed | A - Open, No Restriction |
| NBI Item 70 - Bridge Posting | 5 - 100% or more |
| NBI Item 141 - Posted Loading | |
| MDOT Item 193A - Michigan Overload Class | |
| MDOT Item 193C - Overload Status | |

Analyzed By – Signature and Date          Jon Lidgard, PE                    05/13/21

Checked By – Signature and Date          Mike Soteropoulos, PE                    05/13/21

Database Updated By – Signature and Date

### Grossman residence concrete slab culvert load rating

Description:

New concrete slab culvert has 5 steel 5x3x1/2 angles equally spaced longitudinally along the slab. There are also diagonal diaphragms located in outer bays. There is two layers of 6x6x8/8 mesh reinforcing tack welded to the top of the steel angles.

The slab is 12'-0" wide and 24'-6" long with 8'-0" long span over Pebble Creek and 8'-0" and 8-6" poured directly onto grade.

The previous structure was a steel beam culvert with timber decking and concrete deck that had numerous HMA patches (description from owner). The previous steel beams were left in place for the new construction and used as form work supports and not considered in the overall strength of the slab as the wood that is left in place will eventually deteriorate which will remove any load patch to the beams.

Railings are constructed out of 2x6 and 6x6 pressure treated lumber. Railing is 6" on center 2x6's with 6x6's at the ends and at midspan. See photos.

Assumptions:

Assume previous steel beams will not carry and loading.

Analyzed as an 8' long concrete slab with steel angles and wire mesh treated as reinforcing bars of equivalent area and strength.

Concrete has a strength of 4,000 psi. Wire mesh reinforcing was assumed to have a strength of 50,000 psi. The steel angles had a strength of 55,000 psi.

The deck thickness varies form 11" to 14" over the length of the span so 12" was used as the average depth of the slab.

The timber rails were determined to be 30 lbs/ft.

## ROWE PROFESSIONAL SERVICES COMPANY

| CORPORATE OFFICE (810) 341-7500 | LAPEER (810) 664-9411 | MT. PLEASANT (989) 772-2138 | MYRTLE BEACH, SC (843) 444-1020 | KENTWOOD, MI (616) 272-7125 | AIR-LAND SURVEYS (810) 762-6800 | FARMINGTON HILLS (248) 675-1096 | GRAYLING (989) 348-4036 |
|---|---|---|---|---|---|---|---|

CALCULATED BY ___JDL___  
DATE ___5/12/21___  JOB NUMBER ___21C0090___  
WEATHER ___GROSSMAN CULVERT LOAD RATING___  SHEET ___1___

STEEL ANGLE = 5" × 5" × ½" → AREA = 3.75 in²

$$3.75 in² / 1.27 in² \;(\#10\;BAR) \approx 3\;BARS\;PER\;ANGLE$$

5 TOTAL ANGLES = 15 #10's SPA @ 9.5"

WIRE MESH = 6×6×⁸/₈ WIRE → AREA = .16 in²/FT (PER TWO LAYERS TRUSSES)

THERE ARE 2 LAYERS OF MESH = .32 in²/FT

.32 in²/FT ≈ 0.31 in²/FT = #5 BAR @ 12 SPA.

TIMBER RAIL



SPINDLES SPA @ 6 c/c  
6×6 POSTS LOCATED AT  
ENDS AND MIDSPAN  
8×6×5½ SCUPPERS SPA  
AT 3'-0" c/c

TOTAL WEIGHT ≈ 30 #/FT

(diagram labels: 2×6 RAIL, 2×6 SPINDLE (TYP), 6×6 POST, 6×6 TOE BEAM, 6×6×3½" (TYP), TOP OF SLAB)

**Bridge Name:** Grossman Residence Slab Culvert
**NBI Structure ID:** Grossman
**Bridge ID:** Grossman House

**Analyzed By:** BrR
**Analyze Date:** Thursday, May 13, 2021 12:25:42
**Analysis Engine:** AASHTO LRFR Engine Version 6.8.4.3001
**Analysis Preference Setting:** None

