UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY GROSSMAN,

     Plaintiff,                                Case No. 23-11851

                                          Shalina D. Kumar
v.                                       United States District Judge

CHARTER TOWNSHIP OF
WEST BLOOMFIELD,

     Defendant.

---

## **<u>PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56</u>**

For the reasons stated in this Brief, Plaintiff requests that this Court grant Plaintiff's Motion for Summary Judgment. Pursuant to LR 7.1 and this Court's scheduling order, concurrence was sought prior to filing this motion and has been denied.

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES……………………………………………..……..3

STATEMENT OF ISSUES PRESENTED…………………………………5

STATEMENT OF MATERIAL FACTS……………………………………6

SUMMARY JUDGMENT STANDARD………………………………..21

LAW AND ANALYSIS……………………………………………..21

    I. THERE IS NO GENUINE DISPUTE THAT DEFENDANT VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHT TO PROCEDURAL DUE PROCESS…………………………………………………………….21

    II. THERE IS NO GENUINE DISPUTE THAT DEFENDANT VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS……………………………………………………………24

    III. THERE IS NO GENUINE DISPUTE THAT DEFENDANT MALICIOUSLY PROSECUTED PLAINTIFF………………………………………………26

    IV. THERE IS NO GENUINE DISPUTE THAT DEFENDANT TORTIOUSLY INTERFERED WITH PLAINTIFF'S CONTRACTS…27

RELIEF REQUESTED

# INDEX OF AUTHORITIES

**<u>Cases</u>**

*U.S. SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (internal citation omitted)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

*Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997)

*County of Sacramento v Lewis*, 523 US 833 at 840

*Mettler Walloon, LLC v. Melrose Twp*, 281 Mich.App. 184, 197, 761 N.W.2d 293 (2008)

*City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S. 188, 198-199, 123 S. Ct. 1389, 155 L. Ed. 2d 349 (2003)

*Collins v. City of Harker Heights*, 503 U.S. 115, 126, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992)

*Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001)

*Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976))

*Board of Regents v. Roth*, 408 U.S. 564, 570-71, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)).

*Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986).

*Handy-Clay v. City of Memphis, Tenn.,* 695 F.3d 531, 547 (6th Cir. 2012)

*Range v. Douglas, 763 F.3d 573, 588, 590 (6th Cir. 2014).*

*Dupuis v. Kemp,* 2006 Mich. App. LEXIS 457, 2006 WL 401125 *1 (Mich.App. Feb. 21, 2006)


*Young v. Motor City Apartments Limited Dividend Housing Association No. 1 and No. 2,* 133 Mich.App. 671, 675, 350 N.W.2d 790 (1984).

*Health Call of Detroit v. Atrium Home & Health Care Servs., Inc*., 268 Mich.App. 83, 706 N.W.2d 843; 268 Mich. App. 83, 706 N.W.2d 843 (2005)

*CMI Int'l., Inc. v. Intermet Int'l. Corp. 251 Mich.App. 125, 649 N.W.2d 808*; *251 Mich. App. 125, 649 N.W.2d 808, 812 (2002).*

*Lawsuit Financial, L.L.C. v. Curry*, 261 Mich. App. 579, 593, 683 N.W.2d 233, 241 (2004).


**Federal Statutes and Rules**

*Federal Rule of Civil Procedure 56(a)*

*Fourteenth Amendment, U.S. Constitution*

**STATEMENT OF ISSUES PRESENTED**

I.  WHETHER PLAINTIFF SHOULD BE GRANTED SUMMARY JUDGMENT BECAUSE – AS A MATTER OF LAW – DEFENDANT VIOLATED PLAINTIFF'S PROCEDURAL DUE PROCESS RIGHTS BY FAILING TO ISSUE NOTICE OF THE STOP WORK ORDERS, PLAINTIFF'S RIGHT TO APPEAL, OR THE REQUIRED CORRECTIVE ACTIONS TO LIFT THE STOP WORK ORDERS.

II. WHETHER PLAINTIFF SHOULD BE GRANTED SUMMARY JUDGMENT BECAUSE – AS A MATTER OF LAW – DEFENDANT VIOLATED PLAINTIFF'S SUBSTANTIVE DUE PROCESS RIGHTS BY TAKING ARBITRARY AND CAPRICIOUS ACTIONS AGAINST PLAINTIFF THAT KEPT PLAINTIFF FROM COMPLETING AND RESIDING IN HIS HOME FOR OVER THREE YEARS.

