# PLAINTIFF'S EXHIBIT J

**Gary M. Grossman**

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY GROSSMAN,

     Plaintiff,

  -vs-

THE CHARTER TOWNSHIP OF
WEST BLOOMFIELD,

     Defendant.
_____/

Case No. 23-11851

HON. SHALINA D. KUMAR

VIDEOCONFERENCE DEPOSITION OF

GARY M. GROSSMAN

Taken by the Defendant, on the 10th day of April, 2024, at

30665 Northwestern Highway, Suite 165, Farmington Hills,

Michigan, at 1:05 p.m.

APPEARANCES:

| | |
|---|---|
| FOR PLAINTIFF:<br>(Via Videoconference) | MR. JAN J. RUBINSTEIN, ESQ. P57937<br>The Rubinstein Law Firm<br>30665 Northwestern Highway, Suite 165<br>Farmington Hills, Michigan  48334<br>(248) 220-1415<br>Jjr@therubinsteinfirm.com |
| FOR DEFENDANT:<br>(Via Videoconference) | MR. MATTHEW J. ZALEWSKI, ESQ. P72207<br>Rosati, Schultz, Joppich &<br>Amtsbuechler<br>27555 Executive Drive, Suite 250<br>Farmington Hills, Michigan  48331<br>(248) 489-4100<br>Mzalewski@rsjalaw.com |
| REPORTED<br>STENOGRAPHICALLY BY:<br>(Via Videoconference) | MS. CATHERINE M. COLLIER, CSR-1491<br>Certified Shorthand Reporter |

Gary M. Grossman

Page 2

INDEX

| ATTORNEY | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Mr. Zalewski | 4 | | | |
| Mr. Rubinstein | 91 | | | |

- - -

---

Gary M. Grossman

Page 3

EXHIBITS

| EXHIBIT | | PAGE |
|---|---|---|
| 1 | Satellite View Of Easement | 94 |
| 2 | Photos | 94 |
| 3 | Wetland Concern Inspection | 94 |
| 4 | E-mails | 94 |
| 5 | Wetland Determination Application | 94 |
| 6 | E-mails | 94 |
| 7 | Photo | 94 |
| 8 | Photo | 94 |
| 9 | Notice of Default and Right to Cure | 94 |
| 10 | Promissory Note | 94 |

(Exhibits Attached)

- - -

---

Gary M. Grossman

Page 4

Farmington Hills, Michigan
Wednesday, April 10, 2024
1:05 P.M.

- - -

GARY M. GROSSMAN
was called as a witness by Defendant and, being first duly sworn by the Notary Public/Certified Shorthand Reporter, testified as follows:

MR. ZALEWSKI: Good afternoon. This is the deposition of Gary Grossman in the matter of Grossman versus West Bloomfield Township, conducted pursuant to notice and all applicable rules.

DIRECT EXAMINATION

BY MR. ZALEWSKI:

Q  Good afternoon, Mr. Grossman.

A  Good afternoon.

Q  Could you spell your full name for the record?

A  Sure. It's G-a-r-y M-i-c-h-a-e-l G-r-o-s-s-m-a-n.

Q  Thank you very much.

Well, my name is Matthew Zalewski, and I represent West Bloomfield Township in this lawsuit. The purpose of the deposition today is just to ask you questions about the lawsuit. I will tell you this is probably going to be one of my shorter Plaintiff's deps, because you gave some very

---

Gary M. Grossman

Page 5

elaborate answers to written discovery, and I appreciate that. So we'll primarily be looking at filling in some blanks and getting some clarifications about a number of things this afternoon.

Now, before we get into it, have you had your deposition taken before?

A  I have once, yes.

Q  And when was that?

A  Probably six or seven or eight years ago.

Q  Okay. Was it in a lawsuit you were personally involved with as a party?

A  Yes, I was a party.

Q  What was the nature of that lawsuit?

A  It was a personal injury lawsuit relating to a fall down some stairs.

Q  All right. Do you recall who the other party was?

A  I don't recall their official legal name. It was in Detroit.

Q  Okay. Well, so -- I think you just -- I think you sat through the deposition that we had this morning of Mr. Harris; correct?

A  That's correct.

Q  So you had a chance to see the deposition in action. But just as a reminder, we do have a court reporter

Gary M. Grossman

Page 6

here keeping track of everything that we say. So I would just ask you to verbalize your questions instead of a nod or shake of the head so that we can get something that's actually a word into the court reporter's transcript.

Please listen carefully to the questions I ask. If you don't understand a question, let me know. I'm not here to trick you. I want to make sure we are answering the same questions here.

If you ever need a break, let me know. I will probably take one along the way, if we need one, depending how long we go. I just ask that, if there's a question pending at the time, you answer the question before we go on the break.

Do you have any questions about the procedure here today?

A   No. I think you've explained it clearly, Matt. I appreciate that. Thank you.

Q   Thank you.

Did you do anything to prepare for your deposition today?

A   I had a light lunch.

Q   As did I.

So did you review any documents before the deposition?

Gary M. Grossman

Page 7

A   Yes. I reviewed the original complaint and I reviewed my response to the first interrogatories. I have those two documents here.

Q   Okay.

A   And if I need to reference them, I'll identify which document that I'm referencing to assure that you and the court reporter will be able to make that reference.

Q   That's wonderful. That will make it easy, too, if I need to refer to one of them. We won't have to project it on the screen.

Did you speak to anybody prior to the deposition other than your attorney?

A   No.

Q   All right. Do you have any other documents in front of you besides those that you just mentioned?

A   Just my notepad.

Q   All right. And I take it there's nobody else in the room with you other than your attorney?

A   That is correct.

Q   Well, let's just start with a few basics. What's your home address?

A   My residence address?

Q   Yeah. Your residence, yeah.

A   I currently reside at 7450 Brynmawr Court in West

Gary M. Grossman

Page 8

Bloomfield, Michigan.

Q   All right. And then I understand you're connected with another property in West Bloomfield Township, the one involved in this case; correct?

A   Yes, that's the subject property.

Q   6221 West Maple Road?

A   That's correct, 6221 West Maple Road in West Bloomfield.

Q   Excellent.

I think when I refer to the property or the subject property or you refer to it, we can understand that that's probably -- that is the property that we're going to be talking about. Is that good for you?

A   That's good for me. I agree.

Q   The first property you mentioned, your home address, is that a property that you own?

A   It is not. It's my mother's residence.

Q   Okay. Do you own any other properties in West Bloomfield Township?

A   I do not.

Q   Or anyplace else?

A   I do not.

Q   What is your occupation?

A   I'm a real estate broker.

Gary M. Grossman

Page 9

Q   How long have you been in that role?

A   Since 1985.

Q   Prior to that, did you do anything else?

A   Prior to that, I was in school.

Q   Perfect.

Do you have any professional certifications?

A   I'm a licensed real estate broker. That's the primary license, yes.

Q   Do you have any in building trades?

A   In 1985, I was a licensed builder in the state of Michigan, but I've let that license lapse.

Q   Okay.

A   I was also a licensed -- I'm sorry. I was also a licensed real estate broker in the state of California, and I've let that lapse as I'm now residing in Michigan.

Q   When did you let the building license -- builder's license lapse?

A   Probably around 1986 or 1987.

Q   Okay. So not very long.

And why was that?

A   I really wasn't using it.

Q   What's your educational background? What's the highest level of education you've completed?

Gary M. Grossman

Page 10

A  I have an MBA from the University of Michigan in Ann Arbor.

Q  All right.  And where did you do your bachelor's?

A  Also University of Michigan.

Q  What was your concentration there?

A  It was a BGS degree, a Bachelor of General Studies, which is the widest possible liberal arts degree.

Q  Well, let's just jump into it.  So let's talk about the subject property.  How long have you owned the property?

A  Approximately five years.  March of 2019 is when I acquired it.

Q  When you acquired it, what was your intention in acquiring it?  And --

A  To --

Q  Go ahead, as long as you understand what I'm asking you.

A  Well, my intention was to complete the repairs necessary to achieve a certificate of occupancy and to move in and make that my final permanent home.

Q  All right.  At the time that you purchased it, it was not occupiable; correct?

A  That's correct.

It did not have a certificate of occupancy. There were 22 pre-existing code violations that must

Gary M. Grossman

Page 11

all be corrected before a certificate of occupancy can be issued.

Q  Right.

It's my understanding from the allegations in the lawsuit it's your position that all of those have been addressed?

A  No, that's not correct.

Q  Oh, it is not.  Okay.  Well, we'll get back to that in a moment.

Now, your property is kind of unique because it's got a Maple Road address, but it's not actually fronting Maple Road really, is it?  It's set back quite a far ways from the road, isn't it?

A  That's correct.  It's approximately half a mile from Maple Road.

Q  And that's to the north or to the south of Maple?

A  It's located approximately half a mile south of Maple Road.

Q  South.

And what is your access to the residence on that property?

A  The property is landlocked.  The sole access is via an easement that crosses over several other parcels that allows me access to the main road, which is Maple Road.

Gary M. Grossman

Page 12

Q  Now, through that easement, is there some sort of road or path?

A  Yes.  It can be considered a dirt path.  It's got gravel covering most of it.  And as part of the easement is a bridge that crosses over Pebble Creek.

Q  All right.  Is any part of this path or easement, to your knowledge, a public easement?

A  None of it is.

Q  All right.

A  Well, let me clarify that.  My access egress easement directly overlays the public utility easement that has the exact same footprint.

Q  Okay.  Do you have any materials, any drawings, that specifically show the path of the easement?  Survey?  Whatever.

A  So you're referring, Matt, to an official document or a licensed surveyor's document showing the entire easement path?

Q  Yeah, that would probably be the prime example of what I might be looking for.

A  So the answer to that is no.

I have a title to my property that identifies the easement in metes and bounds terms, and that includes the path over the neighbors' properties.

Gary M. Grossman

Page 13

Q  And --

A  And -- go ahead.

Q  You said you have the complaint in front of you; right?

A  I do.

Q  So Exhibit -- I believe it's Exhibit A to the complaint is a property description that has the legal description on it.  Is that legal description the metes and bounds description you're referring to?

A  Yes.  Yes.  I'm sorry.  The metes and bounds is a way of describing dimensions in real property.

Q  Absolutely.

So --

MR. RUBINSTEIN:  Let me -- I apologize, Matt.  I did want to let you know that I have, like, a satellite image.  Gary doesn't have it with him. But if you guys want to talk about it, I have a satellite image here that, I believe, does show the easement, if you want to have some place a picture --

MR. ZALEWSKI:  Yeah.  Is that something you've produced before or --

MR. RUBINSTEIN:  I'll be honest with you. I don't know.

Gary M. Grossman

Page 14

MR. ZALEWSKI: Okay. I don't think I've seen it.

MR. RUBINSTEIN: Okay. Well, if you want to take a minute, I can scan it over to you, if you want --

MR. ZALEWSKI: Yeah. Why don't we go off the record for a couple of minutes so you can do that. I'd like to take a look at it.

MR. RUBINSTEIN: All right. No problem.

(Pause had in the proceedings.)

BY MR. ZALEWSKI:

Q   All right. Well, we just are back on the record. And Mr. Rubinstein provided me the satellite view that we were just talking about before we went on the brief break.

And I am going to share my screen here. I know, Mr. Grossman, you have a copy of this in front of you as well. Can you see my screen? Is it showing the satellite view?

A   Yes. Yes, I see it.

Q   Excellent.

MR. ZALEWSKI: I will mark this Exhibit 1 for this deposition.

Jan, I will -- my usual practice is, I provide all the documents to the court reporter

Gary M. Grossman

Page 15

after the deposition, and, of course, I'll copy you on that.

MR. RUBINSTEIN: Okay. No problem.

BY MR. ZALEWSKI:

Q   So, Mr. Grossman, just to confirm, this is a satellite view of your property?

A   So at the bottom of the page where the blue Post-it note has a line saying "Subject Property," that is --

Q   Yes.

A   -- the property.

Q   Okay.

A   The caption above that is the "Neighbor's Parcel." And the parcel directly north of that, above that, is yet another parcel. That one. And the parcel above that is yet another parcel. And then, finally, the last parcel above that that touches Maple Road is the Montessori school that faces Maple Road. My easement path goes through all of those properties. And in this satellite image, the light gray line to the left of those parcels is the easement path.

Q   The light gray line?

A   Yeah.

Q   I think I'm having a little trouble -- I'm trying to

Gary M. Grossman

Page 16

figure out how can we best --

A   Well, if you move your cursor to the left --

Q   To the left?

A   To the left. A little bit more. A little bit more. So you're now -- so right there, that is the easement path. And that gray --

Q   Oh, okay.

A   Right. Going down there, exactly. So my easement --

Q   So we are looking -- just to describe it here. I've got my cursor pretty much all the way to the left of the Montessori parcel, pretty much riding alongside the rear of those individual homes or site condos, whatever they are, next to the Montessori. And there's a path that I see a curb cut going onto Maple; correct?

A   That's correct.

Q   Okay.

A   And that easement path goes for half a mile. It varies from 50- to 60-feet wide from the west edge of the properties that it crosses over.

Q   Okay. So I've moved my cursor here. I think I'm still along the path; correct?

A   That is correct.

Q   And I'm in the parcel directly above yours, directly

Gary M. Grossman

Page 17

to the north of yours.

A   That is correct.

Q   It's been labeled "Neighbor's Parcel" in this exhibit.

Who is the owner of this parcel?

A   The owner's last name is Daouk. D-a-o-u-k, I believe.

Q   I've certainly seen that name in the file. I believe he's a physician. He goes by Dr. Daouk?

A   Yeah. There's two brothers and the brothers own several parcels there. I don't know the exact ownership situation. But Dr. Daouk is certainly one of the owners.

Q   All right. Now, you mentioned that there is a bridge as part of this easement; correct?

A   That's correct.

Q   Where is that bridge?

A   Well, the bridge is almost exactly where your cursor is in the southwest corner of that parcel.

Q   Okay. Is it closer to the property line or --

A   It's almost exactly where your cursor is. I'm going to guess it's approximately a hundred feet north of the property -- of my north property line.

Q   So none of the bridge physically sits on your property?

Gary M. Grossman

Page 18

A  That's correct, none of it sits on my property. It's approximately a hundred feet away.

Q  As I'm sure you are well aware, this case also involves and this whole history of facts has involved issues regarding wetlands and environmental features. Are you aware if any of the area of this easement or surrounding this easement is wetlands? Right now I'm just asking do you know if there are wetlands in this vicinity. Then we can narrow it down if you do.

A  Sure. The short answer to your question, Matt, is I don't know, because there is no official designation of wetlands on either my property or the neighbor's parcel, the subject property or the neighbor's parcel. It's never been officially determined by West Bloomfield Township.

Q  I don't even know if it makes a difference, but I know there's been this term thrown around in this case, I think you heard it in the deposition this morning, an environmental feature setback. Do you know if any portion of this area of the property around the bridge is part of an environmental feature setback?

A  I do not know if there is an environmental feature setback. I suspect that there is no official

Gary M. Grossman

Page 19

environmental feature setback designation because there is no official wetlands determination to identify an environmental feature.

Q  Let's take a break from sharing for a moment. We'll get back to pictures, I'm sure, in a moment. But going back to your acquisition of the house. So there were 22 items that needed to be done; correct?

A  At minimum.

Q  At minimum. Was anything dealing with the bridge among the items that you understood needed to be done at the time that you purchased the property?

A  No.

Q  And yet at some point you became aware that the bridge seemed to need some repairs; correct?

A  Yes. I specifically invited the fire marshal of West Bloomfield Township to visit the site of the bridge to inspect it and determine whether West Bloomfield Township fire department vehicles, which would include EMS, could safely cross the bridge, and the fire marshal told me no.

Q  Okay. And was there anything that precipitated your request for them to come out?

A  Yes. Prior to my inviting the fire marshal to make

Gary M. Grossman

Page 20

that visit, a different officer within the fire department did a survey of proximity to fire hydrants to my property and could not find a nearby fire hydrant, paid a visit, and made a remark that the bridge may be a problem for the department's fire trucks to cross.

So I was quite concerned that, number one, I did not have a close by fire hydrant. And, number two, fire engines, fire trucks, and EMS vehicles may not be able to access my house because of the condition of the bridge.

Q  And about when did you have these interactions with the fire officials?

A  Give me just a moment. THE DEPONENT: Catherine, I'm reading from the complaint, page 7, paragraph 53. June 3rd, 2020, was the first date that the fire marshal paid a visit to my bridge.

Q  Okay. So once you have these interactions with the fire marshal, what was your response?

A  Following the first meeting with the fire marshal, I called the fire marshal out again a second time to show him a possible alternative access path for fire department vehicles to access my property. It was not a legal path. It would be trespassing over a

Gary M. Grossman

Page 21

Consumers Energy easement to the south of my property. And I walked the fire marshal to that area. And the fire marshal explained that the West Bloomfield Township trucks cannot go off-road. The area that I offered as an alternative path was an unpaved dirt easement, and he said that's not acceptable.

Q  Okay. So what did you do next?

A  And for the record, that was on September 8, 2020.

Q  Okay. So having learned that that was not acceptable, what was your next step?

A  My next step was to restore the concrete bridge deck back to the way it was originally so that the West Bloomfield Township fire trucks could safely cross.

Q  And if we're looking at your complaint, I believe you've noted that that was between October 5th and October 12th, 2020; correct?

A  That is correct.

Q  So you verify sitting here today that those would be the proper date echeances?

A  Yes.

Q  At that particular moment in time with respect to that list of items that needed to be done on the house, setting aside the bridge for a minute, what, to your understanding, remained to be done with the

Gary M. Grossman

Page 22

structure of the house itself in order to achieve a certificate of occupancy?

A  It's a very long list.  But, in general, all of the plumbing needed to be replaced.  All of the electrical needed to be replaced.  Most of the heating ductwork needed to be replaced.  Roof repairs were required.  Windows needed to be replaced.  It was an extensive list.

Q  So at this point in time, October of 2020, is the house basically gutted?

A  Significant amount of demolition was accomplished, but salvageable portions of the house were left as is.

Q  At the time that you undertook the bridge repairs, so staying in this October 2022 area, was there any work happening at the house itself at that moment in time?

A  Yes.

Q  And what work was, if you can remember?

A  Well, we're going back almost four years.  The work on the house was somewhat continuous in terms of repairing the roof, demolishing damaged portions of the house, removing old electrical, removing old plumbing, removing old heating equipment, and performing the repairs and installing the new

Gary M. Grossman

Page 23

equipment under the permits that were pulled to do that work.

Q  Okay.  Looking at the bridge work itself, did you contact the township at all about that work before causing it to be done?

A  No.  There was no need.  It's maintenance work.  Maintenance does not require permits.

Q  Okay.  Who performed the work?

A  I did with various helpers and assistants.

Q  Could you identify who the helpers and assistants were?

A  No.  They were mostly Craigslist workers.  And my brother loaned me some of his workers, and I don't remember any of their names.

Q  Now, with this work being done on the bridge, which you just told me was within Dr. Daouk's or Mr. Daouk's property, did you contact Mr. Daouk before doing the work?

A  No, I did not.

And I had no need to do that, either.  Because my dominant estate easement not only gives me the right to perform maintenance on my easement path, including the bridge, as the sole dominant easement holder, the sole user of the easement, I have the responsibility to perform that maintenance

Gary M. Grossman

Page 24

to allow access to my house.

Q  So after the work was completed -- I think I know the answer to this, but just for the record here.  After the work was completed, did you contact the township to inspect the work?

A  After the work was completed, I invited the fire marshal for a third meeting at the bridge site.  That was on April 9th, 2021.  Complaint paragraph 62.  At which point, the fire marshal said it looks good, but he needs to see a load rating report to assure that the bridge would be capable of carrying a heavy load of a fire truck.

Q  It's my understanding that the fire marshal has ultimately essentially given his blessing to the bridge; is that right?

A  Yes.  Following my hiring an engineer to perform a structural load rating report of the bridge, which determined it could carry all loads legally allowed on public highways in the state of Michigan.

Q  All right.  So as you're sitting here today, you don't have any more concerns about fire access to the residence; correct?

A  That's correct.

Q  And your understanding is that the fire department has no further concerns about it?

Gary M. Grossman

Page 25

A  That is my understanding, yes.

Q  All right.  But as we know from your complaint, there are some other people in the township who have concerns.

Now, you mentioned you had your third meeting with the fire marshal in April of '21.  But at some time between the completion of repairs in October of '20 and this fire marshal meeting, you had some other interaction with the township, didn't you?

A  Yes.

Q  And, I guess, at what point did you understand -- do you understand that the township became aware of the bridge renovation repairs?  I guess, the township, not counting the fire department.

A  Right, I understand the question.  Just give me a moment to look up the date here.  I want to give you a correct date.

It would be December 2nd, 2020, when the township engineer, Jason Rosell, and the township environmental manager, John Roda, visited the neighbor's parcel with the bridge and the subject property with my house.

Q  Do you have an understanding of why they were out there on December 2nd, 2020?

Gary M. Grossman

Page 26

A I don't have a clear understanding. Because their field notes indicate -- or John Roda -- the environmental manager's field notes indicated they were out there to inspect a sewer tap project, but they never looked at the sewer tap project.

Q And the sewer tap project, was that something on your property?

A Yes. Yes. That was to connect my residence to the municipal sewer.

Q Had you or an agent of yours called for an inspection of the sewer tap?

A Not at that time. The work was not completed.

Q Do you have an understanding of why they were supposedly coming out to look at the sewer tap?

A No.

Q But then they ultimately saw the bridge. Were you there when Mr. Roda and -- sorry. The other person?

A Jason Rosell.

Q Mr. Rosell, yes.
Were you there at all when they were there?

A Yes. I was there the entire time.

Q So what was the nature of your interaction with them that day?

A Jason Rosell offered some helpful advice regarding sedimentation control for the sewer tap work, which

Gary M. Grossman

Page 27

I then complied with. And John Roda expressed in a highly emotional manner great dissatisfaction with the maintenance work on the bridge and made allegations of wetlands disturbance.

Q Okay. What was the nature of those allegations of wetlands disturbance?

A I don't know, because there wasn't any.

Q So you're saying he just random -- in your mind, just kind of vaguely, broadly said that there had been wetlands disturbance?

A That was his claim on his field notes.
He also took photos of the bridge in the area that he alleged were wetlands, that he alleged work was done in that area, and that he alleged damage was result -- damage resulted.

Q And I know you mention that in your interrogatories, and there are some photos that you reference as part of your answer.

A That's correct.

Q Yeah, I'm just getting specific here.
So in your interrogatories, page 13, this is answer to number 13. Convenient, interrogatory 13 on page 13. I see there's a reference to document 27, Roda photos, where Plaintiff's position has always been that there's no wetland disturbance,

Gary M. Grossman

Page 28

and the possible wetlands Roda identified were on the neighbor's parcel.
So let me share my screen. You might have this in front of you as well. Are you seeing photos?

A I am now, yes.

Q Excellent.
So these are the photos that are attached as document 27 to your interrogatories. Are you familiar with these?

A I am. Because I demanded them of the township and they delivered these photos to me.