**Report By:** brr
**Report Date:** Thursday, May 13, 2021 12:26:31

**Structure Definition Name:** Slab
**Member Name:** S1
**Member Alternative Name:** Slab analysis

## Load and Resistance Factor Rating Summary

| Live Load | | Rating | | Girder Summary Capacity | Location | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Factor | Controls | (Ton) | Span | (ft) | Percent | Impact | Lane | |
| HL-93 (US) | Inventory | 1.269 | STRENGTH-I Concrete Flexure | 45.67 | 1 | 4.00 | 50.0 | As Requested | As Requested | |
| HL-93 (US) | Operating | 1.645 | STRENGTH-I Concrete Flexure | 59.21 | 1 | 4.00 | 50.0 | As Requested | As Requested | |

Note:
"N/A" indicates not applicable
"**" indicates not available

**Bridge Name:** Grossman Residence Slab Culvert
**NBI Structure ID:** Grossman
**Bridge ID:** Grossman House

**Analyzed By:** BrR
**Analyze Date:** Thursday, May 13, 2021 13:12:14
**Analysis Engine:** AASHTO LRFR Engine Version 6.8.4.3001
**Analysis Preference Setting:** None

**Report By:** brr
**Report Date:** Thursday, May 13, 2021 13:12:50

**Structure Definition Name:** Slab
**Member Name:** S1
**Member Alternative Name:** Slab analysis

## Load and Resistance Factor Rating Summary

| Live Load | | Rating Factor | Controls | Girder Summary Capacity (Ton) | Location Span | (ft) | Percent | Impact | Lane |
|---|---|---|---|---|---|---|---|---|---|
| Type 3 | Legal | 2.201 | STRENGTH-I Concrete Flexure | 55.03 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Type 3-3 | Legal | 2.615 | STRENGTH-I Concrete Flexure | 104.61 | 1 | 4.00 | 50.0 | As Requested | As Requested |
| Type 3S2 | Legal | 2.414 | STRENGTH-I Concrete Flexure | 86.91 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 1 Unit Truck 01-NL and DL | Legal | 2.325 | STRENGTH-I Concrete Flexure | 38.82 | 1 | 4.00 | 50.0 | As Requested | As Requested |
| Michigan 1 Unit Truck 02-DL | Legal | 2.147 | STRENGTH-I Concrete Flexure | 50.88 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 1 Unit Truck 03 | Legal | 2.575 | STRENGTH-I Concrete Flexure | 70.04 | 1 | 4.00 | 50.0 | As Requested | As Requested |
| Michigan 1 Unit Truck 04 | Legal | 2.575 | STRENGTH-I Concrete Flexure | 86.78 | 1 | 4.00 | 50.0 | As Requested | As Requested |
| Michigan 1 Unit Truck 05-DL | Legal | 2.406 | STRENGTH-I Concrete Flexure | 101.03 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 2 Unit Truck 08-DL | Legal | 2.342 | STRENGTH-I Concrete Flexure | 107.04 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 2 Unit Truck 09-NL and DL | Legal | 2.325 | STRENGTH-I Concrete Flexure | 59.75 | 1 | 4.00 | 50.0 | As Requested | As Requested |
| Michigan 2 Unit | Legal | 2.147 | | 70.21 | 1 | 3.20 | 40.0 | As Requested | As Requested |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Truck 10-DL | | | STRENGTH-I Concrete Flexure | | | | | |
| Michigan 2 Unit Truck 11-DL | Legal | 2.196 | STRENGTH-I Concrete Flexure | 91.56 | 1 | 3.20 | 40.0 | As Requested   As Requested |
| Michigan 3 Unit Truck 20 | Legal | 2.447 | STRENGTH-I Concrete Flexure | 106.94 | 1 | 4.00 | 50.0 | As Requested   As Requested |