III. WHETHER PLAINTIFF SHOULD BE GRANTED SUMMARY JUDGMENT BECAUSE – AS A MATTER OF LAW – DEFENDANT MALICIOUSLY PROSECUTED DEFENDANT BASED ON ALLEGED ACTIONS AND VIOLATIONS THAT NEVER OCCURRED.

IV.     WHETHER PLAINTIFF SHOULD BE GRANTED SUMMARY JUDGMENT BECAUSE – AS A MATTER OF LAW – DEFENDANT TORTIOUSLY INTERFERED WITH PLAINTIFF'S LOAN AND CONSTRUCTION CONTRACTS, CAUSING PLAINTIFF TO BREACH HIS CONTRACTS AND DEFAULT ON HIS LOANS.

**STATEMENT OF MATERIAL FACTS**

Plaintiff is an individual who resides in Oakland County, Michigan and owns real property located at 6221 W. Maple Road, West Bloomfield, Michigan 48322. Defendant, Charter Township of West Bloomfield, ("WBT") is a municipal corporation formed under the laws of the State of Michigan and is physically located in Oakland County, Michigan.

Certain WBT municipal employees have conspired to intentionally and illegally injure Plaintiff by using their official government positions to apply and maintain two (2) Stop Work Orders ("SWO") on the Subject Property without explanation or any valid reason, halting rehabilitation work and effectively locking Plaintiff out of his home for almost three (3) years. Defendant has inflicted economic and non-economic injury for the past almost three (3) years, terrorizing Plaintiff with the threat of losing his home. Defendant has extorted Plaintiff to make duplicate payments and to pay for services not delivered, threatened Plaintiff with permanent loss of property rights, and has demanded that Plaintiff force his neighbor to act against his will. As will be explained, Defendant has prosecuted Plaintiff in the 48th District Court criminal division without merit. The Stop Work Orders have also caused Plaintiff to default on his construction loan, forcing Plaintiff to pay nearly three times the mortgage cost to a private lender. The Stop Work Orders halted construction when the interior walls were open and all attic insulation was removed,

6

threatening the condition of the Subject Property. Without climate control in the Subject Property for the past almost three years, some of the completed work within the Subject Property may need to be removed and redone, which further negatively impacts Plaintiff's ability to complete restoration work and to reside in the Subject Property. (See Exhibit A– Plaintiff's Complaint).

By way of background, the property that is the subject of this lawsuit (the "Subject Property") is a parcel of improved land commonly known as 6221 W. Maple, West Bloomfield Township, Michigan 48322. (See Exhibit B – Deed). The Subject Property is unique and is surrounded on all four sides by acres of undeveloped land and protected forest.

On March 26, 2019, Plaintiff purchased the Subject Property. At the time Plaintiff purchased the Subject Property, the Township had determined it to be uninhabitable with 22 pre-existing code violations including damaged electric service, mold, structural issues, rotted wood, damaged plumbing and 17 other violations, all of which were required to be corrected before the Township would issue a Certificate of Occupancy. See Exhibit C – List of Code Violations. On April 29, 2019, Plaintiff secured a construction loan to rehabilitate the house located on the Subject Property and correct all code violations for the sole purpose of Plaintiff moving into the code-compliant structure as his permanent home. (See Exhibit D – Loan Information). Beginning on or about May 22, 2021, in connection with the

proposed renovation work on the Subject Property, Plaintiff applied for and received necessary building permits from the Township, including, electrical, mechanical, indoor plumbing, and exterior sewer tap plumbing (the "Building Permits" – Exhibit E).

Shortly after securing the building permits, Plaintiff commenced rehabilitation work to correct all pre-existing Code violations. In reliance on the Building Permits issued by the Township, Plaintiff invested in excess of $100,000.00 to correct code violations and improve the Subject Property in conformance with building code. From the date Plaintiff purchased the Subject Property, the Township performed 20 inspections, determining steady correction of the pre-existing code violations. (See Exhibit F – Inspection List). As the Subject Property is landlocked, title includes an access easement (the "Access Easement") over an adjacent property to the north, owned by a neighbor (the "Neighbor's Parcel"). See Exhibit B – Deed Reflecting Easement. The Access Easement is the only authorized access to the Subject Property from Maple Road, which is the nearest public right of way. The Access Easement path over the Neighbor's Parcel consists of a single lane gravel road, and a small steel bridge with a clear span of only 8 feet (the "Bridge") crossing over a creek. The Bridge consists of structural steel beams spanning the creek, and a concrete deck roadway surface. While the steel beam structure of the bridge was structurally sound, the concrete deck surface was significantly disintegrated, with

much of the concrete missing entirely. This resulted in an uneven roadway and a 14-inch deep dip measured from the gravel bridge approach ramps to the center of the bridge roadway.