Q All right. This very first one in the first upper quadrant here of the first page -- is it a quadrant? How many are on there per page?
MR. RUBINSTEIN: Matt, bear with me --
BY MR. ZALEWSKI:

Q It's more than a quadrant. It's upper sixth.
MR. RUBINSTEIN: Matt, bear with me for a moment. We have a little bit of an obstructed view.
MR. ZALEWSKI: Okay.
MR. RUBINSTEIN: So I'm going to try to minimize all of us so that we can see the photo.
MR. ZALEWSKI: Sure.
MR. RUBINSTEIN: All right. I think we now

Gary M. Grossman

Page 29

have an unobstructed view. I can no longer see you, but I can see the full photo. Go ahead.
MR. ZALEWSKI: Okay. As long as you can hear me. I guess that's all that matters.
MR. RUBINSTEIN: But I want to see you.
MR. ZALEWSKI: I can see you.
MR. RUBINSTEIN: All right.
BY MR. ZALEWSKI:

Q So what we've got here, this appears to be some sort of a property line map here. Is there a reason that you included this in your interrogatory response packet?

A Sure. So for starters, the image that you're showing here is turned sideways.

Q Yeah.

A North is to the right and the top of the image is to the west.

Q Okay. I can rotate it counterclockwise.

A That's okay. I'll work with it.
The rest of the photos --

Q There we go.

A There you go.

Q Right. It's going to get a little smaller, though. Well, we'll do the best we can.
Okay. Let's get back to the far south of

Gary M. Grossman

Page 30

the property -- or the photo. So what exactly is this showing me?

A So the section that's marked "6221" is the subject property, and my home is at the bottom of that section below where the 6 appears. The red circle on the neighbor's property is the approximate location of the bridge. Well, no, higher. The larger red circle.

Q Is this your annotation, this circle?

A That's John Roda's notation.

Q Okay.

A So that's the location of the bridge, which crosses over Pebble Creek.

To the right and below the light blue area is a representation of a pond that Michigan EGLE experts determined was a man-made pond at one point, a swimming hole so to speak. And the lower smaller red circle, which is mostly on the subject property, seems to show part of that pond on the subject property. But, in fact, that is incorrect. None of the pond is on the subject property.

Q So there are quite a few photos that -- other photos beyond that one we just looked at. I'm not looking for a detailed description of each one, but in terms of these photos being attached in support of your

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

---

Gary M. Grossman

Page 31

suggestion that the wetland -- there's no wetland disturbance or that the photos depict areas that wouldn't be your responsibility, to what extent are these contributing? Are there any you want to particularly speak about potentially?

A Well, the photos were included by John Roda supposedly as evidence of some sort of construction activity in some sort of wetlands that caused some sort of environmental damage. The problem is, there was never any construction activity in wetlands. There were no wetlands on the subject property and there was no environmental damage. And that was confirmed by Michigan EGLE's experts who visited the property approximately seven months after the bridge was constructed at my invitation.

Q Okay. And have you provided documentation to support that?

A You'll have to be more specific with your question.

Q Regarding EGLE's determination.

A Sure. Just a moment. I apologize for the delay.

Q I apologize if I missed something. It may have just blended together with some other document.

A I don't know where it's --

THE DEPONENT: So this reference, Catherine, is in the complaint, paragraph 93.

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

---

Gary M. Grossman

Page 32

On July 14, 2021, Michigan EGLE performed a site visit. Robert Primeau -- P-r-i-m-e-a-u -- completed a findings report, that in that findings report says, quote, "Based on our site investigation, we have determined that the activities cited did not appear to cause impact to wetlands," unquote.

Q All right. Do you have a copy of that findings report?

A Yes. It was, of course, delivered to West Bloomfield Township. I'd be happy to send you another copy.

Q Going back to -- or sticking with, I guess, December 2nd, 2020, did Mr. Roda or Mr. Rosell give you any -- make any request of you to take remedial action related to the wetland disturbance that they identified?

A No.

Q Did they ever suggest to you that a stop work order might be placed on the property on that date?

A I don't recall.

I did reach out to John Roda several days later requesting to meet with him to address whatever concerns he had. And, number one, he denied a meeting. And, number two, I found out

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

---

Gary M. Grossman

Page 33

later he had already issued a stop work order the day before the meeting -- the day before my request.

Q I just want to -- before we move on to that point, I want to share my screen again.

A Sure.

MR. ZALEWSKI: And, by the way, I don't know that I specified it, but those photos that I put up a moment ago, we'll make those Exhibit 2 to the deposition.

BY MR. ZALEWSKI:

Q I should be sharing again. And I'm showing to you what has been produced in this case as documents Bates stamped Township 190 through 191. I honestly don't know if you've seen this before if you haven't looked through every page of discovery yourself. This is a summary of inspections on a particular permit or item, I suppose, wetland item. Do you think you've seen this before at all, Mr. Grossman?

A I can give you absolute assurance I've seen none of that.

Q Okay.

A That was not shared with me any information with regards to what their problem is with me, the subject property, or the neighbor's parcel or the bridge. I have not received a valid violation

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

Gary M. Grossman

Page 34

notice. I've not received any information on any ordinance that they believe I violated. And I've certainly not received any information on what needs to be corrected based on a violation of an ordinance.

Q  Okay. We will step through each piece of that one-by-one. Before we do, I just want to close out this December 2nd issue.

So I've scrolled to the bottom of this report here -- which, again, has been produced in the discovery even if you haven't seen it before -- where there's an entry from John Roda, where it says, about midway through, if you look at the third line, three-quarters of the way through the line, "JR and JR spoke to property owner Gary Grossman on-site and discussed violations and what processes and permitting would be required with what was discovered."

Are you suggesting -- as you sit here today are you suggesting that that's inaccurate?

A  Well, first of all, I have seen this particular document, just this portion of it. These were the field notes that I demanded of the township when I discovered the secret stop orders that were placed on the property.

Gary M. Grossman

Page 35

The wording, "spoke to property owner Gary Grossman on-site and discussed violations and what processes and permitting would be required," is a fairly generic description of John Roda's expression of discontent. He did not mention any specific ordinances or specific permits or certainly any remedial action. It was just a lot of screaming.

Q  Okay.

MR. RUBINSTEIN: Matt, before you go on to your next question, is this Exhibit 3?

MR. ZALEWSKI: Yes. Thank you.

MR. RUBINSTEIN: Okay.

MR. ZALEWSKI: I'm normally much better at announcing that in advance.

MR. RUBINSTEIN: No problem.

BY MR. ZALEWSKI:

Q  So after your encounter with Mr. Roda and Mr. Rosell on December 2nd, what was going on at the property? At that time, was there anything going on at the house?

A  Not much. It was December 2nd. It was the middle of winter. No work was being done on the bridge and very little work was being done on the house.

Q  You mentioned at some point you learned that there was a stop work order placed on the property. Can

Gary M. Grossman

Page 36

you tell me from your point of view when you first became aware of that?

A  I don't have the exact date in front of me, but it was approximately four months later. I believe it was in March of the following year. When I did complete the sewer tap plumbing work, requested an inspection. The inspection was scheduled. My plumbing subcontractor was ready for the inspection and it was cancelled the day before. And when I called up to ask why, I was informed there's a stop order on my house, which was bewildering to me because I didn't know anything about it.

So I went into the township hall that day, asked what was going on. They explained to me there was a stop order. They had no explanation for why I shouldn't have been informed. And the end result was, I wasn't going to get my inspection.

Q  So who is "they"? If you back it up a minute to before you walked into the township hall, who was the first person who communicated to you that there was a stop work order on the property?

A  I believe it was Daniel Vergun, permit coordinator for West Bloomfield Township.

Q  And then when you went to the township in person, who did you speak to?

Gary M. Grossman

Page 37

A  That's what I meant. I met with Daniel Vergun.

Q  Okay.

A  I don't recall who I communicated with over the phone, who contacted me to inform me my inspection wasn't going to happen.

Q  So it's your position that there was never any stop work order placed on the property; correct? I should say there was no, like, placard posted on the property that you ever saw; correct?

A  Well, there's well over a dozen steps that due process requires by law for them to issue a stop order. Pretty much none of them were followed, but certainly there was no written stop order posted on the property.

Q  Okay. That's the question I was asking.

And then you did not -- as far as you know, you did not receive any letters about the stop order?

A  I can assure you I received no letters.

Q  Did Mr. Vergun in that conversation that you had with him suggest to you any next steps that you could take?

A  No. That's not his position.

I asked for additional information. Because this was all new to me. And he provided me

Gary M. Grossman

Page 38

those field notes and he provided me the photographs, which would be respectively Exhibit 3 and Exhibit 2 to this deposition.

Q  Did you speak with anybody other than Mr. Vergun in that first visit to the township after learning about the stop work order?

A  My conversation was primarily with Daniel Vergun. There were other staff members in the building department permit area that observed what was going on because I was rather upset and a bit animated.

Q  Okay. After that initial conversation, I mean, what did you do next, if anything, regarding this stop work order issue?

A  I stopped work.

Q  Did you ever push back on the existence of the stop work order?

A  I tried to do everything I possibly could to meet with every individual who would be involved to resolve the matter and was completely unsuccessful.

So I met with Gordon Bowdell, Dan Roda -- or John Roda face-to-face to see if we could resolve this matter. And that was unsuccessful because they could not give me a solution that would result in the stop order being lifted. They presented all kinds of demands, but without identifying what the

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

Gary M. Grossman

Page 39

result would be if all the demands were met.

In addition, there was no basis for the demands because the stop order was placed without due process.

Q  Okay. But you never appealed the existence of a stop work order; correct?

A  As far as I know, there was no official stop work order. Nobody ever in three years has yet presented me with a written stop work order.

Q  But you were aware that one was being enforced nevertheless; right?

A  Yes. They refused to do inspections on my property.

Q  Okay. I'm going to share my screen again here. Make sure I'm sharing the right one first. Let's start with this one.

All right. You should be seeing an e-mail. The top page of the e-mail is an e-mail from Michelle Gartland to you dated Thursday, May 27th, 2021. Is that what you're seeing?

A  Yes, I see that.

MR. ZALEWSKI:  All right. We'll make this Exhibit 4, I think.

BY MR. ZALEWSKI:

Q  I want to scroll to the bottom of it first, roughly the bottom, the last e-mail in this particular

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

Gary M. Grossman

Page 40

chain. Down at the bottom of the page Bates stamped Township 171, you see there's an e-mail from Amy Neary to garygrossman08@comcast.net. Is that you, Mr. Grossman?

A  Yes, it is.

Q  "Subject: 6221 West Maple," as we move onto the next page, Township 172.

Are you familiar with this e-mail? Does it look familiar to you?

A  Oh, absolutely, yes.

Q  You've probably seen it quite a few times, haven't you?

A  I've seen it enough.

Q  All right. What is your understanding of this e-mail?

A  Well, my first understanding is, there's no legal basis for Amy Neary to make any demands of me whatsoever because no due process was followed in order to place the two stop orders that I believe are currently on my house.

Q  Okay. But understanding that's your position, what is your understanding of why Amy Neary sent you this e-mail?

A  Gross malfeasance.

Q  Okay. I'm just going to put it out there. Is this

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

Gary M. Grossman

Page 41

not an e-mail in which Amy Neary is telling you what you can do to resolve the situation of the stop work order on your property?

A  No. It's a list of demands, but it does not say if all these demands are met the stop order will be removed automatically. It says will consider. And even so, many of these demands are impossible to meet or are illegal.

Q  Well, so first -- on the first point, at the very bottom it's highlighted, "The first thing we would suggest you do is apply for a wetland determination and have it surveyed. Once you have that base information, you can begin to have your engineer work on the environmental and engineering approvals. The stop work order will remain in place until such time as we have approvable plans/permits for the grading and bridge repair work."

Is that not telling you precisely when the stop work order would be removed?

A  No, absolutely not.

Q  How is it not?

A  It says, "The stop work order will remain in place until such time as we have approvable plans." It does not say that if they have approvable plans then the stop order will be

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

Gary M. Grossman

Page 42

released.

Q   Okay. I understand where you're coming from. But did you ever ask for clarification of that sentence?

A   I had short discussions with Amy Neary. They were unproductive.

Furthermore, even if I believe that accomplishing every one of her demands would result in a stop order being lifted, many of the demands are impossible to accomplish or are illegal. One of the demands is, I'm supposed to coerce my neighbor into doing something against his will.

Q   Well, let's — we're going to get there, I promise you.

But to close the loop on this first point, did you ever submit plans or permits for the grading and bridge repair work?

A   No, absolutely not.

Q   Okay.

A   Because it's maintenance work. The ordinance says maintenance work does not require plans or permits.

Q   All right. So then your other position that you've taken here is that these requests, some or all of them, are impossible or illegal. So let's just walk through them.

A   Again, you're putting words in my mouth, Matt. Some

Gary M. Grossman

Page 43

of these demands are reasonable and I've complied with them.

Q   Well, let's —

A   Let's walk through them all.

Q   Let's walk through each one of them and see what your position is on each of them.

So number 1, "Environmental use permits (after the fact)." Item (a), "Apply for a wetland determination. Once determination is complete, it will need to be surveyed and identify the wetland boundaries. Environmental features setback, 100 year floodplain."

What's your reaction to this one?

A   She has no legal basis to demand that.

Q   And why do you believe that?

A   Because the township cannot unilaterally demand of a property owner that they get a wetland determination.

Q   What do you mean by "unilaterally demand"?

A   They can't just say to a property owner you have to get a wetlands determination. The procedure is —

Q   This — go ahead.

A   The procedure is, that the property owner has to agree to a wetlands determination authorization and then allow the township or a contractor of their

Gary M. Grossman

Page 44

choice to perform a wetlands determination, which will assuredly take away from the property owner their property rights permanently.

Q   Okay. Now, when you are saying "property owner," in this context, are you referring to yourself or are you referring to Mr. Daouk?

A   Both.

Because she demanded at different points a wetlands determination from me and a wetlands determination from Dr. Daouk. But she wanted me to coerce Dr. Daouk to agree to do this.

Q   Well, and what is your understanding as to why the wetlands determination was being requested?

A   I believe that Amy Neary wants to restrict property owners to having access to the full bundle of rights that they would otherwise enjoy.

Q   What is the basis of this belief?

A   She has been incessant about wetlands determination, which would likely take away property ownership rights by restricting access to any portion of a property that was determined to be wetlands and a 25-foot environmental feature setback.

Q   Is your understanding of this supposed incessance of Ms. Neary based on anything other than your own experience with her?

Gary M. Grossman

Page 45

A   That's it. I never met her before in my life.

Q   Okay. So to put it another way, are you aware of her requests of other properties that may or may not have wetlands?

A   I am not aware of any other circumstance in which she demanded a wetlands determination authorization of some other property owner without any basis.

Q   Okay. Despite that, did you ever apply for a wetland determination?

A   I was extorted to apply for a wetlands determination in order to get my permits renewed at a certain point in time.

Q   Okay. I'm just going to flip to another document here, Exhibit 5 we'll make it, which is entitled Wetland Determination Application. Is this document familiar to you, Mr. Grossman?

A   It is.

Q   Is this, in fact, your Wetland Determination Application?

A   It is.

Q   It says it was May 27, '21. Is this the only Wetland Determination Application you've ever submitted?

A   Yes.

Q   Did the township in any way respond to this

Gary M. Grossman

Page 46

application?

A  No.  They took my money and they did not perform any services.

Q  Do you have any reason as to why that may be the case, any understanding of the reason?

A  You're asking me to identify what Amy Neary is thinking.  I don't have the capacity.

Q  I'm sorry.  I've got to keep flipping through a few exhibits here.  This is the down side of the Zoom depositions, because we can't shuffle them as easily.

A  No worries.

Q  Exhibit 6 is going to be an e-mail chain starting with an e-mail from Michelle Gartland to you dated 9/29/21.  Do you see that?

A  I do.

Q  And if we scroll to the bottom, we see that same e-mail from April 29th that we looked at in the other exhibit.  It just looks like the chain -- a couple different chains start emanating from that e-mail.  Different highlighting in the documents, too.

You see at the bottom at Township 34 there's an e-mail dated August 26, '21 from Amy Neary.  It says, "Good morning.  Please advise of

Gary M. Grossman

Page 47

the status of your wetland determination re neighboring property owner permission.  If we do not receive a complete application (including neighboring property owner permission to enter their property) by September 15, 2021, we will be seeking elevated enforcement action to obtain compliance."

And the next e-mail above that, August 31st, says, "I've received your e-mail."

Does that seem familiar to you?

A  Yes, absolutely.

I have responded to every e-mail I've received from every West Bloomfield Township official, director or employee.

Q  So does this perhaps refresh your recollection as to why no action may have been taken by the township on the wetland application we just talked about?

A  The parcel identified for a wetland determination that I signed and paid for was for my neighbor's parcel.  I don't have the authority to allow a wetlands determination on somebody else's property.  West Bloomfield Township does not have authorization to enter somebody else's property and perform a wetlands determination without their authorization.  So despite my signing a wetlands determination authorization and paying the fee, they took no

Gary M. Grossman

Page 48

action, but they kept my money.

Q  But from this e-mail -- and I think you're saying it and I think you've recognized it here.  But from this e-mail, isn't it apparent that the reason the township didn't take any action, if that's the case, was because the property owner was not listed -- was not consulted about the application?

A  I think the property owner had no awareness that any of this was going on at all.

Q  Okay.  And isn't that kind of the crux of this discussion that's happening?  She's asking you the status of property -- neighboring property owner permission?

A  There's two issues going on here.  This issue is relating to a wetlands determination on the neighbor's parcel, which she demanded that I authorize and pay for without the neighbor's permission.  And now she's ordering me to coerce my neighbor into giving his permission to lose some of his property rights, and I refused.

Q  I'm not understanding how you're saying at the same time she was coercing you to give permission without your neighbor's permission at the same time she's asking you about the status of the neighbor's permission.  Help me understand your position more.

Gary M. Grossman

Page 49

A  She wants me to get the neighbor's permission to have a wetlands authorization -- a wetlands determination performed on the neighbor's property, and she's involving me in the middle of it.

Q  And that was -- but didn't this -- this is all emanating from that December 2nd, 2020, site visit of Mr. Roda, isn't it?

A  It must be.

But I don't see where the wetlands determination comes in.

Q  At which Mr. Roda, like it or not, identified wetlands disturbance; correct?

A  He claims he identified it.  Michigan EGLE denied it.  And approximately 17 months later when Roda finally performed his code compliance recheck inspection, he determined there was no evidence of any activity, no evidence of any wetlands damage, and, in fact, no wetlands on my property, on the subject property.  The wetlands that Roda was concerned about were on the neighbor's parcel.

Q  Where on the neighbor's parcel were those wetlands located?

A  The suspected wetlands are in the area of the artificial swimming pond that was dug out many, many years ago.  So they would be in the southwest corner

Gary M. Grossman

Page 50

of the neighbor's parcel, approximately east -- southeast of the bridge.

Q So if we go back to the photos that were marked as Exhibit 2 and we look at the one that said "6221" -- get it back on the proper orientation here -- are you suggesting that it's in the area of that smaller red circle what he identified?

A Well, I mean, this is kind of a difficult question to answer, Matt, because you're asking me to identify something that did not exist and where I think John Roda imagined it existed.

So based on the photographs he submitted and based on the field notes that are already part of this exhibit, I'm guessing that the circled areas are the ones that are of concern to Mr. Roda. The lower smaller circle is likely the area that he has expressed concern with because it's within the subject property, my property.

But subsequently it was determined there's no wetlands on my property, obviously no wetlands damage, and no evidence of any activity that would have caused damage.

Q Okay. And that's what I want to zero in on as well. So in that smaller circle area -- and let's just set aside whether it's on your property, the other

Gary M. Grossman

Page 51

property, both properties at the moment -- to your knowledge, was any work done in that region of the properties?

A The only work that was done is that I had a mini excavator on-site, a small track vehicle with a shovel on the front, that I was using to excavate the trench for the sewer tap line. But because of delays from the township, we instead used the excavator to dig holes to plant trees. And my operator drove the excavator in that area in the process of digging trees. That area is where my apple orchard is. And we planted probably six or seven new apple trees in addition to the ones that were pre-existing.

Q All right. And then in terms of the larger circle area, the red circle area, again, that's where the bridge is; correct?

A That is correct.

Q Again, understanding what you've said before about not being sure about what Mr. Roda was seeing or suspecting, is it your understanding that he believed there were wetlands issues within that circled area?

A I can't read John Roda's mind. And that area is a flowing creek. I'm not an expert on wetlands, but

Gary M. Grossman

Page 52

flowing water is not typically considered wetlands. Rather --

Q Is it -- you can finish.

A Rather it's the still water that is downstream from the creek that would be considered wetlands based on various criteria.

Q Is it potentially an environmental feature setback area?

A So an environmental feature can be a wetlands. It can be a creek. It can be a tree. I don't know how an environmental feature is identified, but certainly a wetlands is an environmental feature. And the environmental feature setback is an additional 25 feet from the edge of the determined wetlands.

Q Okay. So I'm going to take a break in a moment here, but just -- I want to wrap up this topic. With respect to the wetlands determination, if Mr. Roda saw wetlands issues around the bridge, why is it inappropriate for him to ask you to procure the wetlands survey?

A Because it's not my property.

Q You were just telling me earlier in the deposition about how you're the dominant estate of the easement and you can just go in as you please to perform

Gary M. Grossman

Page 53

maintenance. Why are you suddenly not -- would you not suddenly be on the hook if you had done something wrong?

A I didn't say I go in as I please. Those are your words, Matt, not mine.

What I said is, that I have the right to perform maintenance work on my easement and I have the responsibility as the sole dominant easement holder to perform that maintenance. I do not need the permission of the servient estate property owner, which would be Dr. Daouk. And, in fact, I could perform maintenance over his objection.

Q And then who is responsible if something about that maintenance activity is in violation of township ordinances?

MR. RUBINSTEIN: Objection. It asks for a legal conclusion.

You can answer.

THE DEPONENT: I'm not an attorney, Matt, but I would think it's the property owner.

Part of my rights and responsibilities as the dominant estate easement holder is to perform the maintenance to allow continuous access. It does not allow me to take away property rights of the owner by allowing a wetlands determination to be

Gary M. Grossman

Page 54

made on my neighbor's property.

MR. ZALEWSKI: Okay. Let's take a break there. Let's just say 10 minutes. We've been going a good solid hour and a half. Holy moly. You're very easy to talk to, Mr. Grossman. Yeah, just about 10 minutes. And then we'll come back for a bit.

(Pause had in the proceedings.)

BY MR. ZALEWSKI:

Q  All right. Mr. Grossman, I'm going to go back to sharing my screen. And this was what I had previously identified as Exhibit 4. Let's, as I promised, continue walking through these items that Amy Neary indicated needed to be completed. So we've talked about 1(a), the wetland determination.

What about 1(b), "Submit application for use permits"? And you see what it's required to do. What's your reaction to that?

A  So use permits is a shorthand for environmental use permit. What that means is, that you have a permit to perform work within an environmentally sensitive area. None of this is applicable. And none of this is applicable to West Bloomfield Township because the ordinances do not require maintenance work to have permits.

Gary M. Grossman

Page 55

So the wetland, EFS, floodplain, all that on Mr. Grossman's property, the subject property, and the property to the north with the bridge, which would be the neighbor's property, she's requiring me to get permits for both of those, which makes no sense at all, because there was no work at all on the subject property, and the work on the neighbor's property with the bridge was maintenance.