Note:
"N/A" indicates not applicable
"**" indicates not available

**Bridge Name:** Grossman Residence Slab Culvert
**NBI Structure ID:** Grossman
**Bridge ID:** Grossman House

**Analyzed By:** BrR
**Analyze Date:** Thursday, May 13, 2021 13:15:37
**Analysis Engine:** AASHTO LRFR Engine Version 6.8.4.3001
**Analysis Preference Setting:** None

**Report By:** brr
**Report Date:** Thursday, May 13, 2021 13:15:49

**Structure Definition Name:** Slab
**Member Name:** S1
**Member Alternative Name:** Slab analysis

## Load and Resistance Factor Rating Summary

| Live Load | | Rating Factor | Controls | Girder Summary Capacity (Ton) | Location Span | (ft) | Percent | Impact | Lane |
|---|---|---|---|---|---|---|---|---|---|
| Michigan 2 Unit Truck 06 -DL | Permit | 3.011 | STRENGTH-II Concrete Flexure | 152.68 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 2 Unit Truck 07 -DL | Permit | 3.336 | STRENGTH-II Concrete Flexure | 199.18 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 2 Unit Truck 12 -DL | Permit | 3.289 | STRENGTH-II Concrete Flexure | 193.06 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 2 Unit Truck 13 -DL | Permit | 3.435 | STRENGTH-II Concrete Flexure | 215.39 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 2 Unit Truck 14 | Permit | 4.246 | STRENGTH-II Concrete Flexure | 281.08 | 1 | 4.00 | 50.0 | As Requested | As Requested |
| Michigan 2 Unit Truck 15 -DL | Permit | 3.710 | STRENGTH-II Concrete Flexure | 266.01 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 2 Unit Truck 16 -DL | Permit | 3.623 | STRENGTH-II Concrete Flexure | 250.71 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 2 Unit Truck 17 -DL | Permit | 3.833 | STRENGTH-II Concrete Flexure | 290.13 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 2 Unit Truck 18 -DL | Permit | 4.185 | STRENGTH-II Concrete Flexure | 322.21 | 1 | 4.00 | 50.0 | As Requested | As Requested |
| Michigan 3 Unit Truck 19 -DL | Permit | 3.289 | STRENGTH-II Concrete Flexure | 193.06 | 1 | 3.20 | 40.0 | As Requested | As Requested |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Michigan 3 Unit Truck 21 -DL | Permit | 3.833 | STRENGTH-II Concrete Flexure | 290.13 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 3 Unit Truck 22 -DL | Permit | 3.964 | STRENGTH-II Concrete Flexure | 319.87 | 1 | 3.20 | 40.0 | As Requested | As Requested |
| Michigan 3 Unit Truck 23 -DL | Permit | 4.185 | STRENGTH-II Concrete Flexure | 322.21 | 1 | 4.00 | 50.0 | As Requested | As Requested |
| Michigan 3 Unit Truck 24 -DL | Permit | 3.665 | STRENGTH-II Concrete Flexure | 223.58 | 1 | 4.00 | 50.0 | As Requested | As Requested |
| Michigan 3 Unit Truck 25 -DL | Permit | 4.329 | STRENGTH-II Concrete Flexure | 354.97 | 1 | 4.00 | 50.0 | As Requested | As Requested |

Note:
"N/A" indicates not applicable
"**" indicates not available

# EXHIBIT "G"



INNOVATIVE IDEAS
EXCEPTIONAL DESIGN
UNMATCHED CLIENT SERVICE

*[handwritten: 1 Fshh year ntar m't report.]*

May 19, 2022

Mr. Jason Rosell
Engineering Manager, Planning & Development Services
Charter Township of West Bloomfield
4550 Walnut Lake Road
West Bloomfield, MI 48325

RE:    **Grossman Residence – Slab Culvert**
       6221 W Maple Road

       DLZ No.      2245-7395-00

Dear Mr. Rosell:

We are pleased to provide the following review on behalf of the West Bloomfield Township Development Services Department. Our review is based on the load rating report provided by Rowe Engineering on May 18, 2021 and a site visit performed by DLZ on May 11, 2022.