On one occasion, Plaintiff met at the Subject Property with a West Bloomfield Township Fire Department (WBTFD) Fire Inspector, David Goff.  This was the first of four meetings with WBTFD representatives to address fire safety at the Subject Property. The Fire Inspector expressed concern about WBTFD fire engines not being able to cross the Bridge to access the Subject Property because of the disintegrated concrete deck. Plaintiff reached out to WBTFD and met three more times at the site with the WBTFD Fire Marshal to determine whether or not firefighters and EMS support personnel could safely access the Subject Property.

June 3, 2020, was the date of the first Fire Marshal inspection. Plaintiff was informed that WBTFD fire engines, fire trucks and the aerial ladder truck *would not cross the bridge* with the disintegrated deck and the 14" deep dip because the equipment could get stuck on the bridge, not only becoming unavailable to fight a fire at the Subject Property, but also blocking other emergency response vehicles from access to the Subject Property. September 8, 2020, was the date of the second meeting with the Fire Marshal, and at this meeting Plaintiff presented an alternative access route that did not require crossing the Bridge. This alternative was rejected,

and the Fire Marshal reiterated WBTFD fire trucks and fire engines are not designed to travel off-road.

Beginning October 5, 2020, and continuing to October 12, 2020, Plaintiff maintained his easement by restoring the concrete deck on the Bridge at his sole cost and expense. The deck restoration allowed WBTFD, other first responders, and other invitees and guests to safely cross the Bridge and access the Subject Property. The owner of the neighboring parcel took no issue regarding the bridge maintenance work. The maintenance work made no alterations to the Bridge's steel beam structure. When the maintenance work was complete, the top surface of the restored Bridge deck was perfectly level and matched the top height of the gravel approach ramps at each end of the Bridge.

On December 2, 2020, Plaintiff met with the Township Environmental Manager and the Township Engineer at the Neighbor's Parcel and the Subject Property. The Environmental Manager expressed concerns. Several days later Plaintiff emailed the Environmental Manager requesting to meet and review his concerns. *There was no response to the meeting request.* April 9, 2021, was the third and final meeting with the Fire Marshal, and at this meeting the Bridge with the restored deck was presented for evaluation. The Fire Marshal said WBTFD equipment would cross the Bridge, subject to a load rating report showing it could support the weight of the WBTFD equipment. (See Exhibit G – Byron Turnquist's

Deposition Transcript at pp. 36-41). On May 18, 2021, the load rating report was completed and determined the restored Bridge was more than capable of supporting all legal loads allowed on a public roadway by the Michigan Department of Transportation (MDOT). The restored Bridge would allow the WBTFD safe access to the Subject Property. See Exhibit H – Load Rating Report. *On March 4, 2021, without any advance notice to Plaintiff, the Township informed Plaintiff the plumbing inspection scheduled for the following day was cancelled because of two secret Stop Orders, that were improperly executed and not served on Plaintiff by way of posting, despite WBT City Ordinances requiring such conduct.*

**Despite Plaintiff's request for an explanation, no additional information or details regarding the Stop Orders was provided, other than some inaccurate field notes and unclear site photos dated December 2, 2020.** Plaintiff subsequently learned that the two Stop Orders were placed months earlier, with the first placed on December 8, 2020, and the second on January 21, 2021. Municipal due process steps required for legal Stop Order placement are identified in multiple overlapping Township Ordinances and written standard procedures. The steps are described below sorted in chronological order of application. For added clarity the list of due process steps are grouped into four sequential phases: Immediate phase, Violation phase, Hearing phase, and Delivery phase.

Immediate phase: According to defendant's ordinances, Stop Orders may be placed immediately only when there is 'imminent danger[1]', or 'serious concern[2]' or 'imminent threat[3]' of dangerous construction or environmental harm. Even when circumstances do qualify for immediate placement of a Stop Order, the municipal due process steps described below must follow for the Stop Order placement to be legal. <u>The Stop Order placement is procedurally deficient because none of the required municipal due process steps followed the immediate placement of the Stop Orders</u>. At the time the Stop Orders were placed it was the middle of winter and there was no ongoing work activity, meaning work was already "stopped". There never was any 'imminent danger', or 'serious concern' or 'imminent threat'. For over 2-1/2 years following the initial inspection, Defendant has not required any specific work to be stopped, or for there to be any corrective action to resolve 'imminent danger', or 'serious concern' or 'imminent threat'.