MR. RUBINSTEIN: Guys, I apologize. I have to pause this for just a minute, if you guys don't mind. Bear with me. Somebody just walked into my waiting room. Just bear with me for a moment, please.

MR. ZALEWSKI: Okay. We'll go off the record, then.

(Pause had in the proceedings.)

MR. ZALEWSKI: All right. We'll get back on the record and sharing the screen.

BY MR. ZALEWSKI:

Q  Mr. Grossman, we're talking about the use permits. Were you still in the middle of a thought when we broke or do you have anything more to say on that?

A  So item 1(b)(i), "The amount of disturbance (existing and proposed) within the wetland, EFS, and floodplain on Mr. Grossman's property and the

Gary M. Grossman

Page 56

property to the north."

The answer to that is zero. There's no disturbance whatsoever. There was no construction activity on my property at all. And the work on the bridge was done within the footprint of the existing bridge deck. In fact, we even built catwalks along the sides of the bridge so that all the workers can walk on the catwalks and not touch the ground.

Item (ii), 1(b)(ii), "Construction drawings of the bridge, including cross-section," is a ridiculous demand because I was not doing construction. I was restoring a disintegrated bridge deck back to the way it was, and that's maintenance.

Item 1(b)(iii), "Mitigation and restoration plans for the disturbance." Again, if there's no disturbance, there's no mitigation or restoration.

"EGLE permit." I invited EGLE to come out and inspect the situation, and they determined no permit was needed.

"FEMA permit." Again, EGLE indicated no FEMA permit was needed.

Would you like me to continue?

Q  I think that's good.

So you took action regarding EGLE and FEMA.

Gary M. Grossman

Page 57

Despite your position on sub items (b)(i), (ii), and (iii), did you submit anything to the township to try to resolve those issues?

A  There's nothing to resolve.

Q  Okay.

A  They're asking about disturbances and restoration plans when there is no disturbance and nothing to be restored.

Q  And, again, you never sought any sort of appeal of these requirements?

MR. RUBINSTEIN: I'm sorry. Can you repeat that question?

BY MR. ZALEWSKI:

Q  You never pursued an appeal of those requirements?

A  What I did is, I addressed some of the demands that made sense and had multiple conversations about the ones that did not make sense. And as I indicated earlier, I invited EGLE to come out and inspect the property and to create a report to satisfy those corresponding demands.

Q  Understood.

What about number 2, the "Engineering plan approval" items? Did you --

A  So "Engineering construction plan approval will be required for the new bridge."

Gary M. Grossman

Page 58

It's not a new bridge. The bridge has been there for decades. It's a structural steel bridge with a concrete deck roadway surface. The structural steel was untouched, still in place. And this was acknowledged by Michigan EGLE in their report.

"Bridge and shared access drive may need to be constructed to RCOC standards." That's Road Commission of Oakland County.

That would be approximately half a million to three-quarters of a million dollars in cost for a private driveway. Kind of an absurd demand. RCOC standards means you're going to have two roadways north and south, setbacks. It's ridiculous. It would cost a million dollars a mile to construct a road to RCOC standards, and I have half a mile of road. Plus a bridge, which would likely cost another couple -- few hundred thousand dollars to rebuild to RCOC standards. So that's just a bizarre threat that has no basis.

Q  Did you respond to the township's request for that in any way to that effect?

A  I didn't reconstruct the road or the bridge to RCOC standards.

Q  No. I mean, in terms of pushing back on the

Gary M. Grossman

Page 59

request, what did you do to do that, if anything?

A  I think I had multiple conversations with that. But there were many, many other issues.

The response from West Bloomfield Township was absent. The only response was, all of these demands must be met. And that was the point where the extortion occurred when my permits, which require activity within every six months or they have to be renewed -- and my permits were renewed by Daniel Vergun, permit coordinator, every six months without a problem, without a fee, until a certain point in time when I went to renew my permits and I was told, "We're not going to renew your permits unless you comply with every demand that Amy Neary has made."

These are building department permits and Amy Neary is planning and development services department. So somehow these two departments were colluding to force me to comply with all of these demands.

Now, when I went to have my permits renewed, there was only several days left before they were to expire, and I did not want my permits to expire. Because I had an uninhabitable house. At that point, it had no permits to do repair work.

Gary M. Grossman

Page 60

And I was fearful that the township could declare my home a nuisance. They could condemn it and eventually they could take it by eminent domain. So I was very concerned that I had permits in place.

I had to hire an attorney to meet with West Bloomfield Township to negotiate with them so that I could get my permits renewed. And my attorney was finally able to negotiate them down to just the wetlands determination survey authorization that you presented earlier and I had to pay fees to renew all my permits. And the only reason they expired is because of the illegal stop orders. I paid $695 to West Bloomfield Township for a wetlands determination survey authorization and to renew permits that the only reason they needed to be renewed was because of them.

Q  And just to be clear, when you said that this negotiation happened, negotiated the township down to just the wetland, that was just for purposes of renewal of the permits, keeping them active; correct?

A  That is correct.

Q  All right.

A  There's no way I would have agreed to a wetlands determination authorization. I had to sign it under

Gary M. Grossman

Page 61

duress.

Q  But the point being, this was not some global negotiation to resolve the stop work order issue?

A  This was just to get my permits renewed.

Q  Okay. Just being clear.

A  Yeah.

Q  I don't think we covered 2(a)(iii).

A  2(a)(iii).

Q  What are your concerns, if any, about that?

A  "A soil erosion and sedimentation control permit."

So this is an SESC permit that is required when earth is disturbed. Whether it is graded, excavated, or earth is added to a location, the township wants to assure that any erosion or sedimentation does not go into the water.

This is not applicable because no soil was moved. Nothing was graded. Nothing was added. Nothing was removed. All I did was put a new concrete deck into the footprint where the old disintegrated concrete deck was. It's not an applicable permit. And --

Q  Go ahead.

A  And no permit is required for maintenance, even in an environmental features area, according to West Bloomfield Township ordinance.

Gary M. Grossman

Page 62

Q Was there absolutely no activity on the soil around the bridge? Is that what you're telling me?

A Yes, that's correct.

Q All right. Help me understand, as I go to another couple of pictures here. These are two photos. I think, actually, they were presented in the deposition this morning.

MR. ZALEWSKI: I'm going to mark this one Exhibit 6, I think -- 7.

BY MR. ZALEWSKI:

Q Do you see that, Mr. Grossman?

A I see the exhibit. I see the photo, yes.

Q Okay. Is that a photo of the bridge that you —

A Yes.

Q — repaired?

And from this perspective, what are we looking at? Are we looking southward toward the residence of your property?

A Correct. Yeah.

Q Do you -- actually, I think this was a document that the township produced. So I'm sure I can find the answer. But do you have an idea of when this photo might have been taken?

A It was certainly taken before -- when I restored the deck and the bridge. I don't know what the date of

Gary M. Grossman

Page 63

the photo is.

Q Is it a fair and accurate representation of what the bridge looked like before you performed your repair activities?

A Yeah.

Q All right. Now, then, I'm going to switch to what we'll note is Exhibit 8. Again, this was a document that was produced in this morning's deposition as well. There's a note on it that's not mine. That's original to how it was presented in the last dep.

Do you recognize what's depicted in this photo, Mr. Grossman?

A Same bridge, same perspective.

Q All right. And I assume it's fair to say this is an after photo. This is after the repairs; correct?

A That is correct.

MR. RUBINSTEIN: Is this Exhibit 8, Matt?

MR. ZALEWSKI: Yes. Yes.

MR. RUBINSTEIN: All right.

BY MR. ZALEWSKI:

Q I would note in looking at the two photos, if I just quickly switch back to Exhibit 7, we see, fair to say, a lot of brush around the bridge? We see the bridge seemingly caving in toward the right of the photo. And then here we see the bridge

Gary M. Grossman

Page 64

reconstructed. I also notice all that brush is gone. There are some boulders there. Were those boulders there before and just obscured by the brush? I guess what I'm getting at --

A The boulders --

Q Yeah. Go ahead.

A I added the boulders.

Q Okay. Well, I guess what I'm getting at is, it looks like there was some sort of work done on the ground. I mean, you mentioned that there were catwalks so that people weren't touching the ground. But something was done on the ground, was there not?

A Well, to pour concrete, you have to create forms that are made of sturdy wood and plywood to hold the concrete. So, yes, some very minor excavation around the edges of that concrete to the north and the south, the bottom and the top of that roadway, were scratched out of the ramps that lead up to the bridge. And then after the forms were removed, the dirt and gravel that forms the ramp was pushed back into those voids. But other than that, nothing was added.

The photos indicate that the ramps went up. The bridge was lower than the approach ramps. The restoration of the deck leveled the roadway surface

Gary M. Grossman

Page 65

so that it was even with the tops of the approach ramps. It restored the disintegrated concrete. It also evened out the dips and the sideways bends so that the entire level surface -- entire surface of the deck was level.

Q Okay. I did just want to confirm that with you, too. Because from this before photo that I put back up here, it's kind of hard to tell what the material of the bridge is it's so deteriorated. I see dirt. I see what looks like concrete. It almost looks like wood. But the base of that originally was concrete; correct?

A So the way the bridge was constructed is, there are steel beams that run north/south. There are timbers that run east/west across those steel beams. Then there's a layer of plywood that covers the timbers and then there's concrete over the plywood.

Now, the bridge had been in poor shape for over 20, 30 years. And I've had conversations with the previous owners who had considered replacing the bridge because it was in bad shape back then. So what you're looking at here is a combination of bare concrete -- I'm sorry. Bare plywood where everything has been disintegrated or rolled off the bridge, some concrete, some dirt, and some plants

Gary M. Grossman

Page 66

that are growing in the disintegrated concrete and dirt.

(Pause had in the proceedings.)

MR. ZALEWSKI: All right. Back on the record.

BY MR. ZALEWSKI:

Q  Again, I apologize for my computer crashing. Before it did, you were -- the last thing I heard you telling me was basically about the layered materials of the bridge. Did I miss anything else that you may have said after I dropped off the deposition?

A  I don't know. But what I was explaining was, that what you were looking at in that photograph was a mix of disintegrated concrete, dirt, vegetation. And some of the plywood was bare because all the concrete had disintegrated and pushed off the bridge.

Q  All right. I really do think we were right at the end of the thought when that happened. So I guess the crash happened at a convenient moment.

So that was in connection with our discussion of item 2(a)(iii), the soil erosion and sedimentation control, in Exhibit No. 4.

And then that leaves one more item in Amy Neary's list of items that she asked you to resolve.

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

Gary M. Grossman

Page 67

And one was "Zoning approval," "Documentation of existing easement and permission from neighboring property owners to improve access drive/bridge must be submitted with your engineering and environmental applications."

Did you do that or do you have other responses to that?

A  Again, maintenance work on the bridge or on the roadway itself does not require permits. I can grade the road. I can add gravel to the road. I can plow the snow on the road. I can remove fallen trees that are blocking the road. None of that requires permits. The work on the bridge itself also doesn't require permits. And none of this requires permission from the neighboring property owners. It's both my responsibility -- it's my right and my responsibility.

Q  All right. So having surveyed all of those items -- I mean, it sounds like this has kind of been an ongoing back and forth. You submitted the wetland determination. I mean, you obviously had pushback from the township. You submitted EGLE, et cetera. But when it comes to you requesting from the township what it is that needs to be done, is it fair to say that that list of items is what keeps

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

Gary M. Grossman

Page 68

coming back to you --

A  I don't know.

Q  -- to resolve the stop work orders?

A  I don't know. In three years, I have never received a document that said, "If you do this, we will release the stop work orders."

I have received open-ended demands that simply say the stop orders will remain in place, but there's no assurance that the stop orders will be removed if these demands are satisfied. John Roda gave me a list of demands and then Amy Neary expanded on them. I have every reason to believe this will be a continuously moving set of goal posts and I may never get the stop orders removed, which is why we're in federal court.

Q  Okay. I really don't have a lot to ask about the next issue. But, of course, as you know, you were issued a ticket, a couple of them, for a variety of ordinance -- alleged ordinance violations back in September of 2021. Does that sound familiar to you?

A  Oh, yes, very. I appreciate your bringing this up, Matt. Thank you.

Q  I think the record of those is pretty much what it is. And you were very forthright in your answers to my questions in written discovery, and I appreciate

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

Gary M. Grossman

Page 69

that.

So I think the main question I had for you is, after the dismissal of these charges in exchange for the plea to the double parking charges, in the transcript of that hearing, there's discussion about further negotiations and the site visit that was going to happen. To what extent were there further negotiations between you and the township after that court date where the double parking charges were -- or plea was entered?

A  None.

Q  Okay.

A  And I'll elaborate.

Q  Please do.

A  For clarity, the demand list of Amy Neary included pretty much the neighbor's parcel with the bridge and the subject property with my house. All those demands applied to both. She wanted to see wetlands determination surveys on both properties. She wanted various environmental permits on both properties. She wanted EGLE and FEMA opinions on both properties.

The 48th District Court criminal prosecution of me for failing to have various environmental permits for alleged activity on

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

Gary M. Grossman

Page 70

alleged wetlands, causing alleged damage was all on the subject property, my property. The case was dismissed because there was no evidence, no witnesses. And while they subpoenaed the neighbor, Dr. Daouk, I suspect in the hopes that he would testify against me, he showed up, as he was obligated to do, but he refused to testify against me, instead took me out for dinner afterwards. That's the first time I met him.

The agreement as part of the dismissal was that there would be an inspection of the scene of the crime the following morning. And approximately nine representatives of West Bloomfield Township showed up to see the alleged damage. And what was determined at that visit was there was nothing there. There was no evidence of any activity. There was no evidence of any environmental damage on my property or the neighbor's property. And there was no evidence of any wetlands on the subject property, on my property.

And John Roda conceded that he can't bring a case before the environmental commission with a recommendation of no remediation. And foolishly I thought that must be the end of it. They'll release the stop orders. But nothing happened. No

Gary M. Grossman

Page 71

enforcement action was taken. No after-the-fact permit fees or permits were required. No fees or fines were paid. They found no wrongdoing for me on my property. And the dismissal was without prejudice. They have never refiled the case.

Q  But there were still the suspected wetlands on the Daouk parcel; correct?

A  I don't know what their suspicions were.

But they never took action on the Daouk parcel, either.

Q  Does that go back to the discussion we were having several -- within the past half hour or so about the red circle areas?

A  I mean, John Roda can circle anything he wants on a map. But if the township has a desire to do a wetlands determination on somebody's property, they have to have a valid legal reason for doing so. They can't just go about taking people's property rights without the ability to do so.

To my knowledge, because I'm sure I would have heard about it from Dr. Daouk, that property has never had a violation on it, certainly no citations. He's never been dragged into court. So this has been going on, Matt, for three years. No legitimate violations have been issued. No

Gary M. Grossman

Page 72

legitimate citations have been issued. No ordinances have been identified as having been violated. And yet the stop orders are still in place on my property.

Q  To your knowledge, has Dr. Daouk or anybody acting on his behalf done work on his property since October of 2020?

A  To my knowledge, no.

Q  You mentioned that Dr. Daouk took you out to dinner. Was that the day of the court plea hearing?

A  Yes.

Q  That would have been May 10th, 2022?

A  I believe that's correct, yes.

Q  Did you discuss this matter during that dinner?

A  No.

Q  Have you had any other conversations with Dr. Daouk about anything related to this matter at any time?

A  No.

Q  Realizing that it's probably a lengthy list and you can't catch it all, how many conversations would you say you've had with township employees or officials regarding this matter?

A  Well, as I've detailed in the complaint, I have had conversations with everyone from the permit coordinator, the environmental manager, the building

Gary M. Grossman

Page 73

department director, the environmental plan and services department director. I've met directly with township supervisor Steve Kaplan, the chief of police, the head of human resources for West Bloomfield Township. I've talked with Jim Manna to advocate on my behalf to get this situation fixed.

And after exhausting all of those efforts, Jim Manna reported back to me that Steve Kaplan said, "He's going to have to sue us."

Q  Did you have -- you mentioned you had direct conversation with Steve Kaplan?

A  Yes.

Q  How many times have you spoken with him?

A  I met with him face-to-face one time with the chief of police and the head of human resources. The chief of police Mike Patton and director of human resources Lanny Whetstone.

Q  Do you recall when that meeting occurred?

A  I don't have it in front of me, but it was prior to the criminal prosecution of me for the alleged activity, the alleged wetlands, and causing alleged damage.

In fact, that was to say, "Look, this is wrong. Your people are doing all this illegally. You need to stop it and lift the stop orders."

Gary M. Grossman

Page 74

Q  And what was the result of that meeting?

A  They prosecuted me as a criminal in 48th District Court with what I consider to be imaginary charges and citations that were issued by a code enforcement officer with citation issuing authority that signed the citation saying that he observed -- this will be Rick Goble.  He observed some sort of violation that clearly wasn't there.

Q  Okay.  At the meeting with supervisor Kaplan, did Mr. Kaplan say anything during that meeting?

A  He mostly listened to what I had to say.  I presented approximately 60 exhibits documenting the allegations that I had made in the complaint and in the various exhibits.

And his response was, "My people are too busy to be doing all this.  If this was real, this would be a seven-figure settlement." Those were his words.

Q  Okay.  Since the date of the property inspection after the prosecution, have you had any interaction with township people on the issues involved in this case?

A  So following the township's refusal to release the stop orders after inspecting and determining there was no wrongdoing on my part, I hired a law firm to

Gary M. Grossman

Page 75

negotiate with the township and the township in turn hired another law firm to negotiate with my law firm.  This went on for a year with no result until I fired that law firm, hired The Rubinstein Law Firm, who got results, and filed a complaint in court.

Q  All right.  You've been through a few law firms.  Did you fire them all prior to Mr. Rubinstein?

A  I've only fired one law firm.  The others have been exemplary.

Q  Yeah, I'm not going to pry into attorney-client stuff, but since you offered.

All right.  Just shifting gears a bit -- and I don't have too much more for you.  Going all the way back to that list of things that needed to be done to the house when you purchased it and at the time going back in time to when the stop work order is said to have been placed on the property back in December of 2020.  If that stop work order had not been placed and you had not stopped -- actually, you said you stopped work in March of '21; correct?

A  Yes.  I wanted to be fully compliant with the law.

Q  So in an alternative universe where the stop work order issue wasn't there, if you had continued

Gary M. Grossman

Page 76

working on the property from that point on, about how long do you anticipate it would have taken before you would have been ready to obtain a full C of O?  Recognizing you can't perfectly guess it, but what would be your estimate?

A  It's a difficult thing to estimate for two reasons.  First is that there was COVID, which caused extreme shortages of labor and extremely high cost for materials, if they were even available.

Secondly, as we did more and more demolition of damaged portions of the house, we found more and more work that needed to be done.  So it may be a year.  It may be a year and a half.  That's the best guess I can give you.

Q  Now, you mentioned you had a construction loan on the property; correct?

A  Correct.

Q  Not in this deposition, but you mentioned it in your discovery materials.

A  Yes.

Q  And at some point that loan went into default.  Am I right?

A  That is correct.

Q  At what point did it go into default in time, at what point in time?

Gary M. Grossman

Page 77

A  Give me just a second.  I'll give you the actual date.

Q  Absolutely.

MR. RUBINSTEIN:  Matt, I have the document in front of me.  Do you want me to assist the witness and hand it to him?  Or do you want me to let him --

MR. ZALEWSKI:  As long as we identify what's being handed to him, that's fine.

MR. RUBINSTEIN:  Sure.  I'm actually handing him, from the discovery response and the document produced, a letter dated July 5th, 2022, entitled "Notice of Default and Right to Cure."  I believe that's the answer to your question, but the witness can clarify.

THE DEPONENT:  Yes, that's correct.

BY MR. ZALEWSKI:

Q  Okay.  And what precipitated the default?

A  Well --

Q  I am looking at it now as well, but --

A  -- construction loans require construction.

Q  So at some point, the lender found out that construction was not ongoing?

A  Yes.

Q  And how did they find out that construction was not

Gary M. Grossman

Page 78

ongoing?

A  Well, the way a construction loan works is, a certain amount of work is performed, then it's inspected by the township.  When the inspection is approved, the contractor is due a payment.  And at that point, a draw on the construction loan is made and that draw is used to pay the contractor.  And then you move on to the next phase of construction.  Many, many months went by without me drawing money from my construction loan.

Q  So was there a specific period of time within which you would have had to have done so in order to avoid the default?

A  They were very, very generous with me with the time.  Partly because this was ongoing during COVID and they recognized that unusual circumstances were occurring.  So I don't know exactly what point they decided to issue a notice of default until I received the document.

Q  All right.  And then you ultimately ended up obtaining a different loan.  And I know you've included a Promissory Note in your discovery material packet dated August 1st, 2022.  And my understanding, that note then paid off the loan, the original loan, that you were in default on; is that

Gary M. Grossman

Page 79

right?

A  That is correct.

Q  And then you've been paying on that note?

A  I have.

Q  And that's just a straight-up loan?  That's not a construction loan?

A  So it's called a hard money loan, a private lender.

Q  Perfect.

MR. ZALEWSKI:  All right.  And just for the record, too, since we did reference that document, for a clean record, I'll introduce that Notice of Default as Exhibit 9 and the Promissory Note as 10.

BY MR. ZALEWSKI:

Q  You've itemized quite a few different damages.  I'm not going to go through all of them.  On page 17 of your interrogatory responses, you have quite a listing.  One of them is for property tax for three years.  Do you see that —

A  I do.

Q  — $42,000?

How do you claim that that property tax amount is caused by the events addressed in your complaint?

A  I've been paying $14,000 a year, approximately, in taxes for three years on a home that I cannot live

Gary M. Grossman

Page 80

in, cannot repair, cannot rent out or otherwise make any use of.  I was barely able to put a mortgage on it.  And yet I've been paying all these taxes without receiving benefits.

Q  But you would have been paying those taxes regardless of whether you were living in it or whether the stop work order was on it; correct?

A  I don't think I understand the question.

Q  The property tax is a constant.  You would have been paying those taxes no matter what the state of the property was, wouldn't you?

A  Yes.

Q  In fact, they very well may have increased the more work you accomplished on the property; correct?

A  Actually, they would have likely decreased, because I'm being taxed as an investment property as opposed to a primary residence because I'm not living in the property.

Q  So you're saying —

A  So for the last three years, I've been taxed at a much higher rate than otherwise would be the case.

Q  So you're saying you would have obtained the homestead exemption and submitted it for the PRE, principal residence exemption, at some point?

A  Right.

Gary M. Grossman

Page 81

In addition —

Q  Would that have been within the one- to one-and-a-half-year window that you estimated for the certificate of occupancy do you think?

A  Again, can you repeat the question?

Q  Sorry.  Sorry if that was too many thoughts together.

You had previously told me that your loose estimate of the time it would take for you to complete the repairs on the property, a year, year and a half, maybe more.  Would you have moved in as soon as the repairs were done and a C of O was granted?  Was that your intent?

A  Once I got the certificate of occupancy, yes, I would have moved in.

Q  And at that point, you would have filed for the principal residence exemption?