In 2020, a concrete slab was poured over the top of an existing steel beam structure with timber and concrete decking along the driveway leading to the Grossman residence at 6221 W Maple Rd.  The concrete slab is 24'-6" long, with an overall width of 12'-0" and a clear width of 11'-0".  The clear span over the Pebble Creek is 8'-0" long and with 8'-0" and 8'-6" approach spans poured directly on the grade. There is a timber railing on the structure.  This work was completed without permits and without plans. The following year, Rowe Engineering was hired by the property owner to perform a load rating analysis on the concrete slab structure.

Rowe made several assumptions during their analysis of the structure including the 4 ksi compressive strength of the concrete, using an average slab thickness of 12", and treating steel angles (L5x3x1/2") that were used as longitudinal supports and the double layer of wire mesh (6x6-8/8) embedded in the slab as equivalent rebar. This slab was poured directly on top of the existing steel beam/timber structure.  Keeping in mind, that the timber would eventually deteriorate, Rowe also assumed that there was no load path from the concrete slab to the beams and that the slab would be self-supporting.  The results of their load rating showed that the structure could support the design load of an HL-93 truck along with the loads of the additional 28 MDOT Legal Trucks.  Their results yielded a Federal Inventory Rating of 1.27, a Federal Operating Rating of 1.65, and a Michigan Operating Rating of 2.15.  MI Truck #2 controlled for the MI Operating Rating.

Not having a copy of Rowe's BrR file, DLZ loaded the slab into BrR as well to see if we could reproduce their results. We made a few assumptions of our own to make the load rating even more conservative. DLZ assumed 3 ksi concrete, as we were unable to confirm what was actually placed. The slab thickness varies from 11"-14" thick. Instead of using an average slab thickness, DLZ used 11" and then applied an equivalent load of 3" thick concrete across the slab to be more conservative. We used Rowe's assumptions regarding the equivalent rebar and the railing weight that they calculated.

4494 Elizabeth Lake Rd, Waterford Township, MI 48328   |   OFFICE  248.681.7800   |   ONLINE  WWW.DLZ.COM

Akron   Bellefontaine   Bridgeville   Burns Harbor   Chicago   Cincinnati   Cleveland   Columbus   Detroit   Flint   Fort Wayne   Indianapolis   Joliet
Kalamazoo   Lansing   Lexington   Louisville   Madison   Melvindale   Munster   Muskegon   Pittsburgh   Port Huron   Saint Joseph   South Bend   Toledo
Waterford



INNOVATIVE IDEAS
EXCEPTIONAL DESIGN
UNMATCHED CLIENT SERVICE

ARCHITECTURE • ENGINEERING • PLANNING
SURVEYING • CONSTRUCTION SERVICES

Grossman Residence
Slab Culvert Review
May 19, 2022
Page 2 of 2

DLZ's analysis produced the following results: a Federal Inventory Rating of 1.027, a Federal Operating Rating of 1.331, and a Michigan Operating Rating of 2.158.  MI Trucks #2 & #17 controlled for the MI Operating Rating.

In summary, after reviewing the report by Rowe, DLZ has come to conclusion that their assumptions are reasonable and conservative.  We agree that although the updated, more conservative inventory rating is very close to 1.0, the structure can support the legal loads that are allowed to drive on Michigan roads without any concerns.

If you have any questions, or require additional information, please feel free to contact us.

Sincerely,
DLZ Michigan, Inc.