Violation phase: Typical due process for initiating a Stop Order begins with the Violation phase. Upon discovery of a violation, a code enforcement case is opened, a code case number is assigned, a written courtesy notice or violation notice is drafted, and must be delivered to the accused by mail with return receipt requested. The notice must describe the ordinance violation, and the remedy necessary to

---

[1] WBT Ord Sec 1-12(a)
[2] WBT Ord Sec 8-308(c)
[3] WBT Ord Sec 20-111

correct the matter, and a deadline for correcting the violation. *A compliance recheck is performed a week after the initial visit.* The vast majority of code cases are resolved at this stage, without initiation of a Stop Order. Continuing non-compliance by the accused results in a final code compliance letter, stating that a municipal hearing will be scheduled to place a Stop Order if non-compliance continues. <u>The Stop Order placement is procedurally deficient because no code enforcement case was opened, no code case number was assigned, there was no courtesy notice or violation notice issued to the accused and nothing delivered by mail with return receipt requested. There was no notice describing the ordinance violation, and no description of the remedy necessary to correct the matter within a 5-day compliance deadline.</u> <u>*A compliance recheck was not performed a week after the initial visit.*</u> <u>There was no final code compliance letter stating that a municipal hearing will be scheduled to place a Stop Order if non-compliance continues</u>.

Hearing Phase: A written Notice of Hearing must be delivered to the accused 10 days prior to the hearing[4]. There are two possible hearing venues. A Stop Use Order hearing is before the Environmental Commission, at a regularly scheduled meeting. The Township Supervisor is required to concur if the Environmental Commission votes to affirm a Stop Use Order. A Stop Work Order hearing is before the full Township Board, including the Township Supervisor and all other elected

---

[4] WBT Ord 20-113(1)

officials, and takes place at a regularly scheduled meeting. Both types of Stop Order hearing notices must identify the ordinance noncompliance, that is the reason for the hearing. The hearing notice must specify the date, time, and location of the hearing. The hearing notice must state that a full day is allowed for the hearing, the accused has a right to counsel[5], right to bring witnesses[4], evidence[4], and experts[4]. The Township Board votes[6]. The Environmental Commission votes[7], and the Township Supervisor must concur in writing with the Environmental Commission vote.

The Stop Order placement is procedurally deficient because no written Notice of Hearing was delivered to the accused. There was no identification of the ordinance noncompliance that is the reason for the hearing. There was no specified date, time, or location for a hearing. There was no statement that a full day is allowed for the hearing, the accused has a right to counsel, right to bring witnesses, evidence, and experts. There never was a Township Board hearing, so no Township Board voted to place a Stop Work Order. There never was an Environmental Commission hearing, so no Environmental Commission voted to place a Stop Use Order. As there was no Environmental Commission hearing and no vote, the Township Supervisor did not concur in writing with an Environmental Commission vote to place a Stop Use Order.

[5] WBT Ord 20-113(1)(d)
[6] WBT Ord 20-113(3)
[7] WBT Ord 12-15(d)

Delivery Phase: If the Township Board votes to affirm a Stop Work Order, or if the Environmental commission votes to affirm a Stop Use Order, and the Township Supervisor concurs, the voting entity must create a public record[8] of the decision by entering it into the meeting minutes. The voting entity must deliver a written notice[9] of the decision to the accused. The actual Stop Order must be in writing. The written Stop Order must state the scope of the work to be stopped[10], and the corrective actions[10] that must be accomplished for work to be resumed. The written Stop Order must be delivered, including being posted[10] on the Subject Property. Compliance recheck inspections must follow posting of the Stop Order to determine compliance.

The Stop Order placement is procedurally deficient because there was no public record of a decision to place a Stop Order, and nothing entered into meeting minutes. There was no notice to the accused of the decision to place a Stop Order. *There was no Stop Order in writing*. There was no written description specifying the scope of the work to be stopped, and no written description specifying the corrective actions that must be accomplished for work to be resumed. No written Stop Order was delivered, and nothing was posted on the Subject Property. *There were no compliance recheck inspections to determine compliance.* (See Exhibit I re Stop Work Orders – Deposition Transcript of Brian Harris at pp. 38-50).

---

[8] WBT Ord 20-113(3)
[9] WBT Ord Sec 20-113(3)
[10] WBT Ord Sec 1-12(a)

**Plaintiff is unable to ascertain with certainty the substance of the reason for the two Stop Orders because there are no written violation notices, there were no hearings, and there are no written Stop Orders**. Plaintiff infers from Defendant's actions and documents that two (2) properties are likely involved, namely the Subject Property and the Neighbor's Parcel. Plaintiff infers from Defendant's actions and documents that lack of two (2) types of permits are likely involved, namely Building Department construction permits and Planning Development Services Department environmental use permits. Plaintiff infers from Defendant's actions and documents two (2) types of code or ordinance violations are likely involved, namely hazardous construction in violation of building code, and environmental impact, disturbance, or damage in violation of environmental ordinance. None of these potential factors are a substantive reason for a Stop Order on the Subject Property.