A  That's correct.

Q  Excess property insurance cost for three years, $18,000.  And you're attributing that to the state of the building; correct?

A  That's correct.

A construction project is very risky and very expensive to insure when the house is not occupied.  So I'm paying $9,000 a year for property

Gary M. Grossman

Page 82

insurance with a $10,000 deductible, which is approximately three times what I would be paying if I had a certificate of occupancy and a regular homeowners insurance policy. And I would get more --

Q  No. Go ahead.

A  -- if I had a regular certificate of occupancy and a regular homeowners insurance policy.

Q  Okay. You have $3,800 for a portable toilet for three years. You've kept one on the property during this whole period?

A  I've had to in anticipation of the stop order being lifted. I'm hoping that it would be resolved in the next month, the next month, the next month, the next month for three years.

Q  So you're making monthly payments on that. All right. Is that what it is, monthly payments?

A  Yes.

And, also, I do not have water turned on at the house, which is one of the code violations. The plumbing needs to be repaired before I have water. And I don't have a way of removing sewage because my tap into the municipal sewer has been stopped because the township has refused inspections. So I need a portable toilet on-site to keep the place

Gary M. Grossman

Page 83

sanitary.

Q  What about the items for electricity expense and natural gas expense? Why is that arising from what you've alleged in this complaint?

A  Because I've been paying money for electricity and natural gas, minor as it is, for the entire duration of when I cannot do work on the house, live in it or rent it out.

Q  I think the rest of those line items are self-explanatory. But then you have a note $1,837 is added each month as a result of continuing excess expense. What does that mean?

A  Well, for example, the property insurance at three times the cost of what it otherwise would be is continuing. Every month that goes by I'm continuing to pay these excess expenses. I'm continuing to pay a hundred dollars a month for a portable toilet. I'm continuing to pay excess costs for property insurance. I'm continuing to pay for the privilege of having an electric meter and a gas meter even if I don't use much electricity or gas.

Q  All right. So it's the incremental monthly cost of the items in that list that are still actively accruing in your mind?

A  The excess amount of mortgage interest that I'm

Gary M. Grossman

Page 84

paying because I was forced to default on my construction loan.

Q  So your noneconomic damages, am I reading the zeroes correct, $36 million, $1 million a month?

MR. RUBINSTEIN: Objection. It asks for a legal conclusion.

Go ahead.

MR. ZALEWSKI: Well, I'm reading the words on the paper.

BY MR. ZALEWSKI:

Q  So this is page 19 of your responses to our interrogatories, summary of noneconomic damages, $36 million based on $1 million a month since the stop orders halted renovation progress on March 4th, 2021.

MR. RUBINSTEIN: My objection was preserved in the written discovery and I'm just preserving it again here.

MR. ZALEWSKI: Understood, yeah.

BY MR. ZALEWSKI:

Q  So, Mr. Grossman, I've got your narrative here, but tell me how you get to that number.

A  I get to that number based on the pain and suffering that I've been enduring for three years. The terror of losing my house, getting my house foreclosed,

Gary M. Grossman

Page 85

going bankrupt. Losing years of my remaining lifetime as a result of West Bloomfield Township maliciously stalling and keeping me out of my house for no valid reason, no substance to any accusation, and violating due process. They're bullies and they're bullying me with impunity. None of these people involved, none of the individual employees, elected officials, appointed directors, care. It's not their money. There's no light at the end of the tunnel. No solution has been presented. Just a continuous campaign of terror.

Q  Are you afraid that if you satisfy that list of requests of Amy Neary that we've been through that even if you submit those materials that somehow this isn't going to close?

A  First of all, I don't believe it's possible for me to comply with every demand that Amy Neary has made. But even if certain of those demands were met, I don't believe that the stop orders would be released. All of the behavior, all of the actions of West Bloomfield Township have pointed to not acting. Following the dismissal of the 48th District Court criminal prosecution of me when they discovered no evidence of any actions, any wetlands, or any damage, their response was to do nothing.

Gary M. Grossman

Page 86

Their response was to do nothing for the previous three years. So, yes, I'm fearful that they would do nothing, very fearful, a million dollars a month fearful.

Q Why have you never gone to the building board or the zoning board or any of the appropriate boards that might be a venue for an administrative appeal of what the township is asking you to do?

A Well, first of all, I don't know if "appropriate" is the correct word.

The behavior of the township supervisor, appointed directors, managers and employees are federal crimes. The proper venue is the federal court system where we are now.

I don't have a written stop order. I don't have anything I can present to a board of appeals. I don't even know if this is a construction board of appeals matter or an environmental board of appeals matter. I have no information on it. And despite multiple law firms that I've hired to request that information, it's never been produced. I've never received a written stop order. I've never received a violation notice identifying which ordinance or ordinances I have violated.

Q Is that really true, though? I mean, you were cited

Gary M. Grossman

Page 87

under certain ordinances.

A Oh, I was cited. But they were made up -- made up accusations. The case was dismissed.

Q Okay. But the township did identify the ordinances that they are pursuing this under; right? You disagree with it, but they identified it.

A Well, pursuing or pursued? I mean, they pursued it. The case was dismissed. They did not follow up with "You still need to give us these -- you still need to apply after the fact for these permits." They've never required me to pay a permit fee. They've never had me pay a fine for after the fact. They've never identified any remediation, any damage. I've never seen anything that suggested I've done any wrongdoing in a legitimate document.

There's no solution for me because they've never presented a problem. That's what due process is supposed to resolve before it becomes a problem. I've never had a hearing before the environmental commission if an environmental stop use order has been placed on my property. I've never had a hearing before the township board if a building department stop work order was placed on my property.

Q All right. This morning you were in the deposition

Gary M. Grossman

Page 88

with Mr. Brian Harris, and there was some discussion of the vacant property registration and inspections. When was your last encounter with Mr. Harris, your last contact with him?

A My last contact with Brian Harris was a couple of months ago when he reached out to me to confirm whether I was living in the property or not. And I confirmed for him that I was not living in the property and never have.

And, also, at one point, he requested that I send him another copy of the mold remediation report by the mold inspector and the laboratory report from the certified lab that analyzed the mold, which was surprising to me because I had submitted that two years previously. But no --

Q All right. You said that he contacted you to find out if you were living at the property. Was this by phone? By e-mail? By some other form of communication?

A I don't recall specifically. He may have called me and left me a voicemail and I responded with a phone call.

Q Do you understand what was the purpose of that contact?

A The purpose of the contact was to determine whether

Gary M. Grossman

Page 89

I was living in the house or not.

Q In connection with whether it was a vacant property?

A I suppose that if I was living in a house that had a stop work order on it and did not have a certificate of occupancy, that would not look good for me. So I confirmed that I was compliant with the law.

Q All right. Have you been -- has it been being maintained as a vacant property in terms of registered with the township?

A I don't know about a registration process. I think that's something they do internally.

Q Has it undergone vacant property inspections since the time of the stop work order?

A To my knowledge, no.

When Brian Harris stopped doing his inspections because he believed that I had accomplished the necessary repairs for all of the items that he was qualified to issue violations for, he stopped coming around every 30 days, and no one else followed up. There have been a small handful of inspections, but they've been informal.

Q What do you mean by "informal"?

A So after I applied for my sewer tap permit, I did the work. The township had delayed issuing my permit. And the plumbing inspector came out to

Gary M. Grossman

Page 90

inspect the work informally, because there was a stop order on the property apparently, and said, "Everything looks good. You should tie the outdoor plumbing in with the indoor plumbing. Keep going."

He did not tell me there was a stop work order on the property at that time. I didn't find out about that until March when the plumbing work was completed and I called for an inspection. But the inspector showed up and looked at the work, informally approved it. And for the --

Q Any other -- what's that?

A The inspector, for the record, is Chuck Woodward, the plumbing inspector.

Q All right. Were there any other, quote, unquote, informal inspections that occurred?

A There was an occasion, and I don't have the address -- rather, the exact date, when John Roda walked through my entire property from the southeast corner through my east backyard, along the north side yard, walked up to the bridge, and then returned back to his starting point, not tracing his original path, but rather walking through my west-facing front yard, and then along the south side yard back to his point of entry onto my property. This was observed by a friend of mine who recorded it.

Gary M. Grossman

Page 91

Q Okay. And was this before or after the prosecution was resolved?

A This was well after. This was probably just several months ago.

Q Okay. Are there any other informal inspections or entries that you believe have occurred?

A Not to my knowledge.

Q All right. Thank you, Mr. Grossman. That is all I have this afternoon. I appreciate your time.

A Thank you, Matt. I appreciate your help with this.

MR. RUBINSTEIN: I'm going to ask just a few questions, if that's okay.

MR. ZALEWSKI: You sure can.

MR. RUBINSTEIN: Thank you.

CROSS-EXAMINATION

BY MR. RUBINSTEIN:

Q Mr. Grossman, you indicated that there was an inspection with about nine representatives of West Bloomfield the day after your criminal case was dismissed. Did I hear you correctly?

A That is correct.

Q And in that inspection, you indicated that there was no finding of any problems, issues, anything that needed to be corrected. Is that true?

A That is true.

Gary M. Grossman

Page 92

Q Now, from the time that the West Bloomfield officials originally came out to see the maintenance you did on the bridge through the time that they came out after your criminal prosecution, did you do any other work in that area?

A Did I do any other work on the bridge or in the alleged wetlands area?

Q On the bridge or around the bridge or around the wetlands.

A Yes. What I did is, I removed the catwalks and I installed the wooden side barrier railings along the sides of the bridge.

Q Okay. Did you correct or repair anything during that time frame after the maintenance was done through the prosecution of the criminal case?

A No.

Q Okay. Now, when you were charged with this criminal case, was there ever an identification of the specific detail regarding the alleged violations?

A No. It was referred to as, quote, actions, unquote.

Q Okay. And whether it was in those court records, or I should say those criminal records, or in any other record, have you ever seen anything from anybody at the city that specifically identified what they claim to be the detriment or potential damage or

Gary M. Grossman

Page 93

danger to the environment?

A No.

In fact, just the opposite. Michigan EGLE said there was nothing to remediate. And at that meeting following the dismissal of the case, John Roda said there was nothing to remediate.

Q Okay. Now, there were some questions that Mr. Zalewski asked you regarding whether or not you've appealed to any of the boards, the zoning board or the planning commission. When the stop work orders were put in place, or really at any time thereafter, were you ever given any notice of your appeal rights?

A None. I wasn't even aware that these appeal boards existed.

Q Were you ever given any reference to deadlines to appeal or dates of the initiation of those orders?

A No.

Q To this day, as you sit here under oath, can you tell us why the city of West Bloomfield thinks that you damaged the wetlands?

A No.

Q Now, the question was asked if you are — since the inspection after your criminal case, if there's been other vacant house inspections like there was

Gary M. Grossman

Page 94

previously, and you indicated to your knowledge no formal inspections.

A   That's correct.

Q   Now, have you requested the city come and inspect your property?

A   I made a request for an inspection prior to my 48th District Court criminal prosecution, which, of course, was denied because of the stop order. And I had Daniel Vergun, the permit coordinator, I believe, e-mail me. It may have been another employee. But I wanted to get it on record that I have again requested an inspection and it was again denied because of the stop orders.

Q   What kind of inspections have you requested, if you know?

A   Well, other than the original initial electrical inspection where the green approval sticker was presented earlier, I've only requested for the plumbing inspection for the sewer tap work.

MR. RUBINSTEIN: Okay. I have nothing further.

MR. ZALEWSKI: And I have nothing further, either.

(Deposition concluded at 3:52 P.M.)

(Documents were marked Exhibit Nos. 1-10 by

Gary M. Grossman

Page 95

the reporter.)

- - -

Gary M. Grossman

Page 96

CERTIFICATE OF NOTARY PUBLIC

STATE OF MICHIGAN )
) SS
COUNTY OF WAYNE )

I, Catherine M. Collier (CSR-1491), a Notary Public within and for the above county and state, do hereby certify that the foregoing videoconference deposition of GARY M. GROSSMAN was taken before me on Wednesday, April 10, 2024, at 30665 Northwestern Highway, Suite 165, Farmington Hills, Michigan; that I recorded stenographically the foregoing deposition as was given by the above-named witness; that the stenographic notes were transcribed by me; and that said transcript here now appearing is true and correct.

I do further certify that I am not a relative or employee of or an attorney for any party or financially interested in the action.

Catherine M. Collier, CSR-1491
Illinois License No. 084.004768
Notary Public, Wayne County, Michigan
My commission expires: October 29, 2029

Dated: April 17, 2024

Gary M. Grossman

| A | acquiring (1) 10:14 | advise (1) 46:25 | 22:11 55:23 78:3 79:22 83:25 | apparently (1) 90:2 |
|---|---|---|---|---|
| ability (1) 71:19 | acquisition (1) 19:6 | advocate (1) 73:6 | Amtsbuechler... 1:20 | appeal (6) 57:9 57:14 86:7 93:12,14,17 |
| able (4) 7:7 20:10 60:8 80:2 | acting (2) 72:5 85:22 | afraid (1) 85:12 after-the-fact ... 71:1 | Amy (16) 40:2 40:17,22 41:1 42:4 44:14 | appealed (2) 39:5 93:9 |
| above-named ... 96:12 | action (11) 5:24 32:15 35:7 47:6,15 48:1,5 56:25 71:1,9 96:17 | afternoon (5) 4:9,15,16 5:5 91:9 | 46:6,24 54:14 59:14,17 66:24 68:11 69:15 85:13,17 | appeals (3) 86:16,18,18 |
| absent (1) 59:5 | | agent (1) 26:10 | | appear (1) 32:6 |
| absolute (1) 33:19 | | ago (5) 5:10 33:8 49:25 88:6 91:4 | analyzed (1) 88:13 | APPEARANC... 1:14 |
| absolutely (7) 13:13 40:10 41:20 42:17 47:10 62:1 77:3 | actions (3) 85:20 85:24 92:20 | agree (3) 8:15 43:24 44:11 | animated (1) 38:10 | appearing (1) 96:14 |
| | active (1) 60:20 | | | appears (2) 29:9 30:5 |
| | actively (1) 83:23 | agreed (1) 60:24 | Ann (1) 10:1 | apple (2) 51:12 51:13 |
| absurd (1) 58:12 | activities (2) 32:6 63:4 | agreement (1) 70:10 | annotation (1) 30:9 | applicable (5) 4:12 54:22,23 61:16,21 |
| acceptable (2) 21:7,11 | activity (11) 31:8,10 49:17 50:21 53:14 56:4 59:8 62:1 69:25 70:16 73:21 | ahead (8) 10:16 13:2 29:2 43:22 61:22 64:6 82:6 84:7 | announcing (1) 35:14 | application (9) 3:7 45:15,19 45:22 46:1 47:3,16 48:7 54:16 |
| access (14) 11:20,22,24 12:10 20:10,23 20:24 24:1,21 44:15,20 53:23 58:7 67:3 | | | answer (11) 6:13 12:21 18:11 24:3 27:18,22 50:9 53:18 56:2 62:22 77:14 | |
| | | allegations (4) 11:4 27:4,5 74:13 | | applications (1) 67:5 |
| accomplish (1) 42:9 | actual (1) 77:1 | alleged (14) 27:13,13,14 68:19 69:25 70:1,1,14 73:20,21,21 83:4 92:7,19 | answering (1) 6:9 | applied (2) 69:18 89:23 |
| | add (1) 67:10 | | answers (2) 5:1 68:24 | apply (5) 41:11 43:8 45:8,10 87:10 |
| accomplished ... 22:11 80:14 89:17 | added (5) 61:13 61:17 64:7,22 83:11 | | anticipate (1) 76:2 | |
| accomplishing... 42:7 | addition (3) 39:2 51:13 81:1 | allow (5) 24:1 43:25 47:19 53:23,24 | anticipation (1) 82:12 | appointed (2) 85:8 86:12 |
| accruing (1) 83:24 | additional (2) 37:24 52:14 | allowed (1) 24:18 | anybody (4) 7:12 38:4 72:5 92:23 | appreciate (6) 5:2 6:18 68:21 68:25 91:9,10 |
| accurate (1) 63:2 | address (6) 7:22 7:23 8:16 11:11 32:23 90:16 | allowing (1) 53:25 | anyplace (1) 8:22 | approach (2) 64:24 65:1 |
| accusation (1) 85:4 | | allows (1) 11:24 | apologize (5) 13:15 31:20,21 55:9 66:7 | appropriate (2) 86:6,9 |
| accusations (1) 87:3 | addressed (3) 11:6 57:15 79:22 | alongside (1) 16:12 | | approvable (3) 41:16,23,25 |
| achieve (2) 10:19 22:1 | administrative... 86:7 | alternative (3) 20:23 21:5 75:24 | apparent (1) 48:4 | approval (4) |
| acknowledged... 58:5 | advance (1) 35:14 | | | |
| acquired (2) 10:12,13 | advice (1) 26:24 | amount (5) | | |

Gary M. Grossman

57:23,24 67:1 94:17
**approvals (1)** 41:14
**approved (2)** 78:5 90:10
**approximate (1)** 30:6
**approximately...** 10:11 11:14,17 17:22 18:2 31:14 36:4 49:14 50:1 58:10 70:12 74:12 79:24 82:2
**April (7)** 1:11 4:2 24:8 25:6 46:18 96:9,24
**Arbor (1)** 10:2
**area (24)** 18:6 18:21 21:3,5 22:15 27:13,14 30:14 38:9 49:23 50:6,16 50:24 51:10,11 51:16,16,23,24 52:8 54:22 61:24 92:5,7
**areas (3)** 31:2 50:14 71:13
**arising (1)** 83:3
**artificial (1)** 49:24
**arts (1)** 10:7
**aside (2)** 21:24 50:25
**asked (5)** 36:14 37:24 66:25 93:8,23
**asking (9)** 10:16 18:8 37:15 46:6 48:11,24 50:9 57:6 86:8
**asks (2)** 53:16

84:5
**assist (1)** 77:5
**assistants (2)** 23:9,10
**assume (1)** 63:14
**assurance (2)** 33:19 68:9
**assure (4)** 7:6 24:11 37:19 61:14
**assuredly (1)** 44:2
**attached (3)** 3:14 28:8 30:25
**attorney (7)** 2:2 7:13,19 53:19 60:5,7 96:16
**attorney-clien...** 75:11
**attributing (1)** 81:20
**August (3)** 46:24 47:7 78:23
**authority (2)** 47:19 74:5
**authorization ...** 43:24 45:6 47:21,23,25 49:2 60:9,14 60:25
**authorize (1)** 48:17
**automatically ...** 41:6
**available (1)** 76:9
**avoid (1)** 78:12
**aware (9)** 18:3,6 19:15 25:13 36:2 39:10 45:2,5 93:14
**awareness (1)** 48:8

**B**

**b (2)** 3:1 57:1
**Bachelor (1)** 10:6
**bachelor's (1)** 10:3
**back (33)** 11:8 11:13 14:12 19:5,6 21:13 22:20 29:25 32:13 36:18 38:15 50:3,5 54:6,10 55:17 56:13 58:25 63:22 64:20 65:7,21 66:4 67:20 68:1,19 71:11 73:8 75:15,17,19 90:20,23
**background (1)** 9:24
**backyard (1)** 90:19
**bad (1)** 65:21
**bankrupt (1)** 85:1
**bare (3)** 65:22 65:23 66:15
**barely (1)** 80:2
**barrier (1)** 92:11
**base (2)** 41:12 65:11
**based (8)** 32:4 34:4 44:24 50:12,13 52:5 84:13,23
**basically (2)** 22:10 66:9
**basics (1)** 7:21
**basis (6)** 39:2 40:17 43:14 44:17 45:7 58:20

**Bates (2)** 33:13 40:1
**beams (2)** 65:14 65:15
**bear (4)** 28:16 28:19 55:11,12
**behalf (2)** 72:6 73:6
**behavior (2)** 85:20 86:11
**belief (1)** 44:17
**believe (19)** 13:6 13:19 17:7,9 21:15 34:2 36:4,22 40:19 42:6 43:15 44:14 68:12 72:13 77:14 85:16,19 91:6 94:10
**believed (2)** 51:22 89:16
**bends (1)** 65:3
**benefits (1)** 80:4
**best (3)** 16:1 29:24 76:14
**better (1)** 35:13
**bewildering (1)** 36:11
**beyond (1)** 30:23
**BGS (1)** 10:6
**bit (6)** 16:4,4 28:20 38:10 54:7 75:13
**bizarre (1)** 58:19
**blanks (1)** 5:3
**blended (1)** 31:22
**blessing (1)** 24:14
**blocking (1)** 67:12
**Bloomfield (28)**

1:6 4:11,21 8:1 8:3,8,20 18:16 19:18,20 21:4 21:14 32:11 36:23 47:12,21 54:23 59:4 60:6,13 61:25 70:13 73:5 85:2,21 91:19 92:1 93:20
**blue (2)** 15:7 30:14
**board (7)** 86:5,6 86:16,17,18 87:22 93:9
**boards (3)** 86:6 93:9,14
**bottom (10)** 15:7 30:4 34:9 39:24,25 40:1 41:10 46:17,23 64:17
**boulders (4)** 64:2,3,5,7
**boundaries (1)** 43:11
**bounds (3)** 12:23 13:9,11
**Bowdell (1)** 38:20
**break (6)** 6:10 6:14 14:15 19:4 52:16 54:2
**Brian (3)** 88:1,5 89:15
**bridge (78)** 12:5 17:15,17,18,24 18:22 19:11,16 19:19,21 20:5 20:11,18 21:12 21:24 22:14 23:3,15,23 24:7,11,15,17 25:14,22 26:16

Gary M. Grossman

27:3,12 30:7
30:12 31:14
33:25 35:22
41:17 42:16
50:2 51:17
52:19 55:3,8
56:5,6,7,10,13
57:25 58:1,1,2
58:7,17,23
62:2,13,25
63:3,13,23,24
63:25 64:19,24
65:9,13,18,21
65:25 66:10,17
67:8,13 69:16
90:20 92:3,6,8
92:8,12
**brief (1)** 14:15
**bring (1)** 70:21
**bringing (1)**
68:21
**broadly (1)** 27:9
**broke (1)** 55:22
**broker (3)** 8:25
9:8,15
**brother (1)**
23:13
**brothers (2)**
17:10,10
**brush (3)** 63:23
64:1,4
**Brynmawr (1)**
7:25
**builder (1)** 9:11
**builder's (1)**
9:18
**building (8)** 9:10
9:18 38:8
59:16 72:25
81:21 86:5
87:22
**built (1)** 56:6
**bullies (1)** 85:5
**bullying (1)** 85:6
**bundle (1)** 44:15

**busy (1)** 74:16

**C**
**C (2)** 76:3 81:12
**California (1)**
9:16
**call (1)** 88:22
**called (7)** 4:6
20:22 26:10
36:10 79:7
88:20 90:8
**campaign (1)**
85:11
**cancelled (1)**
36:9
**capable (1)**
24:11
**capacity (1)** 46:7
**caption (1)**
15:13
**care (1)** 85:8
**carefully (1)** 6:6
**carry (1)** 24:18
**carrying (1)**
24:11
**case (19)** 1:4 8:4
18:3,19 33:12
46:5 48:5 70:2
70:22 71:5
74:22 80:21
87:3,8 91:19
92:15,18 93:5
93:24
**catch (1)** 72:20
**Catherine (5)**
1:24 20:15
31:25 96:6,21
**catwalks (4)**
56:6,8 64:11
92:10
**cause (1)** 32:6
**caused (4)** 31:8
50:22 76:7
79:22
**causing (3)** 23:5