Brian Bachler
Digitally signed by Brian
Bachler
DN: E=bbachler@dlz.com,
CN=Brian Bachler,
OU=Active, OU=DLZ
Accounts, DC=dlzcorp,
DC=com

Brian Bachler, P.E.
Township Consulting Engineer

CC:     Ms. Kathy Sederlund, Office Manager, Charter Township of West Bloomfield (via email)
        Mr. Jason Rosell, CPII, Engineering Manager, Planning & Devel. Services, Charter Township of West Bloomfield (via email)
        Ms. Amy Neary, Planning and Development Services Director, Charter Township of West Bloomfield (via email)
        Ms. Michelle Gartland, Environmental & Project Analyst, Charter Township of West Bloomfield (via email)
        Ms. Shannon L. Filarecki, P.E., Township Consulting Engineer, DLZ (via email)
        Mr. Yadong Dong, P.E., Township Consulting Engineer, DLZ (via email)
        Ms. Danielle Sutton, Clerk, DLZ (via email)

X:\Projects\2022\2245\739500 WBT As-Needed Eng\Grossman Residence Slab Culvert Analysis

4494 Elizabeth Lake Rd, Waterford Township, MI 48328     OFFICE  248.681.7800     ONLINE  WWW.DLZ.COM

Akron   Bellefontaine   Bridgeville   Burns Harbor   Chicago   Cincinnati   Cleveland   Columbus   Detroit   Flint   Fort Wayne   Indianapolis   Joliet
Kalamazoo   Lansing   Lexington   Louisville   Madison   Melvindale   Munster   Muskegon   Pittsburgh   Port Huron   Saint Joseph   South Bend   Toledo

**✖ Dropbox** Sign

Audit trail

| | |
|---|---|
| **Title** | Grossman - Complaint Revised.pdf |
| **File name** | Grossman%20-%20Complaint%20Revised.pdf |
| **Document ID** | 222a3f34efab2544a2681011a071cf62a16c775b |
| **Audit trail date format** | MM / DD / YYYY |
| **Status** | ⊛ Signed |

 This document was requested from app.clio.com

## Document History

| | | |
|---|---|---|
| ↻ SENT | **06 / 30 / 2023** 13:28:40 UTC | Sent for signature to Gary Grossman (garygrossman08@comcast.net) from jjr@therubinsteinfirm.com IP: 107.147.213.27 |
| ◎ VIEWED | **06 / 30 / 2023** 13:49:26 UTC | Viewed by Gary Grossman (garygrossman08@comcast.net) IP: 96.70.94.154 |
| ↙ SIGNED | **06 / 30 / 2023** 13:59:42 UTC | Signed by Gary Grossman (garygrossman08@comcast.net) IP: 96.70.94.154 |
| ⊘ COMPLETED | **06 / 30 / 2023** 13:59:42 UTC | The document has been completed. |

Powered by ✖ Dropbox Sign

This case has been designated as an eFiling case, for more information please visit www.oakgov.com/efiling.

## STATE OF MICHIGAN
## IN THE OAKLAND COUNTY CIRCUIT COURT

GARY GROSSMAN,
an individual,
    Plaintiff,

Case No.: 2023-   -CZ
Hon.   2023-201199-CZ

JUDGE KWAME' L. ROWE

- vs -

THE CHARTER TWP. OF WEST BLOOMFIELD
a Michigan Municipal Corporation,
    Defendant.

_____/

THE RUBINSTEIN LAW FIRM
Jan Jeffrey Rubinstein (P57937)
Kevin M. Burton (P86626)
Attorney for Plaintiff
30665 Northwestern Hwy., Ste. 165
Farmington Hills, MI 48334
(248) 220-1415
jjr@therubinsteinfirm.com
kb@therubinsteinfirm.com

_____/

### JURY DEMAND

    Plaintiff, GARY GROSSMAN, hereby demands a jury trial in this matter pursuant to MCR 2.508(B).

                             Respectfully submitted,
                             THE RUBINSTEIN LAW FIRM

Dated: June 27, 2023

                             By:_____
                               Jan Jeffrey Rubinstein (P57937)
                               Attorney for Plaintiff