The Subject Property had all required building permits on the dates of the Stop Order placement, so lack of building permits is not a substantive reason for a Stop Order on the Subject Property. Defendant has refused to inspect permitted work at the Subject Property and therefore could not have knowledge of any dangerous or not-to-code construction on the Subject Property, so dangerous or not-to-code construction is not a substantive reason for a Stop Order on the Subject Property. As a result of Defendant's oversight, Defendant prosecuted Plaintiff in 48th District

Court alleging the Subject Property failed to have environmental use permits[11]. To address the issue of possible environmental harm, the 48th District Court ordered a reinspection of the Subject Property and the Neighbor's Parcel, the day following the dismissal. According to ordinance, this compliance recheck reinspection should have occurred 17 months earlier, 5 days after the initial site inspection on December 2, 2020. Plaintiff willingly agreed to the reinspection of the Subject Property, believing it would resolve the matter. The neighbor, who had been subpoenaed to appear in court, agreed to the reinspection of the Neighbor's Parcel.

On the date of the inspection, it was determined there was no environmental impact, disturbance, or damage on the Subject Property or the Neighbor's Parcel at the court-ordered reinspection. Confirmation of no impact, disturbance, or damage was by Defendant's Environmental Manager. This was the employee who performed the initial inspections, claimed environmental impact, disturbance or damage, and who initiated the first Stop Order on the Subject Property 17 months earlier. As it was determined there was no harm to the environment on the Subject Property, this is not a substantive reason for a Stop Order on the Subject Property. The work performed on the Neighbor's Parcel Bridge, restoring the concrete deck within the

---

[11] That case was dismissed by way of a plea to four (4) counts of double parking, at $175.00 each, despite no environmental permits being required.

footprint of the disintegrated deck and without alterations to the steel beam bridge structure, is considered maintenance, according to Defendant's ordinances.

Also, MDOT considers concrete deck replacement to be a standard type of steel bridge maintenance, called a shallow deck overlay. Maintenance work does not require building permits, so lack of building permits on the Neighbor's Parcel is not a substantive reason for a Stop Order on the Subject Property. The maintenance work performed on the Bridge deck is compliant with building code and is not dangerous. Specifically, the load rating of the Bridge performed by Plaintiff's licensed Professional Engineers to satisfy the Fire marshal's concerns states: "… *the culvert is more than capable of supporting all legal loads allowed by MDOT*." *See Exhibit F.*

The restored Bridge deck can certainly allow WBTFD fire engines and fire trucks to safely access the Subject Property. To ensure Plaintiff's load rating report was accurate, Defendant hired DLZ, another licensed Professional Engineer firm, to evaluate the Bridge and the Rowe engineering load rating report. ***The DLZ report confirmed load rating determined by Rowe***. (See Exhibit H).

Dangerous or not-to-code construction activity on the Neighbor's Parcel is not a substantive reason for a Stop Order on the Subject Property. No environmental use permits are required for maintenance work on an existing structure in an environmental feature area such as a creek. Lack of environmental use permits on

the Neighbor's Parcel is not a substantive reason for a Stop Order on the Subject Property. On June 28, 2021, Plaintiff requested EGLE Environmental Quality Analyst Robert Primeau to perform a site visit to the Subject Property and Neighbor's Parcel to give an independent expert opinion of the existence of an environmental harm on either property.

On July 14, 2021, EGLE performed the site visit. On September 22, 2021, Primeau completed a findings report stating: "**Based on our site investigation we have determined that the activities cited did not appear to cause impacts to wetlands**…" EGLE issued no violation, required no remediation, and there was no penalty assessed. This independent government expert opinion of no environmental harm was confirmed by the determination of no environmental harm at the court-ordered reinspection. Environmental impact, disturbance, or damage on the Neighbor's Parcel is not a substantive reason for a Stop Order on the Subject Property. **Since March 4, 2021, when Plaintiff was first made aware of the existence of the Stop Orders, Plaintiff has been unable to work on or otherwise make use of the Subject Property.**

Plaintiff has made every effort to resolve the situation without litigation by bringing government experts and licensed engineers to evaluate both properties and report their findings. *Plaintiff has met with every involved employee of Defendant to explain the procedurally and substantively defective Stop Orders, including the*