70:1 73:21
**caving (1)** 63:24
**certain (5)** 45:11
59:11 78:3
85:18 87:1
**certainly (8)**
17:8,12 34:3
35:6 37:13
52:12 62:24
71:22
**certificate (10)**
10:19,24 11:1
22:2 81:4,14
82:3,7 89:4
96:1
**certifications (1)**
9:7
**certified (2)** 1:24
88:13
**certify (2)** 96:8
96:15
**cetera (1)** 67:22
**chain (3)** 40:1
46:13,19
**chains (1)** 46:20
**chance (1)** 5:24
**charged (1)**
92:17
**charges (4)** 69:3
69:4,9 74:3
**CHARTER (1)**
1:6
**chief (3)** 73:3,14
73:16
**choice (1)** 44:1
**Chuck (1)** 90:12
**circle (11)** 30:5,8
30:9,18 50:7
50:16,24 51:15
51:16 71:13,14
**circled (2)** 50:14
51:23
**circumstance ...**
45:5
**circumstances...**

78:16
**citation (2)** 74:5
74:6
**citations (3)**
71:23 72:1
74:4
**cited (3)** 32:6
86:25 87:2
**city (3)** 92:24
93:20 94:4
**claim (3)** 27:11
79:21 92:25
**claims (1)** 49:13
**clarification (1)**
42:3
**clarifications (...**
5:4
**clarify (2)** 12:10
77:15
**clarity (1)** 69:15
**clean (1)** 79:11
**clear (3)** 26:1
60:17 61:5
**clearly (2)** 6:17
74:8
**close (4)** 20:8
34:7 42:14
85:15
**closer (1)** 17:20
**code (4)** 10:25
49:15 74:4
82:20
**coerce (3)** 42:10
44:11 48:18
**coercing (1)**
48:22
**Collier (3)** 1:24
96:6,21
**colluding (1)**
59:19
**combination (1)**
65:22
**come (5)** 19:24
54:6 56:18
57:18 94:4

**comes (2)** 49:10
67:23
**coming (4)**
26:14 42:2
68:1 89:19
**commission (5)**
58:9 70:22
87:20 93:10
96:22
**communicate...**
36:20 37:3
**communicatio...**
88:19
**complaint (13)**
7:1 13:3,7
20:16 21:15
24:8 25:2
31:25 72:23
74:13 75:5
79:23 83:4
**complete (5)**
10:18 36:6
43:9 47:3
81:10
**completed (8)**
9:25 24:2,4,6
26:12 32:3
54:14 90:8
**completely (1)**
38:19
**completion (1)**
25:7
**compliance (2)**
47:6 49:15
**compliant (2)**
75:23 89:6
**complied (2)**
27:1 43:1
**comply (3)**
59:14,19 85:17
**computer (1)**
66:7
**conceded (1)**
70:21
**concentration ...**

Gary M. Grossman

10:5
**concern (3)** 3:5
  50:15,17
**concerned (3)**
  20:7 49:20
  60:4
**concerns (5)**
  24:21,25 25:4
  32:24 61:9
**concluded (1)**
  94:24
**conclusion (2)**
  53:17 84:6
**concrete (16)**
  21:12 58:3
  61:19,20 64:13
  64:15,16 65:2
  65:10,12,17,23
  65:25 66:1,14
  66:16
**condemn (1)**
  60:2
**condition (1)**
  20:11
**condos (1)** 16:13
**conducted (1)**
  4:11
**confirm (3)** 15:5
  65:6 88:6
**confirmed (3)**
  31:13 88:8
  89:6
**connect (1)** 26:8
**connected (1)**
  8:2
**connection (2)**
  66:21 89:2
**consider (2)**
  41:6 74:3
**considered (4)**
  12:3 52:1,5
  65:20
**constant (1)**
  80:9
**construct (1)**

58:15
**constructed (3)**
  31:15 58:8
  65:13
**construction (...**
  31:7,10 56:3,9
  56:12 57:24
  76:15 77:21,21
  77:23,25 78:2
  78:6,8,10 79:6
  81:23 84:2
  86:17
**consulted (1)**
  48:7
**Consumers (1)**
  21:1
**contact (7)** 23:4
  23:17 24:4
  88:4,5,24,25
**contacted (2)**
  37:4 88:16
**context (1)** 44:5
**continue (2)**
  54:13 56:23
**continued (1)**
  75:25
**continuing (6)**
  83:11,15,15,16
  83:18,19
**continuous (3)**
  22:21 53:23
  85:11
**continuously (1)**
  68:13
**contractor (3)**
  43:25 78:5,7
**contributing (1)**
  31:4
**control (3)** 26:25
  61:10 66:23
**convenient (2)**
  27:22 66:20
**conversation (4)**
  37:20 38:7,11
  73:11

**conversations ...**
  57:16 59:2
  65:19 72:16,20
  72:24
**coordinator (4)**
  36:22 59:10
  72:25 94:9
**copy (5)** 14:17
  15:1 32:8,12
  88:11
**corner (3)** 17:19
  49:25 90:18
**correct (57)** 5:22
  5:23 7:20 8:4,7
  10:22,23 11:7
  11:14 16:16,17
  16:23,24 17:2
  17:15,16 18:1
  19:8,16 21:17
  21:18 24:22,23
  25:18 27:19
  37:7,9 39:6
  49:12 51:17,18
  60:21,22 62:3
  62:19 63:15,16
  65:12 71:7
  72:13 75:22
  76:16,17,23
  77:16 79:2
  80:7,14 81:18
  81:21,22 84:4
  86:10 91:21
  92:13 94:3
  96:14
**corrected (3)**
  11:1 34:4
  91:24
**correctly (1)**
  91:20
**corresponding...**
  57:20
**cost (7)** 58:11,15
  58:17 76:8
  81:19 83:14,22
**costs (1)** 83:18

**counterclock...**
  29:18
**counting (1)**
  25:15
**county (4)** 58:9
  96:4,7,22
**couple (6)** 14:7
  46:20 58:18
  62:5 68:18
  88:5
**course (4)** 15:1
  32:10 68:17
  94:8
**court (17)** 1:1
  5:25 6:4 7:7,25
  14:25 68:15
  69:9,23 71:23
  72:10 74:3
  75:6 85:23
  86:14 92:21
  94:7
**covered (1)** 61:7
**covering (1)**
  12:4
**covers (1)** 65:16
**COVID (2)** 76:7
  78:15
**Craigslist (1)**
  23:12
**crash (1)** 66:20
**crashing (1)**
  66:7
**create (2)** 57:19
  64:13
**creek (5)** 12:5
  30:13 51:25
  52:5,10
**crime (1)** 70:12
**crimes (1)** 86:13
**criminal (11)**
  69:23 73:20
  74:2 85:23
  91:19 92:4,15
  92:17,22 93:24
  94:7

**criteria (1)** 52:6
**cross (4)** 2:2
  19:21 20:6
  21:14
**CROSS-EXA...**
  91:15
**cross-section (1)**
  56:10
**crosses (4)** 11:23
  12:5 16:21
  30:12
**crux (1)** 48:10
**CSR-1491 (3)**
  1:24 96:6,21
**curb (1)** 16:15
**Cure (2)** 3:11
  77:13
**currently (2)**
  7:25 40:20
**cursor (5)** 16:2
  16:11,22 17:18
  17:21
**cut (1)** 16:15

---

**D**

**D (2)** 1:5 2:1
**D-a-o-u-k (1)**
  17:6
**damage (14)**
  27:15,15 31:9
  31:12 49:17
  50:21,22 70:1
  70:14,17 73:22
  85:25 87:13
  92:25
**damaged (3)**
  22:22 76:11
  93:21
**damages (3)**
  79:14 84:3,12
**Dan (1)** 38:20
**danger (1)** 93:1
**Daniel (5)** 36:22
  37:1 38:7
  59:10 94:9

Gary M. Grossman

17:9,12 23:17 44:6,10,11 53:11 70:5 71:7,9,21 72:5 72:9,16

**Daouk's (2)** 23:16,17

**date (11)** 20:17 21:20 25:17,18 32:20 36:3 62:25 69:9 74:19 77:2 90:17

**dated (6)** 39:18 46:14,24 77:12 78:23 96:24

**dates (1)** 93:17

**day (9)** 1:11 26:23 33:2,2 36:9,13 72:10 91:19 93:19

**days (3)** 32:22 59:22 89:19

**deadlines (1)** 93:16

**dealing (1)** 19:11

**decades (1)** 58:2

**December (8)** 25:19,25 32:13 34:8 35:18,21 49:6 75:19

**decided (1)** 78:18

**deck (9)** 21:12 56:6,13 58:3 61:19,20 62:25 64:25 65:5

**declare (1)** 60:1

**decreased (1)** 80:15

**deductible (1)** 82:1

**default (10)** 3:11 76:21,24 77:13

77:18 78:13,18 78:25 79:12 84:1

**Defendant (4)** 1:7,11,19 4:6

**degree (2)** 10:6,7

**delay (1)** 31:20

**delayed (1)** 89:24

**delays (1)** 51:8

**delivered (2)** 28:12 32:10

**demand (8)** 43:14,16,19 56:11 58:12 59:14 69:15 85:17

**demanded (5)** 28:11 34:23 44:8 45:6 48:16

**demands (20)** 38:25 39:1,3 40:17 41:4,5,7 42:7,8,10 43:1 57:15,20 59:6 59:20 68:7,10 68:11 69:18 85:18

**demolishing (1)** 22:22

**demolition (2)** 22:11 76:11

**denied (4)** 32:25 49:13 94:8,13

**dep (1)** 63:10

**department (11)** 19:20 20:2,24 24:24 25:15 38:9 59:16,18 73:1,2 87:23

**department's ...** 20:5

**departments (1)** 59:18

**depending (1)** 6:12

**depict (1)** 31:2

**depicted (1)** 63:11

**DEPONENT (4)** 20:15 31:24 53:19 77:16

**deposition (23)** 1:9 4:10,22 5:7 5:21,24 6:21 6:25 7:13 14:23 15:1 18:19 33:9 38:3 52:23 62:7 63:8 66:11 76:18 87:25 94:24 96:8,12

**depositions (1)** 46:10

**deps (1)** 4:25

**describe (1)** 16:10

**describing (1)** 13:12

**description (6)** 13:7,8,8,9 30:24 35:4

**designation (2)** 18:12 19:1

**desire (1)** 71:15

**despite (4)** 45:8 47:24 57:1 86:19

**detail (1)** 92:19

**detailed (2)** 30:24 72:23

**deteriorated (1)** 65:9

**determination...** 3:7 19:2 31:19 41:11 43:9,9 43:18,21,24 44:1,9,10,13

44:18 45:6,9 45:10,15,18,22 47:1,17,20,23 47:24 48:15 49:3,10 52:18 53:25 54:15 60:9,14,25 67:21 69:19 71:16

**determine (2)** 19:19 88:25

**determined (10)** 18:15 24:18 30:16 32:5 44:21 49:16 50:19 52:14 56:19 70:15

**determining (1)** 74:24

**detriment (1)** 92:25

**Detroit (1)** 5:19

**development (1)** 59:17

**difference (1)** 18:17

**different (6)** 20:1 44:8 46:20,21 78:21 79:14

**difficult (2)** 50:8 76:6

**dig (1)** 51:9

**digging (1)** 51:11

**dimensions (1)** 13:12

**dinner (3)** 70:8 72:9,14

**dips (1)** 65:3

**direct (3)** 2:2 4:13 73:10

**directly (5)** 12:11 15:14 16:25,25 73:2

**director (4)** 47:13 73:1,2 73:16

**directors (2)** 85:8 86:12

**dirt (7)** 12:3 21:6 64:20 65:9,25 66:2 66:14

**disagree (1)** 87:6

**discontent (1)** 35:5

**discovered (3)** 34:18,24 85:24

**discovery (8)** 5:1 33:15 34:11 68:25 76:19 77:11 78:22 84:17

**discuss (1)** 72:14

**discussed (2)** 34:16 35:2

**discussion (5)** 48:11 66:22 69:5 71:11 88:1

**discussions (1)** 42:4

**disintegrated (...** 56:12 61:20 65:2,24 66:1 66:14,16

**dismissal (5)** 69:3 70:10 71:4 85:22 93:5

**dismissed (4)** 70:3 87:3,8 91:20

**dissatisfaction...** 27:2

**District (6)** 1:1,1 69:23 74:2 85:23 94:7

**disturbance (1...**

Gary M. Grossman

27:4,6,10,25 31:2 32:16 49:12 55:23 56:3,16,17 57:7

**disturbances (1)** 57:6

**disturbed (1)** 61:12

**DIVISION (1)** 1:2

**document (17)** 7:6 12:16,17 27:24 28:9 31:22 34:22 45:13,15 62:20 63:7 68:5 77:4 77:12 78:19 79:10 87:15

**documentatio...** 31:16 67:1

**documenting (1)** 74:12

**documents (7)** 6:24 7:3,15 14:25 33:12 46:21 94:25

**doing (7)** 23:18 42:11 56:11 71:17 73:24 74:16 89:15

**dollars (5)** 58:11 58:15,18 83:17 86:3

**domain (1)** 60:3

**dominant (5)** 23:21,23 52:24 53:8,22

**double (2)** 69:4 69:9

**downstream (1)** 52:4

**dozen (1)** 37:10

**Dr (11)** 17:9,12 23:16 44:10,11

53:11 70:5 71:21 72:5,9 72:16

**dragged (1)** 71:23

**draw (2)** 78:6,7

**drawing (1)** 78:9

**drawings (2)** 12:13 56:9

**drive (2)** 1:21 58:7

**drive/bridge (1)** 67:3

**driveway (1)** 58:12

**dropped (1)** 66:11

**drove (1)** 51:10

**ductwork (1)** 22:6

**due (6)** 37:10 39:4 40:18 78:5 85:5 87:17

**dug (1)** 49:24

**duly (1)** 4:6

**duration (1)** 83:6

**duress (1)** 61:1

---
**E**

**E (2)** 2:1 3:1

**e-mail (21)** 39:16,17,17,25 40:2,8,15,23 41:1 46:13,14 46:18,21,24 47:7,8,11 48:2 48:4 88:18 94:10

**E-mails (2)** 3:6,8

**earlier (4)** 52:23 57:18 60:10 94:18

**earth (2)** 61:12

61:13

**easement (31)** 3:3 11:23 12:1 12:5,6,7,11,12 12:14,18,23 13:20 15:19,22 16:6,9,19 17:15 18:7,7 21:1,6 23:21 23:22,24,24 52:24 53:7,8 53:22 67:2

**easily (1)** 46:11

**east (2)** 50:1 90:19

**east/west (1)** 65:15

**EASTERN (1)** 1:1

**easy (2)** 7:9 54:5

**echeances (1)** 21:20

**edge (2)** 16:20 52:14

**edges (1)** 64:16

**education (1)** 9:25

**educational (1)** 9:24

**effect (1)** 58:22

**efforts (1)** 73:7

**EFS (2)** 55:1,24

**EGLE (12)** 30:15 32:1 49:13 56:18,18 56:21,25 57:18 58:5 67:22 69:21 93:3

**EGLE's (2)** 31:13,19

**egress (1)** 12:10

**eight (1)** 5:10

**either (4)** 18:13 23:20 71:10 94:23

**elaborate (2)** 5:1 69:13

**elected (1)** 85:8

**electric (1)** 83:20

**electrical (3)** 22:5,23 94:16

**electricity (3)** 83:2,5,21

**elevated (1)** 47:6

**else's (2)** 47:20 47:22

**emanating (2)** 46:20 49:6

**eminent (1)** 60:3

**emotional (1)** 27:2

**employee (3)** 47:13 94:11 96:16

**employees (3)** 72:21 85:7 86:12

**EMS (2)** 19:21 20:9

**encounter (2)** 35:17 88:3

**ended (1)** 78:20

**enduring (1)** 84:24

**Energy (1)** 21:1

**enforced (1)** 39:10

**enforcement (3)** 47:6 71:1 74:4

**engineer (3)** 24:16 25:20 41:13

**engineering (4)** 41:14 57:22,24 67:4

**engines (1)** 20:9

**enjoy (1)** 44:16

**enter (2)** 47:4,22

**entered (1)** 69:10

**elaborate** ... 

**entire (6)** 12:17 26:21 65:4,4 83:6 90:18

**entitled (2)** 45:14 77:13

**entries (1)** 91:6

**entry (2)** 34:12 90:24

**environment (1)** 93:1

**environmental...** 18:5,20,22,24 19:1,3 25:21 26:3 31:9,12 41:14 43:7,11 44:22 52:7,9 52:11,12,13 54:19 61:24 67:4 69:20,25 70:17,22 72:25 73:1 86:18 87:19,20

**environmental...** 54:21

**equipment (2)** 22:24 23:1

**erosion (3)** 61:10,14 66:22

**ESQ (2)** 1:15,19

**essentially (1)** 24:14

**estate (7)** 8:25 9:8,15 23:21 52:24 53:10,22

**estimate (3)** 76:5 76:6 81:9

**estimated (1)** 81:3

**et (1)** 67:22

**evened (1)** 65:3

**events (1)** 79:22

**eventually (1)** 60:3

**evidence (9)** 31:7 49:16,17

Gary M. Grossman

70:17,19 85:24
exact (4) 12:12
  17:11 36:3
  90:17
exactly (5) 16:8
  17:18,21 30:1
  78:17
EXAMINATI...
  4:13
example (2)
  12:19 83:13
excavate (1)
  51:6
excavated (1)
  61:13
excavation (1)
  64:15
excavator (3)
  51:5,9,10
Excellent (3) 8:9
  14:21 28:7
excess (5) 81:19
  83:11,16,18,25
exchange (1)
  69:3
Executive (1)
  1:21
exemplary (1)
  75:10
exemption (3)
  80:23,24 81:17
exhausting (1)
  73:7
exhibit (24) 3:2
  13:6,6 14:22
  17:4 33:8
  35:10 38:2,3
  39:22 45:14
  46:13,19 50:4
  50:14 54:12
  62:9,12 63:7
  63:17,22 66:23
  79:12 94:25
exhibits (4) 3:14
  46:9 74:12,14

exist (1) 50:10
existed (2) 50:11
  93:15
existence (2)
  38:15 39:5
existing (3)
  55:24 56:5
  67:2
expanded (1)
  68:12
expense (3) 83:2
  83:3,12
expenses (1)
  83:16
expensive (1)
  81:24
experience (1)
  44:25
expert (1) 51:25
experts (2)
  30:16 31:13
expire (2) 59:23
  59:24
expired (1)
  60:11
expires (1) 96:22
explained (3)
  6:17 21:3
  36:14
explaining (1)
  66:12
explanation (1)
  36:15
expressed (2)
  27:1 50:17
expression (1)
  35:4
extensive (1)
  22:8
extent (2) 31:3
  69:7
extorted (1)
  45:10
extortion (1)
  59:7

extreme (1) 76:7
extremely (1)
  76:8

—————————
F
—————————
face-to-face (2)
  38:21 73:14
faces (1) 15:18
fact (11) 30:20
  43:8 45:18
  49:18 53:11
  56:6 73:23
  80:13 87:10,12
  93:3
facts (1) 18:4
failing (1) 69:24
fair (4) 63:2,14
  63:22 67:25
fairly (1) 35:4
fall (1) 5:15
fallen (1) 67:11
familiar (6)
  28:10 40:8,9
  45:16 47:9
  68:20
far (4) 11:13
  29:25 37:16
  39:7
Farmington (5)
  1:12,17,21 4:1
  96:10
fearful (4) 60:1
  86:2,3,4
feature (11)
  18:20,23,24
  19:1,3 44:22
  52:7,9,11,12
  52:13
features (3) 18:6
  43:11 61:24
federal (3) 68:15
  86:13,13
fee (3) 47:25
  59:11 87:11
fees (3) 60:10

71:2,2
feet (3) 17:22
  18:2 52:14
FEMA (4) 56:21
  56:22,25 69:21
field (6) 26:2,3
  27:11 34:23
  38:1 50:13
figure (1) 16:1
file (1) 17:8
filed (2) 75:5
  81:16
filling (1) 5:3
final (1) 10:20
finally (3) 15:17
  49:15 60:8
financially (1)
  96:16
find (5) 20:3
  62:21 77:25
  88:16 90:6
finding (1) 91:23
findings (3) 32:3
  32:3,8
fine (2) 77:9
  87:12
fines (1) 71:3
finish (1) 52:3
fire (30) 19:17
  19:20,22,25
  20:1,2,4,6,8,9
  20:9,13,18,20
  20:21,22,23
  21:2,3,14 24:6
  24:9,12,13,21
  24:24 25:6,8
  25:15 75:8
fired (2) 75:4,9
firm (7) 1:16
  74:25 75:2,3,4
  75:5,9
firms (2) 75:7
  86:20
first (23) 4:6 7:2
  8:16 20:17,21

28:13,13,14
  34:21 36:1,20
  38:5 39:14,24
  40:16 41:9,9
  41:10 42:14
  70:9 76:7
  85:16 86:9
five (1) 10:11
fixed (1) 73:6
flip (1) 45:13
flipping (1) 46:8
floodplain (3)
  43:12 55:1,25
flowing (2)
  51:25 52:1
follow (1) 87:8
followed (3)
  37:12 40:18
  89:20
following (7)
  20:21 24:16
  36:5 70:12
  74:23 85:22
  93:5
follows (1) 4:8
foolishly (1)
  70:23
footprint (3)
  12:12 56:5
  61:19
force (1) 59:19
forced (1) 84:1
foreclosed (1)
  84:25
foregoing (2)
  96:8,12
form (1) 88:18
formal (1) 94:2
forms (3) 64:13
  64:19,20
forth (1) 67:20
forthright (1)
  68:24
found (4) 32:25
  71:3 76:12

Gary M. Grossman

77:22
**four (2)** 22:20
  36:4
**frame (1)** 92:14
**friend (1)** 90:25
**front (9)** 7:15
  13:3 14:17
  28:4 36:3 51:6
  73:19 77:5
  90:22
**fronting (1)**
  11:12
**full (4)** 4:17 29:2
  44:15 76:3
**fully (1)** 75:23
**further (6)**
  24:25 69:6,7
  94:21,22 96:15
**Furthermore (...**
  42:6

_____ **G** _____
**G (2)** 4:5,5
**G-a-r-y (1)** 4:18
**G-r-o-s-s-m-a-...**
  4:18
**Gartland (2)**
  39:18 46:14
**Gary (7)** 1:3,10
  4:10 13:17
  34:15 35:1
  96:9
**garygrossman...**
  40:3
**gas (4)** 83:3,6,20
  83:21
**gears (1)** 75:13
**general (2)** 10:6
  22:3
**generic (1)** 35:4
**generous (1)**
  78:14
**getting (5)** 5:3
  27:20 64:4,8
  84:25