*Environmental Manager who made the initial accusation of damage and conceded there was none, the Building and Planning Department Directors responsible for enforcing the Stop Order ordinances and who illegally placed them, the Director of Human Resources, the Chief of Police, and the Township Supervisor Steve Kaplan.*

For 16 months Defendant had failed to reinspect the two properties for noncompliance, avoiding the determination that everything was compliant with ordinance and code. Defendant chose to ignore Plaintiff-initiated reports from government experts and licensed engineers. Defendant chose to not reinspect the properties showing willful ignorance of Plaintiff's compliance. <u>It has been proven Plaintiff's actions created no hazardous construction condition, and Plaintiff caused no harm to the environment</u>. Defendant was ordered to reinspect by the 48th District court and make the determination whether or not there was noncompliance. **When it was determined that everything was compliant with ordinance and code, Defendant simply refused to lift the illegal Stop Orders.** As of the date of this Complaint, Plaintiff has hired no less than six (6) law firms to address Defendant's concerns, and demand that the Township lift the illegal Stop Orders, but the Township has refused thereby necessitating the commencement of the instant action[12].

---

[12] Remarkably, things have gotten to this point following a conversation Plaintiff has with WBT Board Member Jim Manna, where Manna offered to look into the issues contemplated by this Complaint and help Plaintiff – Manna reached out to Twp. Supervisor Steve Kaplan, who informed Manna that Plaintiff **must sue the Township.**

Plaintiff's claims against Defendant are for declaratory relief, injunctive relief, violation of Constitutional Due Process, Malicious Prosecution, and Tortious Interference with a Contract. As there are no genuine disputes as to any material facts in this matter, Plaintiff is entitled to Summary Judgment as a matter of law.

## I. <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment under *Federal Rule of Civil Procedure 56(a)* is proper when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *U.S. SEC v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (internal citation omitted). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

## <u>LAW AND ANALYSIS</u>

## II. <u>THERE IS NO GENUINE DISPUTE THAT DEFENDANT VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHT TO PROCEDURAL DUE PROCESS</u>

The Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const, Am XIV, § 1.

The United States Supreme Court has interpreted this clause to "guarantee more than fair process," *Washington v. Glucksberg*, 521 U.S. 702, 719, 117 S. Ct. 2258, 117 S. Ct. 2302, 138 L. Ed. 2d 772 (1997), and to cover a substantive sphere as well, "barring certain government actions regardless of the fairness of the procedures used to implement them." *County of Sacramento v Lewis*, 523 US 833 at 840. In disputes over municipal actions, the focus is on whether there was egregious or arbitrary governmental conduct. *Mettler Walloon, LLC v. Melrose Twp*, 281 Mich.App. 184, 197, 761 N.W.2d 293 (2008), citing *City of Cuyahoga Falls, Ohio v. Buckeye Community Hope Foundation*, 538 U.S. 188, 198-199, 123 S. Ct. 1389, 155 L. Ed. 2d 349 (2003). The Due Process Clause was intended to prevent government officials "from abusing [their] power, or employing it as an instrument of oppression." *Collins v. City of Harker Heights*, 503 U.S. 115, 126, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992) (quotations and citations omitted).

There are two steps for determining due process claims. The first step is to "determine whether the interest at stake is a protected liberty or property interest under the Fourteenth Amendment." *Wojcik v. City of Romulus*, 257 F.3d 600, 609 (6th Cir. 2001) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)). If not, the court does not reach the second step, which is to determine whether the deprivation of that interest contravened the notions of due process. *Id.* (citing *Board of Regents v. Roth*, 408 U.S. 564, 570-71, 92 S. Ct. 2701,

33 L. Ed. 2d 548 (1972)).

Broadly speaking, procedural due process requires state actors to provide certain procedural protections before they deprive a person of any protected life, liberty, or property interest. Here, Plaintiff has a protected property interest that attaches to his ownership of the real property that is the subject of this dispute. As for the second step in the analysis, Plaintiff's property interests deprived by WBT contravened the notions of due process. It is undisputed that the Stop Work Orders were procedurally deficient because there was no public record of a decision to place a Stop Order, and nothing entered into meeting minutes. There was no notice to the accused (Plaintiff) of the decision to place a Stop Order. *There was no Stop Order in writing*. There was no written description specifying the scope of the work to be stopped, and no written description specifying the corrective actions that must be accomplished for work to be resumed. No written Stop Order was delivered, and nothing was posted on the Subject Property. There were no compliance recheck inspections to determine compliance. (Dep of Brian Harris) Plaintiff's deposition testimony supports this and further explains his interactions with various WBT officials. (See Exhibit J – Grossman Deposition Transcript). To date, no one from Defendant WBT has produced a written Stop Work Order, explained why two were issued, provided evidence that Plaintiff received notice of the orders or how to appeal them, or provided to Plaintiff what corrective actions were required to lift the Stop

Work Orders. As Plaintiff has established that there is no genuine dispute as to Defendant's violations of Plaintiff's right to procedural Due Process, Plaintiff is entitled to Summary Judgment in his favor pursuant to FRCP 56.