**give (11)** 20:14
  25:16,17 32:14
  33:19 38:23
  48:22 76:14
  77:1,1 87:9
**given (4)** 24:14
  93:12,16 96:12
**gives (1)** 23:21
**giving (1)** 48:19
**global (1)** 61:2
**go (26)** 6:12,14
  10:16 13:2
  14:6 21:4 29:2
  29:21,22 35:9
  43:22 50:3
  52:25 53:4
  54:10 55:14
  61:15,22 62:4
  64:6 71:11,18
  76:24 79:15
  82:6 84:7
**goal (1)** 68:13
**Goble (1)** 74:7
**goes (4)** 15:19
  16:19 17:9
  83:15
**going (42)** 4:24
  8:13 14:16
  16:8,15 17:21
  19:6 22:20
  28:22 29:23
  32:13 35:18,19
  36:14,17 37:5
  38:9 39:13
  40:25 42:12
  45:13 46:13
  48:9,14 52:16
  54:3,10 58:13
  59:13 62:8
  63:6 69:7
  71:24 73:9
  75:11,14,17
  79:15 85:1,15
  90:4 91:11
**good (11)** 4:9,15

  4:16 8:14,15
  24:10 46:25
  54:4 56:24
  89:5 90:3
**Gordon (1)**
  38:20
**grade (1)** 67:10
**graded (2)** 61:12
  61:17
**grading (2)**
  41:17 42:15
**granted (1)**
  81:13
**gravel (3)** 12:4
  64:20 67:10
**gray (3)** 15:21
  15:23 16:6
**great (1)** 27:2
**green (1)** 94:17
**Gross (1)** 40:24
**Grossman (21)**
  1:3,10 4:10,11
  4:15 14:17
  15:5 33:18
  34:15 35:2
  40:4 45:16
  54:5,10 55:20
  62:11 63:12
  84:21 91:8,17
  96:9
**Grossman's (2)**
  55:2,25
**ground (4)** 56:8
  64:10,11,12
**growing (1)** 66:1
**guess (10)** 17:22
  25:12,14 29:4
  32:13 64:4,8
  66:19 76:4,14
**guessing (1)**
  50:14
**gutted (1)** 22:10
**guys (3)** 13:18
  55:9,10

_____ **H** _____
**H (1)** 3:1
**half (9)** 11:14,17
  16:19 54:4
  58:10,16 71:12
  76:13 81:11
**hall (2)** 36:13,19
**halted (1)** 84:14
**hand (1)** 77:6
**handed (1)** 77:9
**handful (1)**
  89:20
**handing (1)**
  77:11
**happen (2)** 37:5
  69:7
**happened (4)**
  60:18 66:19,20
  70:25
**happening (2)**
  22:16 48:11
**happy (1)** 32:11
**hard (2)** 65:8
  79:7
**Harris (5)** 5:22
  88:1,3,5 89:15
**head (3)** 6:3 73:4
  73:15
**hear (2)** 29:4
  91:20
**heard (3)** 18:19
  66:8 71:21
**hearing (4)** 69:5
  72:10 87:19,22
**heating (2)** 22:6
  22:24
**heavy (1)** 24:12
**help (3)** 48:25
  62:4 91:10
**helpers (2)** 23:9
  23:10
**helpful (1)** 26:24
**high (1)** 76:8
**higher (2)** 30:7
  80:21

**highest (1)** 9:25
**highlighted (1)**
  41:10
**highlighting (1)**
  46:21
**highly (1)** 27:2
**Highway (3)**
  1:12,16 96:10
**highways (1)**
  24:19
**Hills (5)** 1:12,17
  1:21 4:1 96:11
**hire (1)** 60:5
**hired (4)** 74:25
  75:2,4 86:20
**hiring (1)** 24:16
**history (1)** 18:4
**hold (1)** 64:14
**holder (3)** 23:24
  53:9,22
**hole (1)** 30:17
**holes (1)** 51:9
**Holy (1)** 54:4
**home (6)** 7:22
  8:16 10:20
  30:4 60:2
  79:25
**homeowners (2)**
  82:4,8
**homes (1)** 16:13
**homestead (1)**
  80:23
**HON (1)** 1:5
**honest (1)** 13:24
**honestly (1)**
  33:13
**hook (1)** 53:2
**hopes (1)** 70:5
**hoping (1)** 82:13
**hour (2)** 54:4
  71:12
**house (28)** 19:7
  20:10 21:24
  22:1,10,12,16
  22:21,23 24:1

Gary M. Grossman

25:23 35:20,23 36:11 40:20 59:24 69:17 75:16 76:11 81:24 82:20 83:7 84:25,25 85:3 89:1,3 93:25

**human (3)** 73:4 73:15,16

**hundred (4)** 17:22 18:2 58:18 83:17

**hydrant (2)** 20:4 20:8

**hydrants (1)** 20:3

**I**

**idea (1)** 62:22

**identification ...** 92:18

**identified (12)** 28:1 32:17 47:17 49:11,13 50:7 52:11 54:12 72:2 87:6,13 92:24

**identifies (1)** 12:23

**identify (8)** 7:5 19:3 23:10 43:10 46:6 50:10 77:8 87:4

**identifying (2)** 38:25 86:23

**ii (2)** 56:9 57:1

**iii (1)** 57:2

**illegal (4)** 41:8 42:9,23 60:12

**illegally (1)** 73:24

**Illinois (1)** 96:21

**image (5)** 13:17

13:19 15:20 29:13,16

**imaginary (1)** 74:3

**imagined (1)** 50:11

**impact (1)** 32:6

**impossible (3)** 41:7 42:9,23

**improve (1)** 67:3

**impunity (1)** 85:6

**inaccurate (1)** 34:20

**inappropriate ...** 52:20

**incessance (1)** 44:23

**incessant (1)** 44:18

**include (1)** 19:21

**included (4)** 29:11 31:6 69:15 78:22

**includes (1)** 12:24

**including (3)** 23:23 47:3 56:10

**incorrect (1)** 30:20

**increased (1)** 80:13

**incremental (1)** 83:22

**indicate (2)** 26:2 64:23

**indicated (7)** 26:3 54:14 56:21 57:17 91:17,22 94:1

**individual (3)** 16:13 38:18 85:7

**indoor (1)** 90:4

**inform (1)** 37:4

**informal (4)** 89:21,22 90:15 91:5

**informally (2)** 90:1,10

**information (7)** 33:22 34:1,3 37:24 41:13 86:19,21

**informed (2)** 36:10,16

**initial (2)** 38:11 94:16

**initiation (1)** 93:17

**injury (1)** 5:15

**inspect (7)** 19:19 24:5 26:4 56:19 57:18 90:1 94:4

**inspected (1)** 78:4

**inspecting (1)** 74:24

**inspection (19)** 3:5 26:11 36:7 36:7,8,17 37:4 49:16 70:11 74:19 78:4 90:8 91:18,22 93:24 94:6,12 94:17,19

**inspections (12)** 33:16 39:12 82:24 88:2 89:12,16,21 90:15 91:5 93:25 94:2,14

**inspector (5)** 88:12 89:25 90:9,12,13

**installed (1)** 92:11

**installing (1)** 22:25

**insurance (6)** 81:19 82:1,4,8 83:13,19

**insure (1)** 81:24

**intent (1)** 81:13

**intention (2)** 10:13,18

**interaction (3)** 25:9 26:22 74:20

**interactions (2)** 20:12,19

**interest (1)** 83:25

**interested (1)** 96:17

**internally (1)** 89:11

**interrogatorie...** 7:2 27:16,21 28:9 84:12

**interrogatory ...** 27:22 29:11 79:16

**introduce (1)** 79:11

**investigation (1)** 32:5

**investment (1)** 80:16

**invitation (1)** 31:15

**invited (4)** 19:17 24:6 56:18 57:18

**inviting (1)** 19:25

**involved (6)** 5:12 8:4 18:5 38:18 74:21 85:7

**involves (1)** 18:4

**involving (1)**

49:4

**issue (9)** 34:8 37:11 38:13 48:14 61:3 68:17 75:25 78:18 89:18

**issued (6)** 11:2 33:1 68:18 71:25 72:1 74:4

**issues (8)** 18:5 48:14 51:22 52:19 57:3 59:3 74:21 91:23

**issuing (2)** 74:5 89:24

**item (8)** 33:17 33:17 43:8 55:23 56:9,15 66:22,24

**itemized (1)** 79:14

**items (13)** 19:7 19:12 21:23 54:13 57:1,23 66:25 67:18,25 83:2,9,23 89:18

**J**

**J (2)** 1:15,19

**Jan (2)** 1:15 14:24

**Jason (3)** 25:20 26:18,24

**Jim (2)** 73:5,8

**Jjr@therubin...** 1:18

**John (16)** 25:21 26:2 27:1 30:10 31:6 32:22 34:12 35:4 38:21 50:11 51:24

Gary M. Grossman

| | | | | |
|---|---|---|---|---|
| 68:10 70:21 71:14 90:17 93:5 | 94:1 **KUMAR (1)** 1:5 | 79:7 **lengthy (1)** 72:19 | 16:4,4 28:20 29:23 35:23 | **lose (1)** 48:19 **losing (2)** 84:25 85:1 |

| K | L | | M (live) | M |
|---|---|---|---|---|

**Joppich (1)** 1:20
**JR (2)** 34:15,15
**July (2)** 32:1
  77:12
**jump (1)** 10:8
**June (1)** 20:17

**L**
**lab (1)** 88:13
**labeled (1)** 17:3
**labor (1)** 76:8
**laboratory (1)** 88:12
**landlocked (1)** 11:22
**Lanny (1)** 73:17
**lapse (3)** 9:12,16 9:19
**larger (2)** 30:8 51:15
**law (12)** 1:16 37:11 74:25 75:2,2,4,4,7,9 75:23 86:20 89:6
**lawsuit (6)** 4:21 4:23 5:11,14 5:15 11:5
**layer (1)** 65:16
**layered (1)** 66:9
**lead (1)** 64:18
**learned (2)** 21:10 35:24
**learning (1)** 38:5
**leaves (1)** 66:24
**left (8)** 15:21 16:2,3,4,11 22:12 59:22 88:21
**legal (9)** 5:18 13:8,8 20:25 40:16 43:14 53:17 71:17 84:6
**legally (1)** 24:18
**legitimate (3)** 71:25 72:1 87:15
**lender (2)** 77:22

**let's (15)** 7:21
  10:8,8 19:4
  29:25 39:14
  42:12,23 43:3
  43:4,5 50:24
  54:2,3,12
**letter (1)** 77:12
**letters (2)** 37:17 37:19
**level (3)** 9:25 65:4,5
**leveled (1)** 64:25
**liberal (1)** 10:7
**license (5)** 9:9,12 9:18,19 96:21
**licensed (5)** 9:8 9:11,14,15 12:17
**life (1)** 45:1
**lifetime (1)** 85:2
**lift (1)** 73:25
**lifted (3)** 38:24 42:8 82:13
**light (5)** 6:22 15:20,23 30:14 85:9
**line (10)** 15:8,21 15:23 17:20,23 29:10 34:14,14 51:7 83:9
**list (12)** 21:23 22:3,8 41:4 66:25 67:25 68:11 69:15 72:19 75:15 83:23 85:12
**listed (1)** 48:6
**listen (1)** 6:6
**listened (1)** 74:11
**listing (1)** 79:17
**little (6)** 15:25

**K**
**Kaplan (5)** 73:3
  73:8,11 74:9
  74:10
**keep (3)** 46:8
  82:25 90:4
**keeping (3)** 6:1
  60:20 85:3
**keeps (1)** 67:25
**kept (2)** 48:1
  82:10
**kind (8)** 11:10
  27:9 48:10
  50:8 58:12
  65:8 67:19
  94:14
**kinds (1)** 38:25
**know (35)** 6:8
  6:10 13:16,25
  14:17 17:11
  18:8,12,17,18
  18:21,24 24:2
  25:2 27:7,16
  31:23 33:7,14
  36:12 37:16
  39:7 52:10
  62:25 66:12
  68:2,4,17 71:8
  78:17,21 86:9
  86:17 89:10
  94:15
**knowledge (8)**
  12:7 51:2
  71:20 72:5,8
  89:14 91:7

**live (2)** 79:25
  83:7
**living (7)** 80:6
  80:17 88:7,8
  88:17 89:1,3
**load (3)** 24:10,12
  24:17
**loads (1)** 24:18
**loan (12)** 76:15
  76:21 78:2,6
  78:10,21,24,25
  79:5,6,7 84:2
**loaned (1)** 23:13
**loans (1)** 77:21
**located (2)** 11:17
  49:22
**location (3)** 30:7
  30:12 61:13
**long (9)** 6:12 9:1
  9:21 10:9,16
  22:3 29:3 76:2
  77:8
**longer (1)** 29:1
**look (8)** 14:8
  25:17 26:14
  34:13 40:9
  50:4 73:23
  89:5
**looked (6)** 26:5
  30:23 33:15
  46:18 63:3
  90:9
**looking (12)** 5:2
  12:20 16:10
  21:15 23:3
  30:23 62:17,17
  63:21 65:22
  66:13 77:20
**looks (6)** 24:9
  46:19 64:9
  65:10,10 90:3
**loop (1)** 42:14
**loose (1)** 81:8

**lot (3)** 35:7
  63:23 68:16
**lower (3)** 30:17
  50:16 64:24
**lunch (1)** 6:22

**M**
**M (7)** 1:10,24
  4:5,5 96:6,9,21
**M-i-c-h-a-e-l (1)** 4:18
**main (2)** 11:24
  69:2
**maintained (1)** 89:8
**maintenance (...**
  23:6,7,22,25
  27:3 42:19,20
  53:1,7,9,12,14
  53:23 54:24
  55:8 56:14
  61:23 67:8
  92:2,14
**making (1)** 82:16
**malfeasance (1)** 40:24
**maliciously (1)** 85:3
**man-made (1)** 30:16
**manager (2)** 25:21 72:25
**manager's (1)** 26:3
**managers (1)** 86:12
**Manna (2)** 73:5 73:8
**manner (1)** 27:2
**map (2)** 29:10 71:15

Gary M. Grossman

| | | | | |
|---|---|---|---|---|
| **Maple (12)** 8:6,7 11:11,12,15,16 11:18,25 15:18 15:18 16:16 40:6 | 58:13 **meant (1)** 37:1 **meet (4)** 32:23 38:17 41:8 60:5 | 16:19 58:15,16 **million (8)** 58:10 58:11,15 84:4 84:4,13,13 86:3 | 84:4,13 86:3 **monthly (3)** 82:16,17 83:22 **months (8)** 31:14 36:4 | 26:22 27:5 **nearby (1)** 20:3 **Neary (16)** 40:3 40:17,22 41:1 42:4 44:14,24 |
| **March (5)** 10:11 36:5 75:21 84:14 90:7 | **meeting (11)** 20:21 24:7 25:6,8 32:25 33:2 73:18 | **mind (4)** 27:8 51:24 55:11 83:24 | 49:14 59:8,10 78:9 88:6 91:4 **morning (6)** 5:21 18:20 | 46:6,25 54:14 59:14,17 68:11 69:15 85:13,17 |
| **mark (2)** 14:22 62:8 | 74:1,9,10 93:5 **members (1)** 38:8 | **mine (3)** 53:5 63:9 90:25 **mini (1)** 51:4 | 46:25 62:7 70:12 87:25 **morning's (1)** 63:8 | **Neary's (1)** 66:25 **necessary (2)** 10:19 89:17 |
| **marked (3)** 30:3 50:3 94:25 | **mention (2)** 27:16 35:5 | **minimize (1)** 28:23 | **mortgage (2)** 80:2 83:25 | **need (14)** 6:10 6:11 7:5,10 |
| **marshal (14)** 19:17,22,25 20:18,20,21,22 21:2,3 24:7,9 24:13 25:6,8 | **mentioned (10)** 7:16 8:16 17:14 25:5 35:24 64:10 72:9 73:10 76:15,18 | **minimum (2)** 19:9,10 **minor (2)** 64:15 83:6 **minute (4)** 14:4 21:24 36:18 55:10 | **mother's (1)** 8:18 **mouth (1)** 42:25 **move (5)** 10:20 16:2 33:3 40:6 78:8 | 19:16 23:6,20 43:10 53:9 58:7 73:25 82:25 87:9,9 **needed (14)** 19:7 19:12 21:23 22:4,5,6,7 |
| **material (2)** 65:8 78:23 **materials (5)** 12:13 66:9 76:9,19 85:14 | **met (10)** 37:1 38:20 39:1 41:5 45:1 59:6 70:9 73:2,14 85:18 | **minutes (3)** 14:7 54:3,6 **missed (1)** 31:21 **mitigation (2)** 56:15,17 | **moved (4)** 16:22 61:17 81:11,15 **moving (1)** 68:13 | 54:14 56:20,22 60:15 75:15 76:12 91:24 **needs (4)** 24:10 34:3 67:24 |
| **Matt (16)** 6:17 12:16 13:16 18:11 28:16,19 35:9 42:25 50:9 53:5,19 63:17 68:22 71:24 77:4 91:10 | **meter (2)** 83:20 83:20 **metes (3)** 12:23 13:9,11 **Michelle (2)** 39:18 46:14 **Michigan (20)** 1:1,13,17,21 | **mix (1)** 66:14 **mold (3)** 88:11 88:12,14 **moly (1)** 54:4 **moment (14)** 11:9 19:4,5 20:14 21:22 22:16 25:17 | **multiple (3)** 57:16 59:2 86:20 **municipal (2)** 26:9 82:23 **Mzalewski@r...** 1:22 | 82:21 **negotiate (4)** 60:6,8 75:1,2 **negotiated (1)** 60:18 **negotiation (2)** 60:18 61:3 |
| **matter (9)** 4:10 38:19,22 72:14 72:17,22 80:10 86:18,19 | 4:1 8:1 9:12,17 10:1,4 24:19 30:15 31:13 | 28:20 31:20 33:8 51:1 52:16 55:12 | **N** | **negotiations (2)** 69:6,8 |
| **matters (1)** 29:4 **Matthew (2)** 1:19 4:20 | 32:1 49:13 58:5 93:3 96:3 96:11,22 | 66:20 **money (6)** 46:2 48:1 78:9 79:7 | **N (2)** 2:1 4:5 **name (5)** 4:17,20 5:18 17:6,8 | **neighbor (3)** 42:10 48:19 70:4 |
| **MBA (1)** 10:1 **mean (12)** 38:11 43:19 50:8 58:25 64:10 67:19,21 71:14 83:12 86:25 87:7 89:22 | **middle (3)** 35:21 49:4 55:21 **midway (1)** 34:13 **Mike (1)** 73:16 | 83:5 85:9 **Montessori (3)** 15:18 16:12,14 **month (10)** 82:14,14,14,15 | **names (1)** 23:14 **narrative (1)** 84:21 **narrow (1)** 18:10 **natural (2)** 83:3 83:6 | **neighbor's (23)** 15:13 17:3 18:13,14 25:22 28:2 30:6 33:24 47:18 48:16,17,23,24 |
| **means (2)** 54:20 | **mile (5)** 11:14,17 | 83:11,15,17 | **nature (3)** 5:14 | 49:1,3,20,21 |

ON THE RECORD REPORTING & VIDEO
313-274-2800 - ontherecord@dearborncourtreporter.com

Gary M. Grossman

50:1 54:1 55:4
55:7 69:16
70:18
**neighboring (5)**
47:2,4 48:12
67:2,15
**neighbors' (1)**
12:24
**never (26)** 18:15
26:5 31:10
37:6 39:5 45:1
57:9,14 68:4
68:14 71:5,9
71:22,23 86:5
86:21,21,22
87:11,12,13,14
87:17,19,21
88:9
**nevertheless (1)**
39:11
**new (6)** 22:25
37:25 51:13
57:25 58:1
61:18
**nine (2)** 70:13
91:18
**nod (1)** 6:3
**noneconomic (...**
84:3,12
**normally (1)**
35:13
**north (11)** 11:16
15:14 17:1,22
17:23 29:16
55:3 56:1
58:14 64:16
90:19
**north/south (1)**
65:14
**Northwestern ...**
1:12,16 96:10
**Nos (1)** 94:25
**Notary (4)** 4:7
96:1,7,22
**notation (1)**

30:10
**note (10)** 3:12
15:8 63:7,9,21
78:22,24 79:3
79:12 83:10
**noted (1)** 21:16
**notepad (1)** 7:17
**notes (7)** 26:2,3
27:11 34:23
38:1 50:13
96:13
**notice (9)** 3:11
4:12 34:1 64:1
77:13 78:18
79:11 86:23
93:12
**nuisance (1)**
60:2
**number (10)** 5:4
20:7,8 27:22
32:24,25 43:7
57:22 84:22,23

---
**O**
---

**O (3)** 4:5 76:4
81:12
**Oakland (1)**
58:9
**oath (1)** 93:19
**objection (4)**
53:12,16 84:5
84:16
**obligated (1)**
70:7
**obscured (1)**
64:3
**observed (4)**
38:9 74:6,7
90:24
**obstructed (1)**
28:20
**obtain (2)** 47:6
76:3
**obtained (1)**
80:22

**obtaining (1)**
78:21
**obviously (2)**
50:20 67:21
**occasion (1)**
90:16
**occupancy (9)**
10:19,24 11:1
22:2 81:4,14
82:3,7 89:5
**occupation (1)**
8:24
**occupiable (1)**
10:22
**occupied (1)**
81:25
**occurred (4)**
59:7 73:18
90:15 91:6
**occurring (1)**
78:17
**October (7)**
21:16,17 22:9
22:15 25:8
72:7 96:22
**off-road (1)** 21:4
**offered (3)** 21:5
26:24 75:12
**officer (2)** 20:1
74:5
**official (7)** 5:18
12:16 18:12,25
19:2 39:7
47:13
**officially (1)**
18:15
**officials (4)**
20:13 72:21
85:8 92:2
**Oh (5)** 11:8 16:7
40:10 68:21
87:2
**okay (72)** 5:11
5:20 7:4 8:19
9:13,21 11:8

12:13 14:1,3
15:3,12 16:7
16:18,22 17:20
19:23 20:19
21:8,10 23:3,8
27:5 28:21
29:3,18,19,25
30:11 31:16
33:21 34:6
35:8,12 37:2
37:15 38:11
39:5,13 40:21
40:25 42:2,18
44:4 45:2,8,13
48:10 50:23
52:16 54:2
55:14 57:5
61:5 62:13
64:8 65:6
68:16 69:12
74:9,19 77:18
82:9 87:4 91:1
91:5,12 92:13
92:17,21 93:7
94:20
**old (4)** 22:23,23
22:24 61:19
**on-site (4)** 34:16
35:2 51:5
82:25
**once (5)** 5:8
20:19 41:12
43:9 81:14
**one- (1)** 81:2
**one-and-a-hal...**
81:3
**one-by-one (1)**
34:7
**ones (3)** 50:15
51:13 57:17
**ongoing (4)**
67:20 77:23
78:1,15
**open-ended (1)**
68:7