**III.     THERE IS NO GENUINE DISPUTE THAT DEFENDANT VIOLATED PLAINTIFF'S CONSTITUTIONAL RIGHT TO SUBSTANTIVE DUE PROCESS**

The substantive due process component of the *Fourteenth Amendment* bars "certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986). Substantive due process claims "often fall into one of two categories—claims that an individual has been deprived of a particular constitutional guarantee, or claims that the government has acted in a way that shocks the conscience." *Handy-Clay v. City of Memphis, Tenn.,* 695 F.3d 531, 547 (6th Cir. 2012) (punctuation modified). The United States Court of Appeals for the Sixth Circuit has "recognize[d] the difficulty of determining where conscience-shocking behavior resides on the continuum of actions" but has stated that a plaintiff may succeed on a claim in this second category by establishing that a government entity exercised its power in an "arbitrary and capricious" manner. *Range v. Douglas, 763 F.3d 573, 588, 590 (6th Cir. 2014)*.

Here, Defendant West Bloomfield Township has done exactly that. WBT's decision to issue two (2) Stop Work Orders against Plaintiff's property without

providing the order in writing, informing Plaintiff of his rights to appeal, and providing the exact corrective measures that need to be taken in order to have the orders lifted is not based on substantial evidence of any wrongdoing on the part of Plaintiff. The Stop Work Orders appear to have been issued based off the arbitrary and capricious actions of WBT's John Roda. Further, WBT and its officials, including Amy Neary, continued to violate Plaintiff's due process rights by making egregious demands (that changed several times) of actions Plaintiff was required to take with no confirmation that Plaintiff's completion of the list would result in the removal of the Stop Work Orders. To date, WBT has not produced any evidence of valid Stop Work Orders, either on writing or in any other manner. WBT has not produced any evidence supporting that it informed Plaintiff of his rights to appeal or allowed him to exercise rights to appeal. WBT continued to change the demands it claimed Plaintiff had to do, including coercing his neighbor to authorize a wetland determination study on the neighbor's property. Plaintiff paid fees to WBT for services that were never rendered. Instead of producing valid Stop Work Orders in writing, providing adequate notice of his rights, outlining the required corrective actions, or simply removing the illegal Stop Work Orders, Defendant instead initiated criminal charges against Plaintiff in the 48th District Court and continued to prohibit all work at the Subject Property, which effectively kept Plaintiff from residing in his home for over three (3) years. There is no genuine dispute as to

whether WBT provided sufficient evidence, let alone any evidence, that could serve as a rational basis for its decision to issue the Stop Work Orders and to not allow Plaintiff to cure them. As such, Plaintiff is entitled to Summary Judgment pursuant to FRCP 56.

## IV. THERE IS NO GENUINE DISPUTE THAT DEFENDANT MALICIOUSLY PROSECUTED PLAINTIFF

To sustain a claim of malicious prosecution of a civil proceeding the plaintiff must show: (1) the prior proceedings terminated in favor of the present plaintiff; (2) the absence of probable cause for the prior proceedings; (3) malice or showing that the proceedings were filed for a purpose other than to secure the proper adjudication of the claim; and (4) special injury stemming directly from the prior proceedings. *Dupuis v. Kemp,* 2006 Mich. App. LEXIS 457, 2006 WL 401125 *1 (Mich.App. Feb. 21, 2006), *see also Young v. Motor City Apartments Limited Dividend Housing Association No. 1 and No. 2,* 133 Mich.App. 671, 675, 350 N.W.2d 790 (1984).