**operator (1)**
51:10
**opinions (1)**
69:21
**opposed (1)**
80:16
**opposite (1)** 93:3
**orchard (1)**
51:12
**order (44)** 22:1
32:19 33:1
35:25 36:11,15
36:21 37:7,12
37:13,18 38:6
38:13,16,24
39:3,6,8,9
40:19 41:3,5
41:15,19,22,25
42:8 45:11
61:3 75:18,19
75:25 78:12
80:7 82:12
86:15,22 87:20
87:23 89:4,13
90:2,6 94:8
**ordering (1)**
48:18
**orders (17)**
34:24 40:19
60:12 68:3,6,8
68:9,14 70:25
72:3 73:25
74:24 84:14
85:19 93:10,17
94:13
**ordinance (7)**
34:2,5 42:19
61:25 68:19,19
86:23
**ordinances (7)**
35:6 53:15
54:24 72:2
86:24 87:1,4
**orientation (1)**
50:5

Gary M. Grossman

| | | | | |
|---|---|---|---|---|
| **original (5)** 7:1 63:10 78:25 90:21 94:16 | 20:16 24:8 31:25 | 80:3,5,10 81:25 82:2 83:5 84:1 | 56:18,20,21,22 59:10 61:10,11 61:21,23 71:2 | 33:7 50:3 62:5 63:21 64:23 |
| **originally (3)** 21:13 65:11 92:2 | **parcel (25)** 15:13,14,15,15 15:16,17 16:12 | **payment (1)** 78:5 | 72:24 87:11 89:23,25 94:9 | **physically (1)** 17:24 |
| **outdoor (1)** 90:3 | 16:25 17:3,5 17:19 18:14,15 | **payments (2)** 82:16,17 | **permits (33)** 23:1,7 35:6 | **physician (1)** 17:9 |
| **overlays (1)** 12:11 | 25:22 28:2 33:24 47:17,19 | **Pebble (2)** 12:5 30:13 | 42:15,20 43:7 45:11 54:17,19 | **picture (1)** 13:21 **pictures (2)** 19:5 |
| **owned (1)** 10:9 | 48:16 49:20,21 | **pending (1)** 6:13 | 54:25 55:5,20 | 62:5 |
| **owner (17)** 17:5 34:15 35:1 | 50:1 69:16 71:7,10 | **people (6)** 25:3 64:11 73:24 | 59:7,9,12,13 59:16,21,23,25 | **piece (1)** 34:6 **placard (1)** 37:8 |
| 43:17,20,23 44:2,4 45:7 | **parcels (3)** 11:23 15:21 17:11 | 74:15,21 85:7 **people's (1)** | 60:4,7,11,15 60:20 61:4 | **place (10)** 13:20 40:19 41:15,22 |
| 47:2,4 48:6,8 48:12 53:11,20 | **parking (2)** 69:4 69:9 | 71:18 **Perfect (2)** 9:5 | 67:9,13,14 69:20,25 71:2 | 58:4 60:4 68:8 72:4 82:25 |
| 53:25 | **part (10)** 12:4,6 | 79:8 | 87:10 | 93:11 |
| **owner's (1)** 17:6 | 17:15 18:22 | **perfectly (1)** | **permitting (2)** | **placed (9)** 32:20 |
| **owners (5)** 17:13 44:15 65:20 | 27:17 30:19 50:13 53:21 | 76:4 **perform (12)** | 34:17 35:3 **person (3)** 26:17 | 34:24 35:25 37:7 39:3 |
| 67:3,16 | 70:10 74:25 | 23:22,25 24:16 | 36:20,24 | 75:18,20 87:21 |
| **ownership (2)** | **particular (4)** | 44:1 46:2 | **personal (1)** | 87:23 |
| 17:12 44:19 | 21:22 33:16 | 47:22 52:25 | 5:15 | **Plaintiff (2)** 1:4 |
| | 34:21 39:25 | 53:7,9,12,22 | **personally (1)** | 1:15 |
| **P** | **particularly (1)** | 54:21 | 5:11 | **Plaintiff's (2)** |
| **P-r-i-m-e-a-u (...** | 31:5 | **performed (6)** | **perspective (2)** | 4:25 27:24 |
| 32:2 | **Partly (1)** 78:15 | 23:8 32:1 49:3 | 62:16 63:13 | **plan (3)** 57:22 |
| **p.m (3)** 1:13 4:3 | **party (4)** 5:12,13 | 49:15 63:3 | **phase (1)** 78:8 | 57:24 73:1 |
| 94:24 | 5:17 96:16 | 78:3 | **phone (3)** 37:4 | **planning (2)** |
| **P57937 (1)** 1:15 | **path (17)** 12:2,3 | **performing (1)** | 88:18,21 | 59:17 93:10 |
| **P72207 (1)** 1:19 | 12:6,14,18,24 | 22:25 | **photo (13)** 3:9 | **plans (6)** 41:23 |
| **packet (2)** 29:12 | 15:19,22 16:6 | **period (2)** 78:11 | 3:10 28:23 | 41:25 42:15,20 |
| 78:23 | 16:15,19,23 | 82:11 | 29:2 30:1 | 56:16 57:7 |
| **page (13)** 3:2 | 20:23,25 21:5 | **permanent (1)** | 62:12,13,22 | **plans/permits ...** |
| 15:7 20:16 | 23:23 90:21 | 10:20 | 63:1,12,15,25 | 41:16 |
| 27:21,23 28:14 | **Patton (1)** 73:16 | **permanently (1)** | 65:7 | **plant (1)** 51:9 |
| 28:15 33:15 | **pause (5)** 14:10 | 44:3 | **photograph (1)** | **planted (1)** |
| 39:17 40:1,7 | 54:8 55:10,16 | **permission (12)** | 66:13 | 51:12 |
| 79:15 84:11 | 66:3 | 47:2,4 48:13 | **photographs (2)** | **plants (1)** 65:25 |
| **paid (6)** 20:4,18 | **pay (9)** 48:17 | 48:18,19,22,23 | 38:2 50:12 | **plea (3)** 69:4,10 |
| 47:18 60:12 | 60:10 78:7 | 48:25 49:1 | **photos (18)** 3:4 | 72:10 |
| 71:3 78:24 | 83:16,16,18,19 | 53:10 67:2,15 | 27:12,17,24 | **please (6)** 6:6 |
| **pain (1)** 84:23 | 87:11,12 | **permit (20)** | 28:5,8,12 | 46:25 52:25 |
| **paper (1)** 84:9 | **paying (10)** | 33:17 36:22 | 29:20 30:22,22 | 53:4 55:13 |
| **paragraph (3)** | 47:25 79:3,24 | 38:9 54:20,20 | 30:25 31:2,6 | 69:14 |
| | | | | **plow (1)** 67:11 |

Gary M. Grossman

plumbing (11) 22:4,24 36:6,8 82:21 89:25 90:4,4,7,13 94:19
Plus (1) 58:17
plywood (5) 64:14 65:16,17 65:23 66:15
point (27) 19:15 22:9 24:9 25:12 30:16 33:3 35:24 36:1 41:9 42:14 45:12 59:6,12,25 61:2 76:1,21 76:24,25 77:22 78:6,17 80:24 81:16 88:10 90:21,24
pointed (1) 85:21
points (1) 44:8
police (3) 73:4 73:15,16
policy (2) 82:4,8
pond (5) 30:15 30:16,19,21 49:24
poor (1) 65:18
portable (3) 82:9,25 83:17
portion (3) 18:21 34:22 44:20
portions (3) 22:12,22 76:11
position (9) 11:5 27:24 37:6,23 40:21 42:21 43:6 48:25 57:1
possible (4) 10:7 20:23 28:1

85:16
possibly (1) 38:17
Post-it (1) 15:7
posted (2) 37:8 37:13
posts (1) 68:13
potential (1) 92:25
potentially (2) 31:5 52:7
pour (1) 64:13
practice (1) 14:24
PRE (1) 80:23
pre-existing (2) 10:25 51:14
precipitated (2) 19:23 77:18
precisely (1) 41:18
prejudice (1) 71:5
prepare (1) 6:20
present (1) 86:16
presented (9) 38:24 39:8 60:10 62:6 63:10 74:12 85:10 87:17 94:18
preserved (1) 84:16
preserving (1) 84:17
pretty (5) 16:11 16:12 37:12 68:23 69:16
previous (2) 65:20 86:1
previously (4) 54:12 81:8 88:15 94:1
primarily (2)

5:2 38:7
primary (2) 9:9 80:17
prime (1) 12:19
Primeau (1) 32:2
principal (2) 80:24 81:17
prior (7) 7:12 9:3,4 19:25 73:19 75:8 94:6
private (2) 58:12 79:7
privilege (1) 83:19
probably (10) 4:24 5:10 6:11 8:12 9:20 12:19 40:11 51:12 72:19 91:3
problem (9) 14:9 15:3 20:5 31:9 33:23 35:15 59:11 87:17,18
problems (1) 91:23
procedure (3) 6:16 43:21,23
proceedings (4) 14:10 54:8 55:16 66:3
process (7) 37:11 39:4 40:18 51:11 85:5 87:17 89:10
processes (2) 34:16 35:3
procure (1) 52:21
produced (7) 13:23 33:12

34:10 62:21 63:8 77:12 86:21
professional (1) 9:6
progress (1) 84:14
project (5) 7:11 26:4,5,6 81:23
promise (1) 42:12
promised (1) 54:13
Promissory (3) 3:12 78:22 79:12
proper (3) 21:20 50:5 86:13
properties (10) 8:19 12:25 15:20 16:21 45:3 51:1,3 69:19,21,22
property (145) 8:3,5,10,11,13 8:16,17 10:9 10:10 11:10,21 11:22 12:22 13:7,12 15:6,8 15:11 17:20,23 17:23,25 18:1 18:13,14,21 19:13 20:3,24 21:2 23:17 25:23 26:7 29:10 30:1,4,6 30:18,20,21 31:11,14 32:20 33:24 34:15,25 35:1,18,25 36:21 37:7,9 37:14 39:12 41:3 43:17,20 43:23 44:2,3,4 44:14,19,21

45:7 47:2,4,5 47:20,22 48:6 48:8,12,12,20 49:3,18,19 50:18,18,20,25 51:1 52:22 53:10,20,24 54:1 55:2,2,3,4 55:7,8,25 56:1 56:4 57:19 62:18 67:3,15 69:17 70:2,2 70:18,18,20,20 71:4,16,18,21 72:4,6 74:19 75:18 76:1,16 79:17,21 80:9 80:11,14,16,18 81:10,19,25 82:10 83:13,18 87:21,24 88:2 88:7,9,17 89:2 89:8,12 90:2,6 90:18,24 94:5
proposed (1) 55:24
prosecuted (1) 74:2
prosecution (8) 69:24 73:20 74:20 85:23 91:1 92:4,15 94:7
provide (1) 14:25
provided (4) 14:13 31:16 37:25 38:1
proximity (1) 20:2
pry (1) 75:11
public (6) 12:7 12:11 24:19 96:1,7,22
Public/Certifi...

Gary M. Grossman

| | | | | |
|---|---|---|---|---|
| 4:7 | 93:7 | **reasonable (1)** | 2:2 | **relative (1)** |
| **pulled (1)** 23:1 | **quickly (1)** | 43:1 | **red (6)** 30:5,8,18 | 96:15 |
| **purchased (3)** | 63:22 | **reasons (1)** 76:6 | 50:7 51:16 | **release (3)** 68:6 |
| 10:21 19:13 | **quite (6)** 11:13 | **rebuild (1)** | 71:13 | 70:24 74:23 |
| 75:16 | 20:7 30:22 | 58:19 | **REDIRECT (1)** | **released (2)** 42:1 |
| **purpose (3)** 4:22 | 40:11 79:14,16 | **recall (6)** 5:17 | 2:2 | 85:20 |
| 88:23,25 | **quote (3)** 32:4 | 5:18 32:21 | **refer (3)** 7:10 | **remain (3)** 41:15 |
| **purposes (1)** | 90:14 92:20 | 37:3 73:18 | 8:10,11 | 41:22 68:8 |
| 60:19 | | 88:20 | **reference (7)** 7:5 | **remained (1)** |
| **pursuant (1)** | **R** | **receive (2)** 37:17 | 7:8 27:17,23 | 21:25 |
| 4:12 | **R (2)** 4:5,5 | 47:3 | 31:24 79:10 | **remaining (1)** |
| **pursued (3)** | **railings (1)** | **received (11)** | 93:16 | 85:1 |
| 57:14 87:7,7 | 92:11 | 33:25 34:1,3 | **referencing (1)** | **remark (1)** 20:4 |
| **pursuing (2)** | **ramp (1)** 64:20 | 37:19 47:8,12 | 7:6 | **remedial (2)** |
| 87:5,7 | **ramps (4)** 64:18 | 68:4,7 78:19 | **referred (1)** | 32:15 35:7 |
| **push (1)** 38:15 | 64:23,24 65:2 | 86:22,22 | 92:20 | **remediate (2)** |
| **pushback (1)** | **random (1)** 27:8 | **receiving (1)** | **referring (4)** | 93:4,6 |
| 67:21 | **rate (1)** 80:21 | 80:4 | 12:16 13:9 | **remediation (3)** |
| **pushed (2)** 64:20 | **rating (2)** 24:10 | **recheck (1)** | 44:5,6 | 70:23 87:13 |
| 66:16 | 24:17 | 49:15 | **refiled (1)** 71:5 | 88:11 |
| **pushing (1)** | **RCOC (5)** 58:8 | **recognize (1)** | **refresh (1)** 47:14 | **remember (2)** |
| 58:25 | 58:12,16,19,23 | 63:11 | **refusal (1)** 74:23 | 22:19 23:14 |
| **put (7)** 33:8 | **reach (1)** 32:22 | **recognized (2)** | **refused (4)** | **reminder (1)** |
| 40:25 45:2 | **reached (1)** 88:6 | 48:3 78:16 | 39:12 48:20 | 5:25 |
| 61:18 65:7 | **reaction (2)** | **Recognizing (1)** | 70:7 82:24 | **remove (1)** |
| 80:2 93:11 | 43:13 54:18 | 76:4 | **regarding (8)** | 67:11 |
| **putting (1)** | **read (1)** 51:24 | **recollection (1)** | 18:5 26:24 | **removed (7)** |
| 42:25 | **reading (3)** | 47:14 | 31:19 38:12 | 41:6,19 61:18 |
| | 20:15 84:3,8 | **recommendati...** | 56:25 72:22 | 64:19 68:10,14 |
| **Q** | **ready (2)** 36:8 | 70:23 | 92:19 93:8 | 92:10 |
| **quadrant (3)** | 76:3 | **reconstruct (1)** | **regardless (1)** | **removing (4)** |
| 28:14,14,18 | **real (5)** 8:25 9:8 | 58:23 | 80:6 | 22:23,23,24 |
| **qualified (1)** | 9:15 13:12 | **reconstructed ...** | **regards (1)** | 82:22 |
| 89:18 | 74:16 | 64:1 | 33:23 | **renew (4)** 59:12 |
| **question (15)** | **Realizing (1)** | **record (14)** 4:17 | **region (1)** 51:2 | 59:13 60:10,14 |
| 6:7,13,14 | 72:19 | 14:7,12 21:9 | **registered (1)** | **renewal (1)** |
| 18:11 25:16 | **really (6)** 9:23 | 24:3 55:15,18 | 89:9 | 60:20 |
| 31:18 35:10 | 11:12 66:18 | 66:5 68:23 | **registration (2)** | **renewed (7)** |
| 37:15 50:8 | 68:16 86:25 | 79:10,11 90:12 | 88:2 89:10 | 45:11 59:9,9 |
| 57:12 69:2 | 93:11 | 92:23 94:11 | **regular (3)** 82:3 | 59:22 60:7,16 |
| 77:14 80:8 | **rear (1)** 16:13 | **recorded (2)** | 82:7,8 | 61:4 |
| 81:5 93:23 | **reason (9)** 29:10 | 90:25 96:11 | **related (2)** 32:16 | **renovation (2)** |
| **questions (8)** | 46:4,5 48:4 | **records (2)** | 72:17 | 25:14 84:14 |
| 4:23 6:2,6,9,15 | 60:11,15 68:12 | 92:21,22 | **relating (2)** 5:15 | **rent (2)** 80:1 |
| 68:25 91:12 | 71:17 85:4 | **RECROSS (1)** | 48:15 | 83:8 |

Gary M. Grossman

| | | | | |
|---|---|---|---|---|
| **repair (6)** 41:17 42:16 59:25 63:3 80:1 92:13 | 94:14,18 **requesting (2)** 32:23 67:23 | **response (9)** 7:2 20:20 29:11 59:4,5 74:15 77:11 85:25 | **right (66)** 3:11 5:17 7:15,18 8:2 10:3,21 11:3 12:6,9 | 27:24 28:1 31:6 32:14,22 34:12 35:17 38:20,21 49:7 |
| **repaired (2)** 62:15 82:21 | **requests (3)** 42:22 45:3 85:13 | 86:1 **responses (3)** 67:7 79:16 | 13:4 14:9,12 16:5,8 17:14 18:8 23:22 | 49:11,14,19 50:11,15 51:20 52:19 68:10 |
| **repairing (1)** 22:22 | **require (7)** 23:7 42:20 54:24 | 84:11 **responsibilitie...** 53:21 | 24:15,20 25:2 25:16 28:13,25 | 70:21 71:14 90:17 93:6 |
| **repairs (11)** 10:18 19:16 22:7,14,25 25:7,14 63:15 81:10,12 89:17 | 59:8 67:9,14 77:21 **required (9)** 22:7 34:17 35:3 54:17 57:25 61:11,23 | **responsibility ...** 23:25 31:3 53:8 67:16,17 **responsible (1)** 53:13 | 29:7,16,23 30:14 32:8 39:11,14,16,21 40:14 42:21 51:15 53:6 54:10 55:17 | **Roda's (3)** 30:10 35:4 51:24 **role (1)** 9:1 **rolled (1)** 65:24 **roof (2)** 22:6,22 **room (2)** 7:19 |
| **repeat (2)** 57:11 81:5 | 71:2 87:11 **requirements ...** 57:10,14 | **rest (2)** 29:20 83:9 **restoration (4)** | 60:23 62:4 63:6,14,19,24 66:4,18,18 | 55:12 **Rosati (1)** 1:20 **Rosell (6)** 25:20 |
| **replaced (4)** 22:4,5,6,8 | **requires (3)** 37:11 67:13,15 | 56:15,17 57:6 64:25 | 67:17,18 75:7 75:13 76:22 | 26:18,19,24 32:14 35:17 |
| **replacing (1)** 65:20 | **requiring (1)** 55:4 | **restore (1)** 21:12 **restored (3)** 57:8 | 77:13 78:20 79:1,9 80:25 | **rotate (1)** 29:18 **roughly (1)** |
| **report (10)** 24:10,17 32:3 32:4,9 34:10 57:19 58:6 88:12,13 | **reside (1)** 7:25 **residence (10)** 7:23,24 8:18 11:20 24:22 26:8 62:18 | 62:24 65:2 **restoring (1)** 56:12 **restrict (1)** 44:14 **restricting (1)** | 82:17 83:22 87:5,25 88:16 89:7 90:14 91:8 **rights (8)** 44:3 | 39:24 **Rubinstein (33)** 1:15,16 2:4 13:15,24 14:3 14:9,13 15:3 |
| **reported (2)** 1:24 73:8 | 80:17,24 81:17 **residing (1)** 9:17 | 44:20 **result (9)** 27:15 | 44:15,20 48:20 53:21,24 71:19 | 28:16,19,22,25 29:5,7 35:9,12 |
| **reporter (6)** 1:24 4:7 5:25 7:7 14:25 95:1 | **resolve (9)** 38:19 38:21 41:2 57:3,4 61:3 66:25 68:3 | 36:16 38:23 39:1 42:7 74:1 75:3 83:11 85:2 | 93:13 **risky (1)** 81:23 **road (20)** 8:6,7 11:11,12,13,15 | 35:15 53:16 55:9 57:11 63:17,19 75:4 75:8 77:4,10 |
| **reporter's (1)** 6:5 | 87:18 **resolved (2)** | **resulted (1)** 27:15 | 11:18,24,25 12:2 15:18,19 | 84:5,16 91:11 91:14,16 94:20 |
| **represent (1)** 4:21 | 82:13 91:2 **resources (3)** | **results (1)** 75:5 **returned (1)** | 58:8,16,17,23 67:10,10,11,12 | **rules (1)** 4:12 **run (2)** 65:14,15 |
| **representation...** 30:15 63:2 | 73:4,15,17 **respect (2)** 21:22 | 90:20 **review (1)** 6:24 | **roadway (4)** 58:3 64:17,25 | _____ |
| **representative...** 70:13 91:18 | 52:18 **respectively (1)** | **reviewed (2)** 7:1 7:2 | 67:9 **roadways (1)** | **S** |
| **request (7)** 19:24 32:15 33:2 58:21 59:1 86:20 94:6 | 38:2 **respond (2)** 45:25 58:21 **responded (2)** | **Rick (1)** 74:7 **ridiculous (2)** 56:11 58:14 **riding (1)** 16:12 | 58:13 **Robert (1)** 32:2 **Roda (26)** 25:21 26:2,17 27:1 | **S (3)** 3:1 4:5,5 **safely (2)** 19:21 21:14 **salvageable (1)** 22:12 |
| **requested (7)** 36:6 44:13 88:10 94:4,12 | 47:11 88:21 | | | **sanitary (1)** 83:1 |