All elements of Plaintiff's claims are met here. The criminal proceedings initiated against Plaintiff by Defendant were terminated in his favor. Plaintiff was charged for failing to have various environmental permits for alleged activity on alleged property, causing alleged damage, all of which never occurred. The charges brought against Plaintiff were initiated directly by WBT for improper purposes, which was actually to force Plaintiff's neighbor into authorizing a wetlands determination study to take place on the neighbor's property. The charges for

Plaintiff's failure to have various environmental permits for alleged activity were based on entirely made up or inapplicable township ordinances and polices (See Plaintiff's Deposition Transcript at pp. 68-76). There is no genuine dispute that Defendant's actions were malicious and were filed for purposes other than to secure the proper adjudication of the claim, as there was no valid claim made by WBT against Plaintiff. As a result, Plaintiff suffered further injury when the inspection that was ordered as a result of the criminal charges still did not result in the removal of the Stop Work Orders. Defendant has not produced any evidence to support any contention that its actions in initiating criminal charges against Plaintiff was in any way proper or legitimate. And there is no genuine dispute that Defendant was directly involved in criminal charges being brought against Plaintiff. Defendant is liable to Plaintiff for its malicious prosecution of Plaintiff, and Plaintiff is entitled to Summary Disposition.

## V. <u>THERE IS NO GENUINE DISPUTE THAT DEFENDANT TORTIOUSLY INTERFERED WITH PLAINTIFF'S CONTRACTS</u>

Under Michigan law, "tortious interference with a contract or contractual relations is a cause of action distinct from tortious interference with a business relationship or expectancy." *Health Call of Detroit v. Atrium Home & Health Care Servs., Inc.*, 268 Mich.App. 83, 706 N.W.2d 843; 268 Mich. App. 83, 706 N.W.2d 843 (2005) (citations omitted). The elements of the former are "(1) the existence of

a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant." *Id. at 849*.

To show an unjustified instigation of the breach by the defendant, the plaintiff "must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *CMI Int'l., Inc. v. Intermet Int'l. Corp. 251 Mich.App. 125, 649 N.W.2d 808*; *251 Mich. App. 125, 649 N.W.2d 808, 812 (2002)*. In the context of a motion for summary judgment, if the "defendant's conduct was not wrongful per se, the plaintiff must demonstrate specific, affirmative acts that corroborate the unlawful purpose of the interference." *Id*.

"To maintain a cause of action for tortious interference, the plaintiff must establish that the defendant was a 'third party' to the contract rather than an agent of one of the parties acting within the scope of its authority as an agent." *Lawsuit Financial, L.L.C. v. Curry*, 261 Mich. App. 579, 593, 683 N.W.2d 233, 241 (2004).

At all relevant times, Defendant was aware of Plaintiff's contracts with his loan companies and his contractors. Defendant was not a party to those contracts. Defendant's actions in initiating illegal Stop Work Orders against Plaintiff and by continuously refusing to allow Plaintiff to remedy the alleged issues directly and proximately caused Plaintiff to breach his contracts and default on his loans. Defendant's actions of instigating Plaintiff's breach of contracts by issuing the

invalid Stop Work Orders and prohibiting Plaintiff to have work performed on the Subject Property for over three years are entirely unjustifiable. Defendant has not provided a valid defense to its conduct and has not disputed that it tortiously interfered with Plaintiff's contracts. Defendants are liable to Plaintiff, and Plaintiff is entitled to Summary Judgment as a matter of law.

<u>**CONCLUSION AND RELIEF REQUESTED**</u>

WHEREFORE, for the reasons articulated herein, Plaintiff, Gary Grossman, respectfully requests that this Court grant its Motion for Summary Judgment, order any other such relief as deemed necessary and proper, and order the following:

a. Defendant shall immediately lift the Stop Work Orders, perform prompt and fair inspections, issue prompt and fair approvals, and allow the prompt granting of a Certificate of Occupancy;

b. Defendant shall declare both the subject and neighbor properties to be compliant with Township ordinances, and no further enforcement actions shall be taken;

c. Defendant shall pay to Plaintiff $9,000,000 (Nine Million Dollars) in damages;

d. Defendant shall work with Plaintiff to facilitate plans and permit approvals for the subject property improvement phases.

Respectfully submitted,
THE RUBINSTEIN LAW FIRM

By: */s/ Jan Jeffrey Rubinstein*
Jan Jeffrey Rubinstein (P57937)
Attorney for Plaintiff

Dated: May 31, 2024

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY GROSSMAN,

      Plaintiff,

v.

CHARTER TOWNSHIP OF
WEST BLOOMFIELD,

      Defendant.

Case No. 23-11851

Shalina D. Kumar
United States District Judge

---

**CERTIFICATE OF SERVICE**

The undersigned certifies that a copy of Plaintiff Gary Grossman's Motion for

Summary Judgment filed pursuant to Fed. R. Civ. P. 56 was served upon all counsel

of record herein at their respective email addresses on May 31, 2024.


              Signature:/s/ Rachel Caloia
                        Rachel Caloia