Gary M. Grossman

| | | | | |
|---|---|---|---|---|
| sat (1) 5:21 | 66:23 | setback (8) | showed (3) 70:6 | 23:23,24 53:8 |
| satellite (7) 3:3 | see (32) 5:24 | 18:20,23,25 | 70:14 90:9 | solid (1) 54:4 |
| 13:17,19 14:13 | 14:18,20 16:15 | 19:1 43:11 | showing (5) | solution (3) |
| 14:19 15:6,20 | 24:10 27:23 | 44:22 52:7,13 | 12:17 14:19 | 38:23 85:10 |
| satisfied (1) | 28:23 29:1,2,5 | setbacks (1) | 29:14 30:2 | 87:16 |
| 68:10 | 29:6 38:21 | 58:14 | 33:11 | somebody (3) |
| satisfy (2) 57:19 | 39:20 40:2 | setting (1) 21:24 | shuffle (1) 46:10 | 47:20,22 55:11 |
| 85:12 | 43:5 46:15,17 | settlement (1) | side (4) 46:9 | somebody's (1) |
| saw (3) 26:16 | 46:23 49:9 | 74:17 | 90:19,23 92:11 | 71:16 |
| 37:9 52:19 | 54:17 62:11,12 | seven (3) 5:10 | sides (2) 56:7 | somewhat (1) |
| saying (8) 15:8 | 62:12 63:22,23 | 31:14 51:13 | 92:12 | 22:21 |
| 27:8 44:4 48:2 | 63:25 65:9,10 | seven-figure (1) | sideways (2) | soon (1) 81:12 |
| 48:21 74:6 | 69:18 70:14 | 74:17 | 29:14 65:3 | sorry (8) 9:14 |
| 80:19,22 | 79:18 92:2 | sewage (1) 82:22 | sign (1) 60:25 | 13:11 26:17 |
| says (8) 32:4 | seeing (4) 28:4 | sewer (12) 26:4 | signed (2) 47:18 | 46:8 57:11 |
| 34:13 41:6,22 | 39:16,19 51:20 | 26:5,6,9,11,14 | 74:5 | 65:23 81:6,6 |
| 42:19 45:21 | seeking (1) 47:5 | 26:25 36:6 | Significant (1) | sort (8) 12:1 |
| 46:25 47:8 | seemingly (1) | 51:7 82:23 | 22:11 | 29:9 31:7,8,9 |
| scan (1) 14:4 | 63:24 | 89:23 94:19 | signing (1) 47:24 | 57:9 64:9 74:7 |
| scene (1) 70:11 | seen (11) 14:2 | shake (1) 6:3 | simply (1) 68:8 | sought (1) 57:9 |
| scheduled (1) | 17:8 33:14,18 | SHALINA (1) | sit (2) 34:19 | sound (1) 68:20 |
| 36:7 | 33:19 34:11,21 | 1:5 | 93:19 | sounds (1) 67:19 |
| school (2) 9:4 | 40:11,13 87:14 | shape (2) 65:18 | site (7) 16:13 | south (8) 11:16 |
| 15:18 | 92:23 | 65:21 | 19:18 24:7 | 11:17,19 21:1 |
| Schultz (1) 1:20 | self-explanato... | share (4) 14:16 | 32:2,4 49:6 | 29:25 58:14 |
| scratched (1) | 83:10 | 28:3 33:4 | 69:6 | 64:17 90:23 |
| 64:18 | send (2) 32:11 | 39:13 | sits (2) 17:24 | southeast (2) |
| screaming (1) | 88:11 | shared (2) 33:22 | 18:1 | 50:2 90:18 |
| 35:7 | sense (3) 55:6 | 58:7 | sitting (2) 21:19 | SOUTHERN (... |
| screen (8) 7:11 | 57:16,17 | sharing (5) 19:4 | 24:20 | 1:2 |
| 14:16,18 28:3 | sensitive (1) | 33:11 39:14 | situation (4) | southward (1) |
| 33:4 39:13 | 54:21 | 54:11 55:18 | 17:12 41:2 | 62:17 |
| 54:11 55:18 | sent (1) 40:22 | shifting (1) | 56:19 73:6 | southwest (2) |
| scroll (2) 39:24 | sentence (1) | 75:13 | six (4) 5:10 | 17:19 49:25 |
| 46:17 | 42:3 | short (2) 18:11 | 51:12 59:8,10 | speak (5) 7:12 |
| scrolled (1) 34:9 | September (3) | 42:4 | sixth (1) 28:18 | 30:17 31:5 |
| second (2) 20:22 | 21:9 47:5 | shortages (1) | small (2) 51:5 | 36:25 38:4 |
| 77:1 | 68:20 | 76:8 | 89:20 | specific (6) |
| Secondly (1) | services (3) 46:3 | shorter (1) 4:24 | smaller (5) | 27:20 31:18 |
| 76:10 | 59:17 73:2 | shorthand (3) | 29:23 30:17 | 35:5,6 78:11 |
| secret (1) 34:24 | servient (1) | 1:24 4:7 54:19 | 50:6,16,24 | 92:19 |
| section (2) 30:3 | 53:10 | shovel (1) 51:6 | snow (1) 67:11 | specifically (4) |
| 30:5 | SESC (1) 61:11 | show (4) 12:14 | soil (4) 61:10,16 | 12:14 19:17 |
| sedimentation... | set (3) 11:13 | 13:19 20:23 | 62:1 66:22 | 88:20 92:24 |
| 26:25 61:10,15 | 50:24 68:13 | 30:19 | sole (4) 11:22 | specified (1) |

Gary M. Grossman

33:7
spell (1) 4:17
spoke (2) 34:15
35:1
spoken (1) 73:13
SS (1) 96:3
staff (1) 38:8
stairs (1) 5:16
stalling (1) 85:3
stamped (2)
33:13 40:1
standards (5)
58:8,13,16,19
58:24
start (3) 7:21
39:15 46:20
starters (1)
29:13
starting (2)
46:13 90:21
state (7) 9:11,15
24:19 80:10
81:20 96:3,7
STATES (1) 1:1
status (3) 47:1
48:12,24
staying (1) 22:15
steel (4) 58:2,4
65:14,15
stenographic (1)
96:13
stenographica...
1:24 96:11
step (3) 21:11,12
34:6
steps (2) 37:10
37:21
Steve (3) 73:3,8
73:11
sticker (1) 94:17
sticking (1)
32:13
stop (57) 32:19
33:1 34:24
35:25 36:10,15

36:21 37:6,11
37:13,17 38:6
38:12,15,24
39:3,6,7,9
40:19 41:2,5
41:15,19,22,25
42:8 60:12
61:3 68:3,6,8,9
68:14 70:25
72:3 73:25,25
74:24 75:17,19
75:24 80:7
82:12 84:13
85:19 86:15,22
87:20,23 89:4
89:13 90:2,5
93:10 94:8,13
stopped (6)
38:14 75:20,21
82:23 89:15,19
straight-up (1)
79:5
structural (3)
24:17 58:2,4
structure (1)
22:1
Studies (1) 10:6
stuff (1) 75:12
sturdy (1) 64:14
sub (1) 57:1
subcontractor...
36:8
subject (20) 8:5
8:11 10:9 15:8
18:14 25:22
30:3,18,19,21
31:11 33:24
40:6 49:19
50:18 55:2,7
69:17 70:2,19
submit (4) 42:15
54:16 57:2
85:14
submitted (7)
45:23 50:12

67:4,20,22
80:23 88:15
subpoenaed (1)
70:4
subsequently (...
50:19
substance (1)
85:4
suddenly (2)
53:1,2
sue (1) 73:9
suffering (1)
84:23
suggest (3)
32:19 37:21
41:11
suggested (1)
87:14
suggesting (3)
34:19,20 50:6
suggestion (1)
31:1
Suite (4) 1:12,16
1:21 96:10
summary (2)
33:16 84:12
supervisor (3)
73:3 74:9
86:11
support (2)
30:25 31:17
suppose (2)
33:17 89:3
supposed (3)
42:10 44:23
87:18
supposedly (2)
26:14 31:7
sure (15) 4:18
6:9 18:3,11
19:5 28:24
29:13 31:20
33:5 39:14
51:20 62:21
71:20 77:10

91:13
surface (4) 58:3
64:25 65:4,4
surprising (1)
88:14
surrounding (1)
18:7
survey (5) 12:14
20:2 52:21
60:9,14
surveyed (3)
41:12 43:10
67:18
surveyor's (1)
12:17
surveys (1)
69:19
suspect (2)
18:25 70:5
suspected (2)
49:23 71:6
suspecting (1)
51:21
suspicions (1)
71:8
swimming (2)
30:17 49:24
switch (2) 63:6
63:22
sworn (1) 4:7
system (1) 86:14
_____
T
T (1) 3:1
take (15) 6:11
7:18 14:4,8
19:4 32:15
37:22 44:2,19
48:5 52:16
53:24 54:2
60:3 81:9
taken (9) 1:11
5:7 42:22
47:15 62:23,24
71:1 76:2 96:9

talk (3) 10:8
13:18 54:5
talked (3) 47:16
54:15 73:5
talking (3) 8:13
14:14 55:20
tap (11) 26:4,5,6
26:11,14,25
36:6 51:7
82:23 89:23
94:19
tax (3) 79:17,21
80:9
taxed (2) 80:16
80:20
taxes (4) 79:25
80:3,5,10
tell (6) 4:23 36:1
65:8 84:22
90:5 93:20
telling (5) 41:1
41:18 52:23
62:2 66:9
term (1) 18:18
terms (6) 12:23
22:21 30:24
51:15 58:25
89:8
terror (2) 84:24
85:11
testified (1) 4:8
testify (2) 70:6,7
Thank (8) 4:19
6:18,19 35:11
68:22 91:8,10
91:14
thing (3) 41:10
66:8 76:6
things (2) 5:4
75:15
think (30) 5:20
5:20 6:17 8:10
14:1 15:25
16:22 18:19
24:2 28:25

Gary M. Grossman

33:18 39:22
48:2,3,8 50:11
53:20 56:24
59:2 61:7 62:6
62:9,20 66:18
68:23 69:2
80:8 81:4 83:9
89:10
**thinking (1)**
46:7
**thinks (1)** 93:20
**third (3)** 24:7
25:5 34:13
**thought (3)**
55:21 66:19
70:24
**thoughts (1)**
81:6
**thousand (1)**
58:18
**threat (1)** 58:20
**three (13)** 39:8
68:4 71:24
79:17,25 80:20
81:19 82:2,10
82:15 83:13
84:24 86:2
**three-quarters...**
34:14 58:11
**thrown (1)**
18:18
**Thursday (1)**
39:18
**ticket (1)** 68:18
**tie (1)** 90:3
**timbers (2)**
65:14,16
**time (35)** 6:13
10:21 19:13
20:22 21:22
22:9,14,17
25:7 26:12,21
35:19 41:16,23
45:12 48:22,23
59:12 70:9

72:17 73:14
75:17,17 76:24
76:25 78:11,14
81:9 89:13
90:6 91:9 92:1
92:3,14 93:11
**times (4)** 40:11
73:13 82:2
83:14
**title (1)** 12:22
**today (6)** 4:22
6:16,21 21:19
24:20 34:19
**toilet (3)** 82:9,25
83:17
**told (4)** 19:22
23:16 59:13
81:8
**top (3)** 29:16
39:17 64:17
**topic (1)** 52:17
**tops (1)** 65:1
**touch (1)** 56:8
**touches (1)**
15:17
**touching (1)**
64:11
**township (70)**
1:6 4:11,21 8:3
8:20 18:16
19:18,20 21:4
21:14 23:4
24:5 25:3,9,13
25:14,20,20
28:11 32:11
33:13 34:23
36:13,19,23,24
38:5 40:2,7
43:16,25 45:25
46:23 47:12,15
47:21 48:5
51:8 53:14
54:23 57:2
59:4 60:1,6,13
60:18 61:14,25

62:21 67:22,24
69:8 70:13
71:15 72:21
73:3,5 74:21
75:1,1 78:4
82:24 85:2,21
86:8,11 87:4
87:22 89:9,24
**township's (2)**
58:21 74:23
**tracing (1)** 90:21
**track (2)** 6:1
51:5
**trades (1)** 9:10
**transcribed (1)**
96:13
**transcript (3)**
6:5 69:5 96:14
**tree (1)** 52:10
**trees (4)** 51:9,11
51:13 67:12
**trench (1)** 51:7
**trespassing (1)**
20:25
**trick (1)** 6:8
**tried (1)** 38:17
**trouble (1)**
15:25
**truck (1)** 24:12
**trucks (4)** 20:6,9
21:4,14
**true (4)** 86:25
91:24,25 96:14
**try (2)** 28:22
57:3
**trying (1)** 15:25
**tunnel (1)** 85:10
**turn (1)** 75:1
**turned (2)** 29:14
82:19
**two (12)** 7:3
17:10 20:9
32:25 40:19
48:14 58:13
59:18 62:5

63:21 76:6
88:15
**typically (1)**
52:1

---
**U**
**ultimately (3)**
24:14 26:16
78:20
**undergone (1)**
89:12
**understand (12)**
6:7 8:2,12
10:16 25:12,13
25:16 42:2
48:25 62:4
80:8 88:23
**understandin...**
11:4 21:25
24:13,24 25:1
25:24 26:1,13
40:14,16,21,22
44:12,23 46:5
48:21 51:19,21
78:24
**understood (3)**
19:12 57:21
84:19
**undertook (1)**
22:14
**unilaterally (2)**
43:16,19
**uninhabitable...**
59:24
**unique (1)** 11:10
**UNITED (1)** 1:1
**universe (1)**
75:24
**University (2)**
10:1,4
**unobstructed ...**
29:1
**unpaved (1)**
21:6
**unproductive ...**

42:5
**unquote (3)** 32:7
90:14 92:20
**unsuccessful (2)**
38:19,22
**untouched (1)**
58:4
**unusual (1)**
78:16
**upper (2)** 28:13
28:18
**upset (1)** 38:10
**use (8)** 43:7
54:17,19,19
55:20 80:2
83:21 87:20
**user (1)** 23:24
**usual (1)** 14:24
**utility (1)** 12:11

---
**V**
**vacant (5)** 88:2
89:2,8,12
93:25
**vaguely (1)** 27:9
**valid (3)** 33:25
71:17 85:4
**varies (1)** 16:20
**variety (1)** 68:18
**various (5)** 23:9
52:6 69:20,24
74:14
**vegetation (1)**
66:14
**vehicle (1)** 51:5
**vehicles (3)**
19:20 20:9,24
**venue (2)** 86:7
86:13
**verbalize (1)** 6:2
**Vergun (7)**
36:22 37:1,20
38:4,7 59:10
94:9
**verify (1)** 21:19

Gary M. Grossman

| | | | | |
|---|---|---|---|---|
| versus (1) 4:11 | 14:3,5 25:17 | 36:13,24 59:12 | 52:21 53:25 | 41:14,15,17,19 |
| vicinity (1) 18:9 | 29:5 31:4 33:3 | 59:21 64:23 | 60:9,13,24 | 41:22 42:16,19 |
| videoconferen... | 33:4 34:7 | 75:3 76:21 | 69:18 70:1,19 | 42:20 51:2,4 |
| 1:9,16,20,25 | 39:24 50:23 | 78:9 | 71:6,16 73:21 | 53:7 54:21,24 |
| 96:8 | 52:17 59:23 | weren't (1) | 85:24 92:7,9 | 55:6,7 56:4 |
| view (7) 3:3 | 65:6 77:5,6 | 64:11 | 93:21 | 59:25 61:3 |
| 14:13,19 15:6 | wanted (6) | west (33) 1:6 | whatsoever (2) | 64:9 67:8,13 |
| 28:20 29:1 | 44:10 69:18,20 | 4:11,21 7:25 | 40:18 56:3 | 68:3,6 72:6 |
| 36:1 | 69:21 75:23 | 8:3,6,7,7,19 | Whetstone (1) | 75:17,19,21,24 |
| violated (3) 34:2 | 94:11 | 16:20 18:16 | 73:17 | 76:12 78:3 |
| 72:3 86:24 | wants (4) 44:14 | 19:18,19 21:3 | wide (1) 16:20 | 80:7,14 83:7 |
| violating (1) | 49:1 61:14 | 21:13 29:17 | widest (1) 10:7 | 87:23 89:4,13 |
| 85:5 | 71:14 | 32:10 36:23 | window (1) 81:3 | 89:24 90:1,5,7 |
| violation (6) | wasn't (7) 9:23 | 40:6 47:12,21 | Windows (1) | 90:9 92:5,6 |
| 33:25 34:4 | 27:7 36:17 | 54:23 59:4 | 22:7 | 93:10 94:19 |
| 53:14 71:22 | 37:5 74:8 | 60:5,13 61:24 | winter (1) 35:22 | workers (3) |
| 74:7 86:23 | 75:25 93:14 | 70:13 73:4 | witness (4) 4:6 | 23:12,13 56:7 |
| violations (8) | water (5) 52:1,4 | 85:2,21 91:18 | 77:6,15 96:12 | working (1) 76:1 |
| 10:25 34:16 | 61:15 82:19,21 | 92:1 93:20 | witnesses (1) | works (1) 78:2 |
| 35:2 68:19 | way (15) 6:11 | west-facing (1) | 70:4 | worries (1) |
| 71:25 82:20 | 13:12 16:11 | 90:22 | wonderful (1) | 46:12 |
| 89:18 92:19 | 21:13 33:6 | wetland (23) 3:5 | 7:9 | wouldn't (2) |
| visit (9) 19:18 | 34:14 45:2,25 | 3:7 27:25 31:1 | wood (2) 64:14 | 31:3 80:11 |
| 20:1,4,18 32:2 | 56:13 58:22 | 31:1 32:16 | 65:11 | wrap (1) 52:17 |
| 38:5 49:6 69:6 | 60:24 65:13 | 33:17 41:11 | wooden (1) | written (7) 5:1 |
| 70:15 | 75:15 78:2 | 43:8,10,17 | 92:11 | 37:13 39:9 |
| visited (2) 25:21 | 82:22 | 45:9,15,18,22 | Woodward (1) | 68:25 84:17 |
| 31:13 | Wayne (2) 96:4 | 47:1,16,17 | 90:12 | 86:15,22 |
| voicemail (1) | 96:22 | 54:15 55:1,24 | word (2) 6:4 | wrong (2) 53:3 |
| 88:21 | ways (1) 11:13 | 60:19 67:20 | 86:10 | 73:24 |
| voids (1) 64:21 | we'll (11) 5:2 | wetlands (64) | wording (1) 35:1 | wrongdoing (3) |
| vs- (1) 1:5 | 11:8 19:4 | 18:5,7,9,13 | words (4) 42:25 | 71:3 74:25 |
| | 29:24 33:8 | 19:2 27:4,6,10 | 53:5 74:18 | 87:15 |
| **W** | 39:21 45:14 | 27:13 28:1 | 84:8 | |
| waiting (1) | 54:6 55:14,17 | 31:8,10,11 | work (80) 22:16 | **X** |
| 55:12 | 63:7 | 32:7 43:21,24 | 22:19,20 23:2 | X (2) 2:1 3:1 |
| walk (4) 42:23 | we're (7) 8:13 | 44:1,9,9,13,18 | 23:3,4,6,8,15 | |
| 43:4,5 56:8 | 21:15 22:20 | 44:21 45:4,6 | 23:18 24:2,4,5 | **Y** |
| walked (5) 21:2 | 42:12 55:20 | 45:10 47:20,23 | 24:6 26:12,25 | Y (1) 4:5 |
| 36:19 55:11 | 59:13 68:15 | 47:24 48:15 | 27:3,14 29:19 | yard (3) 90:19 |
| 90:17,20 | we've (4) 29:9 | 49:2,2,9,12,17 | 32:19 33:1 | 90:23,23 |
| walking (2) | 54:3,15 85:13 | 49:18,19,21,23 | 35:22,23,25 | yeah (16) 7:24 |
| 54:13 90:22 | Wednesday (2) | 50:20,20 51:22 | 36:6,21 37:7 | 7:24 12:19 |
| want (19) 6:8 | 4:2 96:9 | 51:25 52:1,5,9 | 38:6,13,14,16 | 13:22 14:6 |
| 13:16,18,20 | went (9) 14:14 | 52:12,15,18,19 | 39:6,7,9 41:2 | 15:24 17:10 |

Gary M. Grossman

27:20 29:15 54:5 61:6 62:19 63:5 64:6 75:11 84:19

**year (9)** 36:5 43:12 75:3 76:13,13 79:24 81:10,10,25

**years (18)** 5:10 10:11 22:20 39:8 49:25 65:19 68:4 71:24 79:18,25 80:20 81:19 82:10,15 84:24 85:1 86:2 88:15

---

**Z**

**Zalewski (47)** 1:19 2:3 4:9,14 4:20 13:22 14:1,6,11,22 15:4 28:17,21 28:24 29:3,6,8 33:6,10 35:11 35:13,16 39:21 39:23 54:2,9 55:14,17,19 57:13 62:8,10 63:18,20 66:4 66:6 77:8,17 79:9,13 84:8 84:10,19,20 91:13 93:8 94:22

**zero (2)** 50:23 56:2

**zeroes (1)** 84:3

**zoning (3)** 67:1 86:6 93:9

**Zoom (1)** 46:9

---

**0**

---

**084.004768 (1)** 96:21

---

**1**

---

**1 (5)** 3:3 14:22 43:7 84:4,13

**1-10 (1)** 94:25

**1(a) (1)** 54:15

**1(b) (1)** 54:16

**1(b)(i) (1)** 55:23

**1(b)(ii) (1)** 56:9

**1(b)(iii) (1)** 56:15

**1,837 (1)** 83:10

**1:05 (2)** 1:13 4:3

**10 (6)** 3:12 4:2 54:3,6 79:12 96:10

**10,000 (1)** 82:1

**100 (1)** 43:11

**10th (2)** 1:11 72:12

**12th (1)** 21:17

**13 (4)** 27:21,22 27:23,23

**14 (1)** 32:1

**14,000 (1)** 79:24

**15 (1)** 47:5

**165 (3)** 1:12,16 96:10

**17 (3)** 49:14 79:15 96:24

**171 (1)** 40:2

**172 (1)** 40:7

**18,000 (1)** 81:20

**19 (1)** 84:11

**190 (1)** 33:13

**191 (1)** 33:13

**1985 (2)** 9:2,11

**1986 (1)** 9:20

**1987 (1)** 9:20

**1st (1)** 78:23

---

**2**

---

**2 (5)** 3:4 33:8

38:3 50:4 57:22

**2(a)(iii) (3)** 61:7 61:8 66:22

**20 (2)** 25:8 65:19

**2019 (1)** 10:11

**2020 (10)** 20:17 21:9,17 22:9 25:19,25 32:14 49:6 72:7 75:19

**2021 (6)** 24:8 32:1 39:19 47:5 68:20 84:15

**2022 (4)** 22:15 72:12 77:12 78:23

**2024 (4)** 1:11 4:2 96:10,24

**2029 (1)** 96:22

**21 (4)** 25:6 45:21 46:24 75:21

**22 (2)** 10:25 19:7

**220-1415 (1)** 1:17

**23-11851 (1)** 1:4

**248 (2)** 1:17,22

**25 (1)** 52:14

**25-foot (1)** 44:22

**250 (1)** 1:21

**26 (1)** 46:24

**27 (3)** 27:24 28:9 45:21

**27555 (1)** 1:21

**27th (1)** 39:18

**29 (1)** 96:22

**29th (1)** 46:18

**2nd (7)** 25:19,25 32:14 34:8 35:18,21 49:6

---

**3**

---

**3 (3)** 3:5 35:10 38:2

**3,800 (1)** 82:9

**3:52 (1)** 94:24

**30 (2)** 65:19 89:19

**30665 (3)** 1:12 1:16 96:10

**31st (1)** 47:8

**34 (1)** 46:23

**36 (2)** 84:4,12

**3rd (1)** 20:17

---

**4**

---

**4 (5)** 2:3 3:6 39:22 54:12 66:23

**42,000 (1)** 79:20

**48331 (1)** 1:21

**48334 (1)** 1:17

**489-4100 (1)** 1:22

**48th (4)** 69:23 74:2 85:22 94:6

**4th (1)** 84:14

---

**5**

---

**5 (2)** 3:7 45:14

**50- (1)** 16:20

**53 (1)** 20:16

**5th (2)** 21:16 77:12

---

**6**

---

**6 (4)** 3:8 30:5 46:13 62:9

**60 (1)** 74:12

**60-feet (1)** 16:20

**62 (1)** 24:9

**6221 (5)** 8:6,7 30:3 40:6 50:4

**695 (1)** 60:12

---

**7**

---

**7 (4)** 3:9 20:16 62:9 63:22

**7450 (1)** 7:25

---

**8**

---

**8 (4)** 3:10 21:9 63:7,17

---

**9**

---

**9 (2)** 3:11 79:12

**9,000 (1)** 81:25

**9/29/21 (1)** 46:15

**91 (1)** 2:4

**93 (1)** 31:25

**94 (10)** 3:3,4,5,6 3:7,8,9,10,11 3:12

**9th (1)** 24:8